**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **ANNETTE HARLING,** | : |
| **parent and next friend of S.M.** | : |
| **3650Minnesota Avenue #203** | : |
| **Washington, D.C.  20019** | : |
|           **Plaintiffs** | : |
| | : |
|     **v.** | : |
| **DISTRICT OF COLUMBIA** | : |
| **A Municipal Corporation** | : |
| **One Judiciary Square** | : |
| **441 Fourth Street, N. W.** | : |
| **Washington, D.C. 20001** | : |
| | : |
| **serve:** | : |
| **ADRIAN FENTY, Mayor** | : |
| **District of Columbia** | : |
| **1350 Pennsylvania Avenue, N. W., 5th Fl.** | :    **Civil Action No:** |
| **Washington, D.C. 20002** | : |
| | : |
| **PETER NICKELS** | : |
| **Interim Attorney General** | : |
| **1350 Pennsylvania Avenue, N. W.,** | : |
| **Ste. 409** | : |
| **Washington, D.C. 20004** | : |
|         **and** | : |
| | : |
| **MICHELLE RHEE (officially)** | : |
| **Chancellor, D.C. Public Schools** | : |
| **825 North Capitol St., N. E., Suite 9026** | : |
| **Washington, D.C. 20002** | : |
| | : |
| **Defendants** | : |

_____

**COMPLAINT FOR DECLARATORY JUDGMENT, INJUNCTIVE AND OTHER
RELIEF**

**Comes Now**,  the Plaintiffs, by and through their attorney, Carolyn W. Houck, and respectfully unto

this Honorable Court as follows that:

## JURISDICTION

1.    This Court has jurisdiction pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C Sections 1400-1461; 28 U.S.C. Section 1331 and 1343 and 5 D.C. Municipal Regs. Sections 3000.1 et seq.

2.    Declaratory relief is authorized by 28 U.S.C Sections 2201; 2202.

3.    Venue is proper in this Court pursuant to 28 U.S.C. Section 1391.

## PARTIES

4.    Annette Harling initiates this cause of action on behalf of her minor child, Samuel Mingle, hereinafter referred to as S.M.

5.    S.M's birth year is 1997 and at all times relevant to the filing of this suit, resides in the District of Columbia.

6.    Defendant, the District of Columbia Government is a municipal corporation that receives federal funds pursuant to the Individuals with Disabilities Act ("IDEA"), to ensure access to a free and appropriate education ("FAPE") and is obligated to comply with the applicable federal regulations and statutes including but not limited to the IDEA.

7.    Defendant, Michelle Rhee, being sued in her capacity as the Chancellor of the District of Columbia Public School System ("DCPS") which is the State Educational Agency ("SEA"), charged with responsibility of ensuring that all disabled children in the District of Columbia receive access to a free and appropriate public education "FAPE" and to ensure them equal protection and due process of law.

## FACTUAL BACKGROUND

8.    S.M. is a student receiving special education and related services as a fourth grader at Rock Creek Academy (RCA) . *See Complaint Exhibit S.*

9.    He previously attending Benning Elementary, prior to his unilateral placement at RCA. *See Complaint Exhibit S.*

10.    A February 2004 occupational therapy evaluation noted that S.M. experienced "significant difficulty translating these skills into function for writing tasks. Thus, the evaluator recommended that S.M. receive occupational therapy services. *See Complaint Exhibit A.*

11.    A June 2005 Psycho-educational determined that S.M.'s full scale IQ was in the low average range, his reading composite scores were in the low average range and well as his mathematics. However, the evaluator failed to make an eligibility determination. *See Complaint Exhibit C.*

12.    A June 2005 Speech Language Reevaluation reported that S.M.'s "speech was intelligible. [S.M.] demonstrated low average performance in receptive vocabulary, and low average performance in expressive vocabulary." *See Complaint Exhibit D.*

13.    At the September 2005 MDT/IEP meeting, the members determined that S.M. did not have a learning disability but continued to be speech language impaired. Thus, S.M. remained with one hour of speech language and no interventions for his low average performance in academics. *See Complaint Exhibit E.*

14.    At a May 2006 MDT/IEP meeting, team members stated that S.M. refused to write and further disliked anything that requires writing. The team suggested that he be tested and subsequently obtained the parent's consent to test S.M. *See Complaint*

*Exhibit F.*

15.    Even though a February 2004 OT evaluation recommended that S.M. receive assistance for his writing problems, Benning never instituted the services until May 2006. The MDT/IEP determined that compensatory education services were warranted and awarded him fifty six hours for missed services. *See Complaint Exhibit F.*

16.    There is no evidence of record that supports S.M. receiving the fifty-six (56) hours of compensatory education services for missed occupational therapy services. *See Complaint Exhibit F & H.*

17.    At that May 2006 MDT/IEP meeting, the parent shared that she continued to have concerns about S.M. not completing his school work and voiced her concern about the Febraury 2004 OT evaluation completed without her permission. In addition, S.M.'s teacher shared her concerns about his inability to write. The MDT/IEP team completed a 'DCPS Office of Special Education Progress Report', again reflecting that S.M. was due fifty-six (56) hours of compensatory education services. *See Complaint Exhibit F & H.*

18.    Again no documentation support that Benning ever provided S.M. with the fifty-six (56) hours of compensatory education services. *Id.*

19.    By the time the 2006-2007 school year came around, S.M. began to engage in oppositional defiant behavior that resulted in suspensions. For example, anted octal notes point out that S.M. engaged in "disruptive behavior in the school building/school grounds; failure to obey a lawful order of an administrative/teacher; repeated failure to comply with the orders of the teacher; inappropriate comments

and unnecessary noise in classroom; not following school/classroom rules and regulations; usage of profanity, lying, and being disrespectful."

20.    It was noted that S.M. refused to do any work in class even with prompting from his teachers and on another occasion, security had to be called to the classroom because S.M. claimed he wanted to kill those individuals trying to remove him from the classroom.

21.    In the April 2007 MDT/IEP meeting notes S.M.'s teacher noted that he would not participate in class and his oppositional behavior interfered from completing his class-work.  His mother also noted that she saw the same type of behavior at home. The team recommended that the mother get counseling in the community.  ***See Complaint Exhibit H, J.***

22.    Because the parent did not have her educational advocate present with her at the meeting, she requested that she be allowed to seek advice before consenting to testing. ***Id.***

23.    The parent followed up with a letter consenting to testing, a fact which was supported through testimony by, Rhoda Matthews, the special education coordinator. ***See Complaint Exhibit S.***

24.    In an April 30, 2007 letter, S.M.'s parents were informed by his teacher that S.M. would be retained for the fourth grade.  She indicated in the letter that "when [S.M.] misbehaves, he is removed from the classroom, which means he is not participating in the lesson or learning.  In order to stay in class, he must be willing to follow instructions." ***See Complaint Exhibit I.***

25.    After seeking counsel, the parent filed a due process complaint containing

nineteen(19) issues in which DCPS violated the provisions of the Individuals Disabilities Education Act of 2004. *See Complaint Ex. L.*

26.    The August 1, 2007 administrative due process hearing request alleged that DCPS failed to 1) obtain parental consent prior to evaluating S.M. and failed to provide the parent with a written report; 2)Perform an adequate occupational therapy evaluation in February 2004; 3) evaluate in all areas of suspected disabilities; 4) provide due process rights when suspending S.M.; 5) provide occupational therapy during 2004-2005 school year; 6) perform an adequate speech/language evaluation in June 2005; 7) develop adequate IEP on September 13, 2005; 8) fully implement S.M.'s IEP for the 2005-2006 school year (including summer); 9) provide occupational therapy during school year 2005-2006; 10) provide appropriate school placement for school year 2005-2006; 11) develop adequate IEP on May 23, 2006; 12)develop an adequate compensatory education plan on May 23, 2006; 13) provide compensatory as agreed on May 23, 2006; 14) provide appropriate school placement for school year 2006-2007; 15) provide appropriate summer program during summer 2007; 16) convene a proper MDT/IEP meeting on May 31, 2007; 17) develop an adequate IEP on May 23, 2007 for the school year 2007-2008; 18) evaluate prior to exiting S.M. from occupational therapy in May 2007; and 19) provide appropriate school placement for 2007-2008. *See Complaint Exhibit L.*

27.    As relief, the parent sought findings of denials of FAPE in the nineteen(19) matters contained in her due process complaint and reimbursement for unilateral placement retroactive to the date of enrollment until such time as DCPS could provide an appropriate placement. *See Complaint Exhibit L.*

28.    Among other things, the parent sought funding of an independent psycho-educational clinical, occupational therapy, speech/language, functional behavioral assessment, and a social history evaluation and after completion of said evaluations, that DCPS be ordered to convene a MDT/IEP meeting to review all assessments/evaluations, revise and update the IEP as appropriate and develop a compensatory education plan. *Id.*

29.    In the interim the parent submitted a letter informing the school district that S.M. was going to placed unilaterally at Rock Creek Academy and in response DCPS informed the parent that Benning Es was an appropriate program.

30.    At the hearing held on October 4, 2007, counsel for the parent did not waive or withdraw any of the nineteen issues presented in the August 1, 2007 HOD. *See Complaint Exhibit S.*

31.    The parent testified that she became unemployed because S.M. was continually suspended from Benning ES for the school years 2005-2006 and 2006-2007 and she was unable to perform her job duties because she was required to pick S.M. from school. *See Complaint Exhibit* S.

32.    Her testimony included information regarding the school's failure to complete a functional behavioral assessment and clinical psychological evaluation even though the school was aware of the multiple suspensions. *See Complaint Exhibit S.*

33.    Even though parent's counsel presented evidence to support a finding a denial of FAPE on all nineteen issues contained in the hearing request, the hearing officer only addressed two issues. *See Complaint Exhibit S* .

34.    On October 16, 2007, Hearing Officer Frederick Woods issued a determination

dismissing the parents due process complaint with prejudice, denying the parent's

request for reimbursement and further finding, that DCPS had not denied S.M. access

to a free and appropriate education.  ***See Complaint Exhibit R.***

35.    More specifically, he held that "there was no finding that S.M. was denied [omit]

FAPE [omit] because the parent did not meet their burden of proof under the IDEIA

by proving that the procedural violations of the IDEIA rose to the level of a FAPE

denial." ***Id.***

36.    All the while he dismissed the parent's complaint with prejudice, he suggested that

DCPS complete the occupational therapy evaluation and comprehensive

psychological assessment. ***Id***

## COUNT I

### HEARING OFFICER FAILED TO ADDRESS ALL NINETEEN ISSUES PRESENTED IN THE AUGUST 2007 ADMINISTRATIVE DUE PROCESS HEARING REQUEST.

37.    Plaintiffs re-allege and incorporate by reference as though set fully set forth herein,

paragraphs 1-37 of this Complaint.

38.    As required by the law, the hearing officer's decision must be made on substantive

and procedural grounds, based on a determination of whether the child received a

free and appropriate public education.  The hearing officer failed to address the

substance of the parent's due process complaint.

## COUNT II

### HEARING OFFICER FREDERICK WOODS ERRED IN DETERMINING THAT THE PROCEDURAL INADEQUACIES COMMITTED BY DCPS DID NOT AMOUNT TO A DENIAL OF FAPE.

39.    Plaintiffs re-allege and incorporate by reference as though set fully set forth herein, paragraphs 1-38 of this Complaint.

40.    DCPS failed to provide prior written notice when the parent requested independent evaluations, provided notice of her intent to unilaterally place S.M.  20 U.S.C. 1415.

41.    DCPS failed to respond to the August 2007 administrative due process hearing request as required within ten days of the date.  See 20 USC 1415(c).

42.    DCPS failed to have the appropriate members at the May 2006 and May 2007 MDT/IEP meetings.

## COUNT III

## HEARING OFFICER FREDERICK WOODS ERRED AS A MATTER OF LAW WHEN HE FAILED TO RULE ON THE PARENT'S REQUEST FOR INDEPENDENT EDUCATIONAL EVALUATIONS.

43.    Plaintiffs re-allege and incorporate by reference as though set fully set forth herein, paragraphs 1-42  of this Complaint

44.    In two July 2007 letters, the parent requested that the school independently fund an occupational therapy and speech language evaluation. The school district never responded nor complied with the parent's request.

45.    In accordance with 20 U.S.C. 1415 (b)(1) and 1415(d)(2)(A) and its implementing regulations, 34 CFR 300.502(b), a parent has the right to an independent educational evaluation at public expense is the parent disagrees with an evaluation obtained by the public agency

46.    In addition, the law requires that the school district, without necessary delay, must file a due process complaint to request a hearing to show that its evaluation is appropriate or ensure that an independent educational evaluation is provided at

public expense.

47. There is no evidence of record that supports a finding that the school district complied with the parents request for independent educational evaluations.

**COUNT IV**

**HEARING OFFICER FREDERICK WOODS ERRED AS A MATTER OF LAW WHEN HE FAILED TO DETERMINE THE PARENT'S ENTITLEMENT TO REIMBURSEMENT FOR UNILATERAL PLACEMENT.**

48. Plaintiffs re-allege and incorporate by reference as though set fully set forth herein, paragraphs 1-47 of this Complaint

49. In accordance with 20 USC 1412(C), "if the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of enrollment if the court or hearing officer finds that the agency had not made a free and appropriate public education available to the child in a timely manner prior to that enrollment." See 20 U.S.C. 1412 (C).

50. The parent properly notified the school district of her intent to enroll S.M. unilaterally in a private placement due to DCPS failure to locate an appropriate placement.

51. DCPS responded by telling the parent that Benning ES could provide S.M. with an appropriate education.

52. The hearing officer erred when he failed to determine if the parent was entitled to reimbursement for unilateral placement.

## COUNT V

### HEARING OFFICER FREDERICK WOODS ERRED AS A MATTER OF LAW WHEN HE FAILED TO DETERMINE S.M.'S ENTITLEMENT TO COMPENSATORY EDUCATION.

53.    Plaintiffs re-allege and incorporate by reference as though set fully set forth herein, paragraphs 1-52 of this Complaint

54.    Compensatory education is defined as services above and beyond that normally due a student under the state's education law.

55.    The MDT/IEP team members awarded S.M. fifty-six(56) hours of compensatory education services for missed services for occupational therapy.

56.    There is no evidence that DCPS ever provided S.M. with fifty-six (56) hours compensatory education services.

## COUNT VI

### HEARING OFFICER FREDERICK WOODS ERRED AS A MATTER OF LAW WHEN HE FAILED TO DETERMINE THAT THE IEPs DEVELOPED FOR SCHOOL YEARS 2005-2006 AND 2006-2007 WERE INAPPROPRIATE.

57.    Plaintiffs re-allege and incorporate by reference as though set fully set forth herein, paragraphs 1-56 of this Complaint.

58.    DCPS failed to develop an appropriate IEP for S.M. that would have provided him with educational benefit. The goals/objectives are vague and were not measurable and the speech language goals were photocopies of the previous year.

59.    With respect to placement, DCPS never discussed a suitable placement that could accommodate S.M.'s increasing problems.

## COUNT VII

**HEARING OFFICER FREDERICK WOODS ERRED AS A MATTER OF LAW WHEN HE FAILED TO DETERMINE THAT DCPS FAILED TO EVALUATE S.M. IN ALL AREAS OF SUSPECTED DISABILITIES.**

60.    Plaintiffs re-allege and incorporate by reference as though set fully set forth herein, paragraphs 1-59 of this Complaint.

61.    S.M. had been experiencing behavioral and academic difficulties for both the 2005-2006 and 2006-2007 school years.

62.    DCPS constantly suspended S.M. without intervening on his behalf and did not seek his parent's consent to evaluate him until she got the assistance of counsel.

63.    Based on S.M.'s behavioral and academic difficulties, he was retained in the fourth grade.

## COUNT VIII

**HEARING OFFICER FREDERICK WOODS ERRED AS A MATTER OF LAW WHEN HE FAILED TO DETERMINE THAT DCPS FAILED TO EVALUATE S.M. PRIOR TO EXITING HIM OUT SPECIAL EDUCATION SERVICES.**

64.    Plaintiffs re-allege and incorporate by reference as though set fully set forth herein, paragraphs 1-63 of this Complaint.

65.    DCPS determined in February 2004 that S.M. should receive special education services for occupational therapy.  However, he never received any services based on that recommendation.

66.    Even though both his teacher and parent voiced concerns over S.M.'s handwriting, an occupational therapist stated she believed that S.M. had achieved all of his goals and should no longer receive therapy.

67.    The evaluator failed to evaluate as required by the IDEIA.

## COUNT VIII

**HEARING OFFICER FREDERICK WOODS ERRED AS A MATTER OF LAW WHEN HE FAILED TO DETERMINE THAT DCPS FAILED TO IMPLEMENT S.M.'S IEPS THAT REQUIRED HIS ATTENDANCE IN SUMMER SCHOOL.**

68.    Plaintiffs re-allege and incorporate by reference as though set fully set forth herein, paragraphs 1-67 of this Complaint.

69.    DCPS informed S.M.'s parents that S.M. would be retained in the fourth grade die to his behavior and academic failings.  DCPS informed the parents that S.M. had to go to summer school to be passed to the fifth grade.

70.    Due to S.M.'s behavior, he was released from summer school the second day and thus was retained in the fourth grade.


WHEREFORE, Plaintiffs' respectfully request that this Honorable Court:

1.     Issue a declaratory judgment that the Defendant's have violated the Plaintiffs' rights under the IDEIA and DCMR; reverse and/or remand the hearing officer's decision.

2.     Order  the Defendants reimburse the parent for unilateral placement at Rock Creek Academy.

3.     Order the Defendant to continue funding S.M.'s placement until such time as an appropriate placement is determined.

4.     Order the Defendant to fund an independent psycho-educational clinical, occupational therapy, speech/language, functional behavioral assessment, and a social history evaluation and after completion of said evaluations, that DCPS be ordered to convene a MDT/IEP meeting to review all assessments/evaluations, revise and update the IEP as appropriate and develop a compensatory education plan as necessary.

5.     Award Plaintiffs reasonable attorneys' fees and costs incurred in litigating this action.

6.     Grant other such relief that the Court deems just and proper.


                                        Respectfully submitted,



                                        _____
                                        Carolyn Houck [          ]
                                        8101 Connecticut Ave. 701 North
                                        Chevy Chase, MD 20815
                                        301-951-4278 (office)
                                        301-951-4248 (fax)

## I (a) PLAINTIFFS

**DEFENDANTS**

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
**(EXCEPT IN U.S. PLAINTIFF CASES)**

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION

(PLACE AN x IN ONE BOX ONLY)

1 U.S. Government
  Plaintiff

2 U.S. Government
  Defendant

3 Federal Question
  (U.S. Government Not a Party)

4 Diversity
  (Indicate Citizenship of
  Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | 1 | 1 | Incorporated or Principal Place of Business in This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business in Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

### A. *Antitrust*

410 Antitrust

### B. *Personal Injury/ Malpractice*

310 Airplane
315 Airplane Product Liability
320 Assault, Libel & Slander
330 Federal Employers Liability
340 Marine
345 Marine Product Liability
350 Motor Vehicle
355 Motor Vehicle Product Liability
360 Other Personal Injury
362 Medical Malpractice
365 Product Liability
368 Asbestos Product Liability

### C. *Administrative Agency Review*

151 Medicare Act

Social Security:
861 HIA ((1395ff)
862 Black Lung (923)
863 DIWC/DIWW (405(g)
864 SSID Title XVI
865 RSI (405(g)
Other Statutes
891 Agricultural Acts
892 Economic Stabilization Act
893 Environmental Matters
894 Energy Allocation Act
890 Other Statutory Actions (If Administrative Agency is Involved)

### D. *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

### E. *General Civil (Other)*     OR     F. *Pro Se General Civil*

Real Property
210 Land Condemnation
220 Foreclosure
230 Rent, Lease & Ejectment
240 Torts to Land
245 Tort Product Liability
290 All Other Real Property

Personal Property
370 Other Fraud
371 Truth in Lending
380 Other Personal Property Damage
385 Property Damage Product Liability

Bankruptcy
422 Appeal 28 USC 158
423 Withdrawal 28 USC 157

Prisoner Petitions
535 Death Penalty
540 Mandamus & Other
550 Civil Rights
555 Prison Condition

Property Rights
820 Copyrights
830 Patent
840 Trademark

Federal Tax Suits
870 Taxes (US plaintiff or defendant
871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
610 Agriculture
620 Other Food &Drug
625 Drug Related Seizure of Property 21 USC 881
630 Liquor Laws
640 RR & Truck
650 Airline Regs
660 Occupational Safety/Health
690 Other

Other Statutes
400 State Reapportionment
430 Banks & Banking
450 Commerce/ICC Rates/etc.
460 Deportation

470 Racketeer Influenced & Corrupt Organizations
480 Consumer Credit
490 Cable/Satellite TV
810 Selective Service
850 Securities/Commodities/ Exchange
875 Customer Challenge 12 USC 3410
900 Appeal of fee determination under equal access to Justice
950 Constitutionality of State Statutes
890 Other Statutory Actions (if not administrative agency review or Privacy Act

| **G.** *Habeas Corpus/ 2255* | **H.** *Employment Discrimination* | **I.** *FOIA/PRIVACY ACT* | **J.** *Student Loan* |
|---|---|---|---|
| 530 Habeas Corpus-General<br>510 Motion/Vacate Sentence | 442 Civil Rights-Employment<br>(criteria: race, gender/sex,<br>national origin,<br>discrimination, disability<br>age, religion, retaliation)<br><br>*(If pro se, select this deck)* | 895 Freedom of Information Act<br>890 Other Statutory Actions<br>(if Privacy Act)<br><br><br><br>*(If pro se, select this deck)* | 152 Recovery of Defaulted<br>Student Loans<br>(excluding veterans) |

| **K.** *Labor/ERISA (non-employment)* | **L.** *Other Civil Rights (non-employment)* | **M.** *Contract* | **N.** *Three-Judge Court* |
|---|---|---|---|
| 710 Fair Labor Standards Act<br>720 Labor/Mgmt. Relations<br>730 Labor/Mgmt. Reporting &<br>Disclosure Act<br>740 Labor Railway Act<br>790 Other Labor Litigation<br>791 Empl. Ret. Inc. Security Act | 441 Voting (if not Voting Rights<br>Act)<br>443 Housing/Accommodations<br>444 Welfare<br>440 Other Civil Rights<br>445 American w/Disabilities-<br>Employment<br>446 Americans w/Disabilities-<br>Other | 110 Insurance<br>120 Marine<br>130 Miller Act<br>140 Negotiable Instrument<br>150 Recovery of Overpayment &<br>Enforcement of Judgment<br>153 Recovery of Overpayment of<br>Veteran's Benefits<br>160 Stockholder's Suits<br>190 Other Contracts<br>195 Contract Product Liability<br>196 Franchise | 441 Civil Rights-Voting<br>(if Voting Rights Act) |

## V. ORIGIN

| 1 Original Proceeding | 2 Removed from State Court | 3 Remanded from Appellate Court | 4 Reinstated or Reopened | 5 Transferred from another district (specify) | 6 Multi district Litigation | 7 Appeal to District Judge from Mag. Judge |
|---|---|---|---|---|---|---|

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A **CLASS ACTION** UNDER F.R.C.P. 23 | **DEMAND $**<br>**JURY DEMAND:** | Check YES only if demanded in complaint<br>**YES**      **NO** |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | (See instruction)      **YES**      **NO** | If yes, please complete related case form. |
|---|---|---|

| **DATE** | **SIGNATURE OF ATTORNEY OF RECORD** |
|---|---|

### INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

**I.**    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT  (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

**III.**    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section **II**.

**IV.**    CASE ASSIGNMENT AND NATURE OF SUIT:   The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select <u>one</u> corresponding nature of suit found under the category of case.

**VI.**    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

**VIII.**    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

# EXHIBIT

# A

**District of Columbia Public Schools**
**Local Education Agency**
**Special Education Branch**
**Adapted Physical Education,**
**Occupational/Physical Therapy Unit**
4300 13th Street, NW
**Washington, DC 20011**
**(202) 576-5422**
**(202) 576-7250 Fax**

Student Identifying Information

**NAME:** Samuel Mingle
**D.O.B:** 02/06/1997
**CA:** 07 years 00 months
**SCHOOL:** Benning Elementary School

**THERAPIST:** Winfield A. White OTR/L
**DATE of EVALUATION:** 02/19/2004
**GRADE:** 1st.

## OCCUPATIONAL THERAPY INITIAL EVALUATION

Samuel is a seven years zero month old male referred by the District of Columbia Public Schools (DCPS) for an Occupational Therapy (O.T) evaluation secondary to a request from the Multi-disciplinary team. The objective of an OT evaluation, as related to an educational setting, is to identify whether a child is developing the skills expected of children, in his or her age range. Skills necessary for enabling the student to participate fully in and benefit from his or her educational experience. If it is determined that a child's development is delayed or abnormal in some way that negatively affects his/her ability to function in a school environment, then an OT program is developed. The objective being to bridge developmental gaps or increase the acquisition of delayed skills, improve functional independence, and reduce the effect of the disability on his/her ability to participate in the educational process. It should be emphasized that the delivery of occupational therapy is dependent on the impact of deficits on educational performance. Expert occupational therapy intervention is not indicated when other resources or services can adequately meet the needs of the child or the deficits are of a qualitative nature, for example, handwriting.

### Tests Administered/Observations

1. Motor-Free Visual Perception Test – Third Edition (MVPT-3)
2. Developmental Test of Visual Perception – second edition (DTVP-2)
   - Visual-Motor Integration subtests only
3. Records Review
4. Clinical Observations

Sm3

Mingle, Samuel        Initial O.T. Evaluation                                    2

## Behavioral Observations

Samuel came to the office independently. He presented as a pleasant and happy boy. Samuel was cooperative and attentive for the duration of the assessment. However, he did demonstrate periods of impulsiveness. Due to his impulsiveness instructions had to be repetitively repeated. Samuel did not display any signs of nervousness or apprehension. Samuel appeared to have trouble sitting still as evidence by the constant shifting of his upper body while seated. This assessment took place in a vacant room with good lighting and lasted approximately sixty minutes. Visual and auditory distractions were minimal.

## Visual Perception (motor and non-motor)

Visual perception-motor or visual-motor integration refers to an individual's ability to coordinate eye-hand actions. To do well on this composite, children must demonstrate their visual perceptual skills by performing complex eye-hand coordination. Low scores do not necessarily indicate poor visual perception; they may mean that the children have awkward hand movements. Low scores may also mean that they have difficulty coordinating hand-to-eye movements. Examples of skills of visual-motor integration kind needed in a school environment are copying, drawing, and writing. On the other hand, visual perception (non-motor) refers to an individual's ability to receive, process, and interpret visual stimuli. It is the "purest" measure of visual perception in that only minimal motor skills for example, pointing shall be necessary to show perceptual competence. Samuel was administered the Visual-Motor Integration subtests of the DTVP-2 and the MVPT-R to test visual-motor integration and visual perception (non-motor) respectively. Please note that standardized testing are but one factor use in determining the need for OT intervention. In other words, high or low scores on a standardized test do not determine the need for OT intervention in of itself but is combined with other relevant data in the decision process. This will be discussed in-depth in the summary. Following are the results Samuel obtained:

### Developmental Test of Visual Perception-Second Edition

| Subtests | Raw Scores | Percentile Rank | Standard Scores | Verbal Description |
|----------|------------|-----------------|-----------------|--------------------|
|          |            |                 |                 |                    |

**Average Standard Scores are between 8-12**

Mingle, Samuel          Initial O.T. Evaluation                                3

*VMI Quotient: 103*
*VMI Percentile: 58*
*Descriptor: Average*

This test is standardized for individuals 4 years 0 months to 10 years 11 months. In this
assessment, Samuel was required perform differing visual-motor integration tasks of
increasing complexity. Samuel's scores indicate that he has average visual-motor
integration functioning. Therefore, based on these scores he should not experience any
difficulty performing visual-motor integration tasks for example writing, as visual-motor
integration appears to be an area of strength for him. However, in examining his writing
this was not the case. Please refer to the handwriting section clinical observations for
details. Furthermore, Samuel tended to rush his execution of the activities. Consequently,
he made several unnecessary errors. Yet was able to obtain average scores. Therefore, his
skills appear to be higher than indicated by the test results.

### Motor-Free Visual Perception Test – Third Edition

| Comparison to Same-aged Peers | |
| --- | --- |
| Raw Score | 29 |
| Standard Score | 99 |
| Confidence Interval 90% | +/- 12 |
| Percentile Rank | 47 |
| Age Equivalent | 7 years 0 month |
| Descriptor | Average |

On the MVPT-3, Samuel required frequent cues to scan all choices before selecting an
answer due to his impulsiveness. In addition, as Samuel accuracy level increased he
became "cocky", his tendency to rush his responses increased, while his accuracy level
decrease. After receiving cues to take his time his accuracy level improved. Overall,
Samuel's skills appear to be in the average range. Given his impulsiveness these scores
may not be an accurate measure of Samuel's visual perception. In other words, Samuel's
ability is most likely higher than the test results indicate. In an effort to gain more insight
into his perceptual abilities Samuel was asked to reproduce 4-6 block and bead designs.
He had no difficulty with these tasks. However, he once again required cues to take his
time. Consequently, his difficulties appear to be rooted in his rush to complete tasks
quickly thereby sacrificing accuracy and quality for speed.

### Clinical Observations

Tactile:  During the testing session, Samuel did not demonstrate any evidence of tactile
defensiveness.  Samuel demonstrated adequate ability to process tactile input. He was
able to accurately identify the area of his face, arms or hands when the therapist applied
light pressure, vision occluded. Nor, did he have trouble identifying an object, when one
of several objects were placed in his hand, again with vision occluded. Please note that
Samuel was allowed to view and handled the objects before he was asked to identify

Mingle, Samuel          Initial O.T. Evaluation                                    4

them with vision occluded. These objects included a paper clip, a coin, pencil with and without erasure, and a pencil sharpener.

Muscle Tone: Samuel demonstrated adequate muscle tone of postural muscles as noted in his posture and by his ability to maintain and assume test positions against gravity. He was able to assume and maintain the prone extensor position (trunk, neck, shoulder and hip extensors) and the supine flexor position (abdominal muscles).

Reflexes: Primitive reflexes were not noted in the test positions and appeared to be well integrated.

Equilibrium: Samuel exhibited mature equilibrium reactions in all positions (sitting, quadruped, high kneeling and standing). As well as, adequate balance skills for standing on one foot (left and right) and hopping on one foot (left and right)).

Motor Planning/Motor Coordination: Motor planning skills were adequate. Samuel was able to assume the test positions given either verbal directions or a demonstration. She also was able to follow a 2-3-step obstacle course. Bilateral Motor Coordination (BMC) skills appear adequate as indicated by Samuel's ability to perform jumping with feet together and jumping jacks.

Pencil Grasp/Writing Skills: Samuel displayed a dominant pencil grasp with his right hand. Samuel held his pencil in a pseudo-tripod grasp with a partially closed web space. His grasp was ineffective as his fingers were extended. In addition, his wrist was flexed and his forearm lifted off the table. Consequently, his ability to control his pencil was compromised. Samuel exhibited adequate in-hand manipulation and translation skills. Samuel appeared to exert appropriate pressure during writing. He stabilized his work surface inconsistently with his non-dominant hand. During writing and drawing tasks, Samuel demonstrated the ability to work from left to right. Samuel scored below age on the copying sub-test of the DTVP-2 (this test involves reproducing paper/pencil designs below a model). In addition, to his ineffective pencil grasp, arm positioning, and inconsistent stabilization of his work surface, it appears Samuel's writing was also affected his impulsivity. Samuel's view of his work was obscured by his grip. During near point and far point copying Samuel showed no obvious concern for neatness and demonstrated a lackadaisical attitude to the tasks. He also had trouble copying information. His writing was noticeable for inappropriate spacing, poor letter formation, inadequate letter sizing, and line alignment.

Grasp Pattern: Samuel used mature grasp patterns to manipulate small items. A refined release pattern was noted during various manipulative activities.

Ocular Motor: Samuel ability for his eyes to move together in a coordinated manner appeared normal. He demonstrated the ability to locate an object pointed to by the examiner without difficulty (quick localization). He was also able to track as the examiner pointed from one object to another. He did not demonstrate any difficulty

Mingle, Samuel                Initial O.T. Evaluation                                    5

tracking smoothly across the mid-line and in all directions (horizontally / vertically / diagonally). Samuel demonstrated the ability to use both eyes together to focus on an incoming object.

Hand/Eye Coordination: Hand eye coordination was adequate for Samuel to accurately align blocks in a tower, string beads and place pegs in a pegboard.  Samuel was able to perform age appropriate fine motor dressing skills, including velcro closures, unsnapping, and snapping. As well as, fastening snaps, unzipping, fastening a zipper connected at the bottom, fly fastening a zipper, unfastening buttons and fastening buttons.

Self-help Skills: Samuel reported that he was able to toilet himself without assistance.

Samuel also displayed good joint flexibility, endurance, and muscle strength. Furthermore, he was able to maneuver throughout the school environment including walking up/down stairs, opening doors without difficulty.

<u>Summary</u>

Samuel is a seven years zero month old male referred by the DCPS for an OT assessment at the request of the MDT. In the area of visual motor integration, Samuel demonstrated average ability. In the area of visual perception, Samuel's perceptual skills were also average as measured by the MVPT-3. Given his impulsiveness, Samuel's skills may be higher than the test results indicate.

However, despite these high scores Samuel is experiencing significant difficulty translating these skills into function for writing tasks. This is evidence by his difficulty with letter formation, sizing, spacing and alignment during writing. Furthermore, during writing, Samuel used an awkward pencil grasp that affected his pencil mobility and may lead to hand discomfort in the future.  Based on these findings it appears that Samuel is demonstrating deficits in the sensory motor domain that are hindering his academic progress. In addition, it is felt that occupational therapy intervention may aid him in overcoming some of these obstacles.

Finally, it is important to note that in the school environment Occupational Therapy is a special education related service. The goal of related services is to increase the student's readiness to be educated. In school education takes priority. Furthermore, as was noted previously, expert occupational therapy intervention is not indicated when other resources or services can adequately meet the needs of the child or the deficits are of a qualitative nature. Therefore, OT services are contingent on Samuel being deemed eligible for special education services.

Please note that the responsibility for determining the need for OT services rest on the multidisciplinary team while the intervention strategy rest on the OT practitioner. Determining the need for OT services is done via the evaluation process of which the

Mingle, Samuel          Initial O.T. Evaluation                                    6

administration of a standardized test may be a component. However it is but one factor
involved in the data collection process which may include screening, standardized or
non-standardized tests, depending on the nature of the data being sought. This process
should be directly related to the child's educational needs. The treating therapist using
his or her professional judgement will determine the frame of reference to utilized in
guiding the intervention strategy. In all instances the service that the school district is
mandated to provide is occupational therapy and not one form of intervention over
another. As was previously mentioned the role of OT as a related service is on the child's
functional ability in the school environment. Therefore, as long as these needs are being
addressed appropriately the school-based OT is functioning within his/her scope of
training and practice regardless of the intervention strategy being used. He or she is not
confined to one area of intervention and IDEA has made allowance for this. The law
mandates OT service not the intervention to be used.

1. Based on the information obtained short-term Occupational Therapy intervention
   appears warranted. However, the treating therapist will determine the frequency and
   duration at the MDT meeting after input from other members of the team.

2. Collaboration with teachers to help in
   - the setting of realistic expectations
   - development of modifications of school activities as needed
   - adaptations of school materials as needed

3. Use of a multi-sensory approach should be considered when presenting information
   to Samuel. For example, information given visually can be reinforced verbally
   (auditory) or with the use of manipulatives (tactile).

Winfield A. White, OTR/L

# EXHIBIT

# B

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
DIVISION OF SPECIAL EDUCATION
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM
(MDT)
STUDENT EVALUATION PLAN
(SEP)**

| | MDT |
|---|---|
| | SEP |

MEETING DATE: 01/26/2006

STUDENT: Samuel    Mingle    DOB: 02/06/1997   AGE: 8   GRADE: 03   SCHOOL: Benning Elementary

STUDENT IDENTIFICATION NUMBER: 9103128    TEACHER / HOMEROOM: June    Turner

ADDRESS: 4065    Minnesota Ave    NE    204    Washington    DC    20019
Street #    Street Name,    Quadrant    Apartment #    City,    State,    Zip Code

PARENT(S)/GUARDIAN: Ms. A. Harling    TELEPHONE (H): (202) 575-0228   (W):

**Summarize Area(s) of Concern:**

Samuel's handwriting is not age appropriate, and on most occasions he refuses to do any writing.

**Team Recommendations:**

The team recommends an OT evaluation.

OT
SP

OOG

**EVALUATION(S) IN AREA(S) OF LEARNING CONCERN(S)**

| ASSESSMENT | ASSESSOR | TEST INSTRUMENT | City, | ASSIGNED | TIMELINE DUE DATE |
|---|---|---|---|---|---|
| ☐ Psychological | | | | | |
| ☐ Speech/Language | | | | | |
| ☐ Social History | | | | | |
| ☐ Audiological | | | | | |
| ☐ Vision Screening | | | | | |
| ☐ Medical | | | | | |
| ☐ Educational | | | | | |
| ☐ Hearing Screening | | | | | |
| ☒ Other    Other: TBD | | Other: TBD | | 01/26/2006 | 02/26/2006 |
| Occupational Therapy | | | | | |

| TEAM MEMBERS:  NAME | POSITION | TEAM MEMBERS:  NAME | POSITION |
|---|---|---|---|
| Ms. A. Harling | Parent | Glenda Smith | Principal or Designee |
| Pamela Perkins | Special Ed | | Student |
| June Wilson | General Ed Teacher | | |
| Rhoda Matthews | LEA Representative | | |

The MDT meeting to discuss the evaluation results is scheduled on    03/01/2006    at 9:00 am    in room Main office

Place completed form in MDT folder.

DISTRICT OF COLUMBIA PUBLIC SCHOOLS    07-02-2001    DIVISION OF SPECIAL EDUCATION    MDT - SEP    APPENDIX - A

# EXHIBIT

# C



**DISTRICT OF COLU  IA**
**PUBLIC SCHOOLS**

Office of Special Education
825 North Capitol Street, N.E., 6ᵗʰ Floor
Washington, D.C. 20002-4232
202-442-4800, fax: 202-442-5518
www.k12.dc.us

### D.C. Public Schools
### Department of Special Education
### Psychoeducational Report

#### Confidential

**Name:** Samuel Mingle
**Age:** 8 years 03 months
**Date of Birth:** 2/06/1997
**Date of Evaluation:** 6/06/2005
**Date of Report:** 6/10/2005
**Grade:** 2nd
**School:** Benning ES
**Student ID:**
**Examiner:** Kirsten Myers Denning
**School Psychologist:** School Psychologist

**Reason for Referral:**

Samuel was referred for evaluation to determine if any changes need to be made in his educational plan. He currently attends Benning ES as a Speech and Language Impaired student.

**Test Administered:**

Wechsler Intelligence Scale for Children- Fourth Edition
Wechsler Individual Achievement Test- Second Edition

**Observation and General Behavior**

Samuel is an 8 year 03 month old student who attends Benning ES in the third grade. He willingly separated from his classroom without incident and accompanied this examiner to the assessment site. He was slow to warm towards this examiner however he was compliant to this examiners request. When presented with reading passages he seemed to display difficulties with understanding what was being read. However when presented with words in isolation he was able to read the words appropriately. When presented with mathematical equations he attempted to use strategies to assist him with solving

*S m S*

the equations. Rapport was established and considered adequate for a valid assessment.

## Summary of WISC IV

| WISC IV Composite | Score | Qualitative Description |
|---|---|---|
| Verbal Comprehension Index (VCI) | 87 | Low Average |
| Perceptual Reasoning Index (PRI) | 90 | Average |
| Working Memory Index (WMI) | 97 | Average |
| Processing Speed Index (PSI) | 97 | Average |
| Full Scale IQ (FSIQ) | 89 | Low Average |

## Verbal Comprehension Subtest Scores

| Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Similarities | 7 | 16 |
| Vocabulary | 7 | 16 |
| Comprehension | 9 | 37 |

## Perceptual Reasoning Subtest Scores

| Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Block Design | 5 | 5 |
| Picture Concepts | 10 | 50 |
| Matrix Reasoning | 10 | 50 |

## Working Memory Subtest Scores

| Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Digit Span | 12 | 75 |
| Letter-Number Seq. | 7 | 16 |

---

Children First

**Processing Speed Subtest Scores**

| Subtests | Scaled Score | Percentile Rank |
|---|---|---|
| Coding | 7 | 16 |
| Symbol Search | 12 | 75 |

**Summary of WIAT II**

**WIAT II Composite**

| | Standard Score |
|---|---|
| Reading Composite | 81 |
| Mathematics Composite | 88 |

| Subtests | Standard Score | Percentile | Age Equiv. | Grade Equiv. |
|---|---|---|---|---|
| Word Reading | 93 | 32 | 7:4 | 2:0 |
| Reading Comprehension | 76 | 5 | 6:0 | 1:1 |
| Pseudoword Decoding | 82 | 12 | 5:4 | k:6 |
| Numerical Operations | 86 | 18 | 7:4 | 1:8 |
| Math Reasoning | 95 | 37 | 7:8 | 2:2 |
| Spelling | 87 | 19 | 7:0 | 1:7 |

**Interpretation of WISC IV**

Children First

Samuel was administered the WISC IV where he achieved a Full Scale IQ in the low average range (89). His overall thinking and reasoning abilities exceeded approximately 23% of children his age. Samuel displayed a relative strength with his non-verbal abilities.

On the Verbal Comprehension Index Samuel earned a score in the low average range (87). The Verbal Comprehension Index measures one's verbal reasoning and concept formation. Within the Verbal Comprehension scales Samuel earned a relative strength with being able to relate to his environment. Relative weaknesses were noted with his abstract reasoning abilities and defining words where he earned a score in the borderline range.

Samuel's non-verbal reasoning abilities as measured by the Perceptual Reasoning Index are in the average range (90). These subtest within the PRI measures perceptual organization abilities, visual spatial reasoning and nonverbal reasoning. Samuel displayed a relative strength with Picture Concepts which assess one's nonverbal reasoning skills as well as Matrix Reasoning which asses one's fluid reasoning abilities. A relative weakness was noted with Block Design which assesses one's ability to mentally organize visual information.

Samuel earned a score in the average range on his ability to sustain attention and concentration on Working Memory Index. He performed better than approximately 42% of his peers.

When presented with time constraints and required to process visual information Samuel's ability in processing simple or routine visual material without making errors was in the average range. Weaknesses were noted with Coding subtest, which measures short-term memory and fine motor skills. A relative strength was noted on Symbol Search, which measures attention to detail and mental control.

**Interpretation of WIAT II**

**Reading**

Samuel earned an overall Reading Composite in the low average range (81). When presented with a series of words and required to read them he earned a score in the average range (93). Samuel was able to read one syllable words appropriately, identify ending sounds and letter blends. Difficulties were noted with reading other one, beginning sounds and initial letters to words. When presented with nonsense words and required to read them, Samuel earned a score in the low average range (82). Pseudoword Decoding assesses one's phonetic skills. When presented with reading passages and required to read them he earned a score in the borderline range (76). Samuel attempted to read passages however he displayed difficulties with comprehension which impacted

his ability to respond to questions appropriately. He was able to respond to questions regarding details, identifying a fact and consequences. Difficulties were noted with identifying main ideas, identifying an opinion and defining unfamiliar words with the assistance of context.

## Mathematics

Overall Samuel earned a Mathematics Composite in the low average range (88). When presented with mathematical equations and required to solve them he earned a score in the low average range (86). Samuel was able to solve one, digit without regrouping. Difficulties were noted with solving other one digit addition and subtraction equations. When presented with math concepts and required to solve them he earned a score in the average range (95). He was able to solve problems involving identifying whole numbers, comparing or ordering events and using graphs. Difficulties were noted with solving word problems, problems involving grids and non-standard measurements.

## Written Language

Samuel was administered a spelling test where he achieved a score in the low average range (87). He was able to spell one syllable words. Difficulties were noted with spelling other one and two syllable words.

## Summary

Samuel was administered the WISC IV where he earned a Full Scale IQ in the low average range (89). Verbal Comprehension Index in the low average range (87), Perceptual Reasoning Index in the average range (90), Working Memory Index in the average range (97) and Processing Speed Index in the average range (97). Academically he was administered the WIAT II where he earned a Reading Composite in the low average range (81) and a Mathematics Composite in the low average range (88). This evaluation should be used to assist the MDT to make an eligibility determination.

## Recommendations

1. Learn five new vocabulary words a week to use and improve vocabulary.
2. Decoding skills should be taught.
3. Assistance with writing simple sentences using a writing pyramid.
4. At school and at home he should orally read level appropriate books to improve oral fluency.
5. After a selection has been read Samuel should be able to respond to 'w' questions appropriately.

---

Children First

6

6. Manipulative should be used to assist with mathematical equations.

Kirsten Myers Denning, MS, CAGS
School Psychologist

# EXHIBIT

# D



**DISTRICT OF COLUMBIA
PUBLIC SCHOOLS**

Office of Special Education
825 North Capitol Street, N.E., 6th Floor
Washington, D.C. 20002-4232
202-442-4800, fax: 202-442-5518
www.k12.dc.us

### Speech and Language Reevaluation Report

**Name:** Samuel Mingle
**Date of Birth:** 02/26/97
**Chronological Age:** eight years three months
**Student Identification Number:** 9095145
**Grade:** 2
**School:** Benning Elementary
**Date of Reevaluation:** 06/02/05
**Date of Report:** 06/15/05
**Examiner:** Pamela Perkins, Speech Therapist, DCPS-Certification

**Reason for Reevaluation**
Samuel's speech and language skills were reevaluated to determine current levels of functioning.

**Background Information**
Samuel is a second grade student attending Benning Elementary School. He has received speech-language therapy services one hour weekly at Benning Elementary School from 2003 to the present time. He has improved production of ch, sh, [s], [z], j, and zh.

**Teacher Report**
Samuel's teacher, Ms. Turner, reports that Samuel is sometimes disruptive in class and that he is experiencing behavior problems at school. She reports that he sometimes puts his head on his desk, goes to sleep, and does not complete his assignments. She reports that Samuel does say some sounds and some words incorrectly, but that she does not have difficulty in understanding him when he speaks.

**Tests Administered**
Test of Language Development-P: 3
Peabody Picture Vocabulary Test-III B
Expressive One-Word Picture Vocabulary Test
Fisher-Logemann Test of Articulation

The Test of Language Development-P:3 assessed listening, organizing, speaking, semantics, and syntax skills. Samuel achieved a spoken language quotient of 89 indicating low average performance for the test. He scored within the average range on four of the six core subtests including: relational vocabulary for expressing the relationship between two words presented orally, oral vocabulary for defining words presented orally, grammatic understanding for pointing to a single picture best representing a sentence produced orally from an array of three pictures, and sentence

Sm6

2

imitation for repeating as presented (verbatim) sentences of increasing length and complexity. He scored below average on two core subtests including: picture vocabulary for identifying the picture that best represented a word presented orally, and grammatic completion for completing sentences presented orally using correct grammatical forms (possessives, plurals, past tense, comparatives, irregular verbs). Samuel scored within the average range on two of the three supplemental subtests including: word discrimination for discriminating whether two words presented orally were the same word or two different words, and phonemic analysis for identifying the word or syllable omitted from compound words presented (birthday – birth___?___). He scored below average on the word articulation subtest for producing words correctly.

| Core Subtests | Standard Score |
| --- | --- |
| Picture Vocabulary | 6 |
| Relational Vocabulary | 9 |
| Oral Vocabulary | 12 |
| Grammatic Understanding | 9 |
| Sentence Imitation | 8 |
| Grammatic Completion | 6 |

| Supplemental Subtests | Standard Score |
| --- | --- |
| Word Discrimination | 9 |
| Phonemic Analysis | 9 |
| Word Articulation | 6 |

| Composites | Standard Score |
| --- | --- |
| Listening | 85 |
| Organizing | 91 |
| Speaking | 94 |
| Semantics | 94 |
| Syntax | 85 |

**Spoken Language Quotient – 89**

The Peabody Picture Vocabulary Test-III B assessed Samuel's single word receptive vocabulary. He selected one picture from an array of four pictures which best represented the word presented orally to him. Samuel achieved a standard score of 73 indicating below average performance in receptive vocabulary.

The Expressive One-Word Picture Vocabulary Test assessed Samuel's single word expressive vocabulary. He named a single picture presented or named a word for a group of pictures representing a category. Samuel achieved a standard score of 82 indicating low average performance in expressive vocabulary.

The Fisher-Logemann Test of Articulation assessed Samuel's production of sounds in words and sentences. Error productions included [r] and [r] blends, [s] blends, and th.

**Informal Screening**
During informal screening Samuel's hearing acuity appeared within normal limits.
Speech production including vocal quality, vocal intensity, pitch, rate of speech, and
fluency appeared within normal limits. Articulation errors were present including w/r,
shw/str, and f/th. His speech was intelligible. He spoke with ease in conversations,
discussions, and storytelling. He was able to tell a story about a movie he had seen. The
story was not told in sequence. He was able to provide descriptions of characters and
details of some story events. Samuel was able to write sentences from dictation. The
sentences contained errors in spelling, capitalization, and punctuation. His pragmatic
language including turn-taking during social interactions, asking for clarification,
expressing opinions, and maintaining topic of conversation appeared within normal
limits.

**Summary**
In summary, Samuel is eight years three months old and is a second grade student
attending Benning Elementary School. His hearing acuity appeared within normal limits.
His speech production including vocal quality, vocal intensity, pitch, rate of speech, and
fluency appeared within normal limits. Articulation errors were present including error
productions for [r], [s] blends, and th. His speech was intelligible. Samuel demonstrated
low average performance in receptive and expressive language skills, below average
performance in receptive vocabulary, and low average performance in expressive
vocabulary. Results of this reevaluation will be discussed at the multidisciplinary meeting
to determine Samuel's needs at school.


Pamela Perkins, Speech Therapist
District of Columbia Public Schools-Certification
06/15/05

# EXHIBIT

# E

### DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### WASHINGTON, D.C.

### MULTIDISCIPLINARY TEAM
### (MDT)
### MEETING NOTES

MDT

MEETING DATE: 09/13/2005

STUDENT: Samuel          Mingle          SCHOOL: Benning Elementary

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Aquanette Harling | Aquanette Herling | Parent/Guardian |
| Marie Olazo | M Olazo | Special Ed Teacher |
| June Wilson | J Wilson | General Ed Teacher |
| Rhoda Matthews | Rhoda Matt | LEA Representative |
| Glenda Smith | Glenda E Smith | Principal or Designee |
| K. DENNING | K Denning | Student Psychologist |

The purpose of today's meeting is to review the assessments that were completed on Samuel to determine if he has a learning disability. Samuel is currently in the third grade and is identified as a student with a speech and language impairment.

Team members introduced themselves. The speech therapist is not present at today's meeting. The parent has given written permission for the team to proceed with today's meeting, as the speech issue has not changed. The issue today being addressed is if Samuel has a learning disability.

**Parent Input**

Last year Ms. Herling was concerned that Samuel was not learning anything. However, at home he is able to do the work. The team agreed that if Samuel is able to complete the work at home he must be absorbing the information. However, while in class he is not demonstrating that he knows the information. Ms. Smith, school counselor, stressed that we need to help enhance Samuel's self esteem so that he will speak up in class.
Ms. Harling states that she encourages Samuel everyday.

**Teacher Input**

Ms. Wilson states that Samuel is able to do the math work in class. He has not had any outburst. The reading program has just begun. Ms. Myers-Denning suggested that Ms. Wilson provide prompts to Samuel so that he will stay on task. Additionally, he should be encouraged when he does good work.

THE PARENT ☒ IS PRESENT ☐ IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT Samuel          Mingle

☒ CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

☐ IS TO BE EXITED FROM SPECIAL EDUCATION

NEXT SCHEDULED IEP DEVELOPMENT MEETING DATE: ~~09/13/2005~~ RM Current IEP remains in effect

SM 7

DRAFT RB

### DISTRICT OF COLUMBIA PUBLIC SCHOOLS
#### WASHINGTON, D.C.

### MULTIDISCIPLINARY TEAM
#### (MDT)
### MEETING NOTES (continuation)

MDT

STUDENT: _____Samuel  Mingle_____   SCHOOL: Benning Elementary   DATE: 09/13/2005

---

**Psychologist report**

Samuel was tested on June 6, 2005.  He was administered the WISC-4, and the WIAT, and earned a full scale IQ in the low average range. Academically, he earned a reading composite in the low average rande and mathematics composite in the low average range.  Samuel's academic profile is not that of a student with a learning disability.

The team will continue to monitor Samuel's progress in the classroom.  Strategies where discussed with the classroom teacher to encourage Samuel to work more independently.

**Speech**

Samuel continues to exhibit below average performance in receptive vocabulary and low average performance in expressive vocabulary.  Speech services will continue as outlined on his current IEP.

eligibility
Based on a review of the documentation, the MDT
has determined that Samuel continues to have a
speech/language impairment

---

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

MULTIDISCIPLINARY TEAM (MDT)

**Prior to Action Notice**

Check Purpose:
☐ Initial Evaluation
☐ Initial Placement
☒ Reevaluation
    ☐ Change in Category Exit

Date 09/13/2005

Student Samuel     Mingle     DOB 02/06/1997

School Benning Elementary

    ☐ Related Service Add
    ☒ Related Service
    ☐ Change in Placement
    ☐ Annual
    ☐ Other

Current Disability Category   SLI

Setting   Combination general education and resource classroom

Dear Aquanette Harling

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
☒ Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☐ Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☐ Other

**A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)**

☐ Your child is not eligible for special education service(s).
☒ Your child is eligible or continues to be eligible to receive special education services as a student with SLI
☒ Your child will begin receiving   Speech-Language   as a related service(s).
☐ Your child will no longer receive _____ as a related service(s).
☐ Your child's category of disability is being changed from _____ to _____
☐ Your child's alternative placement on continuum (next setting) is being changed,
    from _____ to _____
☐ Your child is no longer eligible and will be exited from the special education program.
☐ Other:

Location of Services   Benning Elementary

**Description and Explanation of agency action proposed or refused.**

Based on a review of the documentation, the MDT proposes the following setting:
Combination general education and speech services.

**Description of Other Options Considered and reasons for rejection of each option**

The student requires a combination setting with pull out speech services in order to access the general education curriculum.

Other relevant factors to the decision– N/A

MDT Members:
☒ Principal or Designee
☒ Parent
☐ Student
☐ Social Worker
☒ General Education Teacher
☒ Special Education Teacher
☒ Speech and Language
☒ *LEA & Interpreter (*may be one)
☒ Psychologist
☐ Other:

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent:

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the Procedural Safeguards for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact Rhoda Matthews   at   724-4586   (school telephone number).

**See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED**

# EXHIBIT

# F

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

**Multidisciplinary Team**
**(MDT)**
**MEETING NOTES**

### Annual IEP Review Meeting Notes

STUDENT: Samuel     Mingle     SCHOOL: Benning Elementary     DATE: 01/26/2006

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Ms. A. Harling | A. Harling | Parent/Guardian |
| Pamela Perkins | Pamel Perkin | Special Ed Speech Therapist |
| June Wilson | J Wilson | General Ed Teacher |
| Rhoda Matthews | Rhoda Matthe | LEA Representative |
| Glenda Smith | Glenda E Smith | Principal or Designee |
| | | Student |

Samuel is currently identified as a student with a speech and language impairment.

**Parent Input**
Ms. Harling reports that Samuel is doing well, however, she is concerned about his refusal to do any writing. His handwriting is like someone just learning to write.

Ms. Harling reads with Samuel every night for 30mins. This has been helpful in improving his reading skills.

**Teacher Input**

Ms. Wilson reports that Samuel is very smart and capable of doing his school work. His reasoning skills with math are strong. He knows more than he lets on to while in class. Samuel, however, at times is playful, and he refuses to write. He has poor motor skills, and may need to be tested for services. He does not want to write anything, he hates writing.

**Services:** Speech/Language Services

**Level of Testing:** Level I

**Accommodations/Modifications:** Allowance of extra think time before responding orally.

**Setting:** Combination - General education with pull out speech therapy.

**Location:** Benning ES

The Parent ☑ is present ☐ is not present at the meeting.
DISTRICT OF COLUMBIA PUBLIC SCHOOLS     04-05-2004     DIVISION OF SPECIAL EDUCATION     MEETING NOTES

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**
**INDIVIDUALIZED EDUCATIONAL PROGRAM**

DCPS - IEP Page 1 of 4
Additional Comments:

## I. IDENTIFICATION INFORMATION

Student Name: Last **Mingle**   First **Samuel**   MI

Student ID **9103128**   Soc. Sec. No. **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**   Age: **8**   Grade **03**

Gender ☒M ☐F   Date of Birth **02/06/1997**   Ethnic Group **Black**

Address **4065**   Minnesota Ave
House No.   Street Name   Quadrant NE   Apartment # 204

Washington   DC   20019
City   State   Zip Code

☐ Non-attending

Attending School **Benning Elementary**   Home School

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Parent **Ms. A. Harling**

Address of (if different from student):   ☒ Parent ☐ Guardian ☐ Surrogate

House No.   Street Name   Quad   Apt. No.   City   State   Zip Code
Telephone: Home **(202) 575-0228**   Work

## II. CURRENT INFORMATION

Date of IEP Meeting: **01/26/2006**

Date of Last IEP Meeting: **02/03/2005**

Date of Most Recent Eligibility Decision: **09/13/2005**

Purpose of IEP Conference:
☐ Initial IEP   ☒ Review of IEP
☐ Requested Eval.   ☐ 3yr ReEval.

Indicate Level of Standardized Assessment: Level 1

**ADDENDA TO BE ATTACHED AS NEEDED**
Check the appropriate box(es)

| | BEHAVIOR | | TRANSPORTATION |
|---|---|---|---|
| | ESY | | TRANSITION |

## III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements |
|---|---|---|---|---|
| Student | English | English | English | Native Language |
| Parent | English | English | English | Native Language |
| Home | English | English | English | Native Language |

To be completed by Office of Bilingual Education English and Math Proficiency Assessment
Oral
Rdg./ Written
Instrument:
Date:

## IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | SETTING | | | | | | FREQUENCY | | | PROVIDER | BEGINNING DATE | DURATION | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | GenEd Ses. | Time | Total | SpecEd Ses. | Time | Total | Hr./ Min | D/W/M | | (by discipline) | mm/dd/yyyy | # | wks/mos |
| Speech-Language | 0.00 | 0.00 | 0.00 | 1.00 | 1.00 | 1.00 | Hrs | Week | | Speech and Language Thera | 01/27/2006 | 10 | Month |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

TOTAL HOURS: **0.00**   **1.00**   Total Combined Hours Per Week:

## V. Disability(ies) Speech and Language Impaired

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☒ 0-20%   ☐ 21-60%   ☐ 61-100%
Percent of time NOT in a General Education Setting   **3.00%**

## VI. IEP TEAM (Participants in the development of the IEP)    Print and sign your name below.

Ms. A. Harling   *A. Harling*
Parent   Student

Pamela Perkins   *Pamela Perkins*
Special Ed

June Wilson   *Ellie...*
General Ed Teacher

Rhoda Matthews   *Rhoda Matthews*
LEA Representative

Glenda Smith   *Glenda S. Smith*
Principal or Designee

✓ *I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.
Parent/Guardian Signature   *A. Harling*   Date **1-26-06**

District of Columbia Public Schools   04-02-2004   Division of Special Education   Appendix - A   IEP Page 1 of 4

| Student Name | Samuel | | Mingle | | Home School | Benning ES | DCPS - IEP |
|---|---|---|---|---|---|---|---|
| Student ID Number | 9095145 | | DOB | 02/06/97 | Attending School | Benning ES | Page 2 of 4. |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)**

Math Strengths:

Impact of disability on educational performance in general education curriculum:

Reading Strengths-

Impact of disability on educational performance in general education curriculum-

**Score(s) When Available**

Math Cal.
Math Rea.
See goal page:
Date:

Rdg. Com
Rdg. Basic
Written Ex.          5
See goal page:
Date:

**Communication (Speech & Language) (Evaluator)** P. Perkins, Speech Therapist - DCPS-Crt.

Strengths-

Samuel's vocal quality, vocal intensity, pitch, rate of speech, and fluency were within functional limits.

Impact of disability on educational performance in general education curriculum:

Articulation errors impact speech production in his classes. Weaknesses in expressive vocabulary and sentence formulation may impact oral activities in his classes.

**Score(s) When Available**

| Exp.Lang. | SS | 89 |
|---|---|---|
| Rec-Lang. | SS | 85 |
| Artic | Below Average | |
| Voice | WNL | |
| Fluency | WNL | |
| Exp. Voc. | SS | 73 |
| Rec. Voc. | SS | 82 |

See goal page:
Date: 06/02/05

**Motor/Health (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) /Results When Available**

See goal page:
Date:

**Social Emotional Behavioral Areas: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

See goal page:
Date:

**Cognitive/Adaptive Behavior: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

See goal page:
Date:

**Prevocational Skills: (Evaluator)**

Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

See goal page:
Date:

| Student Name | Samuel | | Mingle | HomeSchool | Benning ES | | DCPS - IEP |
| Student ID Number | 9095145 | | DOB | 02/06/97 | Attending School | Benning ES | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐ 1 |

Area addressed by goal: **Communication (Speech/Language)**

ANNUAL GOAL: (including mastery criteria.)

Samuel will improve speech production, receptive vocabulary, and sentence formulation by completing the short-term objectives with 80% accuracy.

Provider(s): **Speech-Language Pathologist**

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Samuel will stabilize production of targeted phonemes in daily speaking activities. | | Monthly |
| Samuel will orally define curriculum-based vocabulary with 80% accuracy. | | Monthly |
| Samuel will formulate semantically and syntactically correct sentences with 80% accuracy. | | Monthly |
| | | tion tule |
| | | ...ly |
| | | ly |

EVALUATION PROCEDURE(S)

☐ Portfolio   ☐ Log   ☐ Chart   ☒ Test   ☐ Documented Observation   ☐ Report   ☐ Other _____

District of Columbia Public Schools      07-02-2001      Division of Special Education      Appendix - A      IEP Page 3 of 4

| Student Name | Samuel | Mingle | | Managing School | Benning Elementary | DCPS - IEP |
|---|---|---|---|---|---|---|
| Student ID Number | 9103128 | | DOB 02/06/1997 | Attending School | Benning Elementary | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
### SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in <u>general education</u>?   ☐ Yes   ☒ No

Explanation for removal out of regular education classroom.

Samuel requires speech therapy in a small structured environment, outside of the general education environment.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hr./ Min | D/W/M. | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for <u>testing</u>:   ☐ None needed

Timing/Scheduling: Allowance of extra think time when awaiting oral response from student or expecting student to follow through with request

Setting:

Presentation:

Response:

Equipment:

## XI. STATE AND DISTRICT ASSESSMENTS:

☒ Level I   Tested with non-disabled peers under standard conditions without accommodations.

☐ Level III (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V  Portfolio:

☐ Level II   (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ Level IV   (Describe the alternative assessment)

## XII. Areas Requiring Specialized Instruction and Related Services:                    Modifications:

☐ Reading          ☐ Physical/Sensory       ☐ Transition          ☒ Language Arts/English
☐ Mathematics      ☐ Social Emotional       ☐ Vocational          ☐ Social Sciences
☐ Written Expression ☐ Physical Development  ☐ Independent Living  ☐ Biological & Physical Sciences
☐ Other:                                    ☒ Speech/Language     ☐ Fine Arts
☐ None      Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| In General Education Classroom Setting | Rejected | Continued school failure |
| Combination General Education and Resource Classro | Accepted | Impact on self-esteem |
| Out of General Education Classroom | Rejected | Time away from non-disabled peers in academic rett |

Modification(s)/Accommodation(s) to address the harmful effects:

Specific scheduling to accommodate for related service sessions

Last Updated By:

## DOCUMENTED LEVEL OF SERVICE
### Complete and attach to MDT/IEP meeting notes

| School | Benning Elementary | Principal | Darwin Bobbitt | Special Education Coordinator | Rhoda Matthews |

| Date 01/26/2006 | Case Manager | Dezmond Williams | Assistant Director | Elva Gloster |

| Student | Samuel | Mingle | DOB 02/06/1997 | Age 8 | Grade 03 | ID# 9103128 | SSN# 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 |

| Parent | Ms. A. Harling | Telephone (H) (202) 575-0228 | (W) |

Address: 4065    Minnesota Ave    NE  204    Washington    DC  20019
Street #    Street    Quad  Apt. No.    City    State  Zip Code

REFERRAL SOURCE: (Check)  ☐ 120 Day  ☐ Reeval.  ☐ HOD  ☐ SA  ☐ MA  ☒ Annual

☐ Nonpublic  ☐ Residential  ☐ Citywide  ☐ Courts  ☒ Local School  ☐ Other:

Previous least restrictive environment (LRE Setting):    Combination general education and resource classroom

## JUSTIFICATION FOR SETTING CONSIDERATION
### (Submit TAT/MDT Documentation)
### SUPPORTIVE DATA/DOCUMENTATION

| 2. ACCOMMODATIONS/ MODIFICATIONS | 3. DATA REQUIREMENTS | | |
|---|---|---|---|
| **Allowance of extra think time when awaiting oral response from student or expecting student to follow through with request** | Current IEP | Yes ☒ | No ☐ |
| | Signatures of required participants (MDT notes) | Yes ☒ | |
| | Intervention Behavior Plan | Yes ☐ | |
| | Copies of current class work and homework assignments: | Yes ☒ | |
| | Medical Reports: | Yes ☐ | No ☒ |
| | Clinical Reports: | Yes ☐ | No ☒ |
| | Psychiatric Reports: | Yes ☐ | No ☒ |
| | Medications: | Yes ☐ | No ☒ |
| | Attendance Record | Yes ☒ | |
| | Copies of most recent evaluation(s) | Yes ☒ | |

| 4. Results of all interventions: (TAT, MDT, etc. and attach meeting notes.) | 5. Resources needed for program implementation |
|---|---|
| 9/13/2005  Reevaluation meeting | None needed |

## 6. CURRENT SETTING CONSIDERATIONS

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | ☒ in general education classroom setting | ☐ general educators with consultation from special education staff | ☒ between 0% and 20% of service time |
| 2 | ☐ combination general education and resource classroom | ☒ combination of general educators, special educators and related service providers | ☐ between 21 % and 60% of service time |
| 3 | ☐ *out of general education classroom | ☐ special educators and related service providers | ☐ between 61 % and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children in those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings)

### Check the level of need as indicated:
**DIRECTIONS:**

| If two or three boxes are checked in the Row 1, check LOW. If two or three boxes are checked in the Row 2, check MODERATE. If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row, check either MODERATE or HIGH, depending on the need of the student. |

## 7. LEVEL OF NEED

| ☒ LOW | ☐ MODERATE | ☐ HIGH |

07-02-2001                    Attention: Technical Support Supervisor, Compliance Team

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**

## RELEASE FOR PERSONAL HEALTH INFORMATION

STUDENT: Samuel          Mingle          SCHOOL: Benning Elementary          DATE: 01/26/2006

The Family Education Rights and Privacy Act (FERPA), a federal law, requires that DCPS, with certain exceptions, obtain your written consent prior to the disclosure of personally identifiable information from your child's education records. Personally identifiable information includes your child's name, social security number, identification numbers and characteristics that would make the identity of the student easily accessible.

I, Annette          Harling          , 01/26/2006          :
_____          _____
Parent/Guardian Name          Date

☑   consent to the disclosure of my child's education records for the purpose of submitting claims to Medicaid and other third party payers for those services.

☐   do not consent to the disclosure of my child's education records for any purpose.

_A. Harling_____          _1-26-06___
Parent/Guardian Signature          Date

_Rhoda Matt_____          _1/26/06___
Witness Signature          Date

DISTRICT OF COLUMBIA PUBLIC SCHOOLS          08-01-2004          DIVISION OF SPECIAL EDUCATION

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**WASHINGTON, D.C.**

## REEVALUATION RESULTS

Student: Samuel          Mingle          DOB: 2/6/1997      Age: 9      Grade: 03      ID: 9103128

The Documented Level of Service (DLS) was reviewed to provide current input regarding functional level and academic needs. See current DLS. Additional information from parent or guardian includes:

The student presents with deficits in the sensory motor domain which are impacting his academic progress.

Based on review of existing information, DLS, and input from the student's parents, the team agrees:

[X] The student continues to require special education and/or related services.

[ ] Sufficient information exists to develop a                    and determine whether additions of modifications to the special education and/or related services are needed to enable student to meet the annual goals in the most current IEP.

[ ] The student no longer requires special education services to address educational disability.

The student no longer demonstrates the following educational disability(ies): _____

**Parents have the right to request testing to determine whether their child continues to require special education services.**

[X] Parent requests testing.      Date: 1/26/2006

[ ] Parent does not request testing.

**Resultant Action**

[X] Request granted        Date: 1/26/2006

[ ] Request refused        Date: _____

Additional Comments:

# EXHIBIT

# G

5/23/06

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

## Multidisciplinary Team
## (MDT)
## MEETING NOTES

### Annual IEP Review Meeting Notes

STUDENT: Samuel          Mingle          SCHOOL: Benning Elementary          DATE: 05/23/2006

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Annette Harling | A. Harling | Parent/Guardian |
| Delise Holloman | | OT |
| June Wilson | | General Ed Teacher |
| Rhoda Matthews | Rhoda Mat | LEA Representative |
| Glenda Smith | Glenda E Smith | Principal or Designee |
| | | Student |

The purpose of today's meeting is to add OT services to Samuel's IEP. Samuel is identified as SLI, and he currently receives speech therapy only.

Services:  Speech Therapy
                 Occupational Therapy

Level of Testing:  Level 1

Accommodations/modifications:  Allowance of extra think time when awaiting oral response from student, preferential seating, oral responses to test/oral reports, use of computer, and use os specifically designed writing tools.

Setting:  Combination

Location of Services:  Benning ES

Comp. Ed.:  Comp. Ed. is warranted in the amount of  56  hours for missed services during the 2004-2005 school year.

ESY:  ESY is not warranted at this time.

The Parent ☑ is present ☐ is not present at the meeting.                                    Sm 9
DISTRICT OF COLUMBIA PUBLIC SCHOOLS        04-05-2004        DIVISION OF SPECIAL EDUCATION        MEETING NOTES

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES

MEETING DATE: 5/23/2006

| MDT |

STUDENT: Samuel          Mingle          SCHOOL: Benning Elementary

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Annette Harling | A. Harling | Parent/Guardian |
| Delise Holloman | Delise B Holloman OOP | OT |
| Jane Wilson | Jane K Wilson | General Ed Teacher |
| Rhoda Matthews | Rhoda Mcc | LEA Representative |
| Glenda Smith | Glenda E Smith | Principal or Designee |
| | | Student |

The purpose of today's meeting is to review the occupational therapy evaluation that was completed on Samuel. Samuel is a third grade student at Benning ES. He is currently identified as SLI, and he receives speech therapy only.

Parent Input

Ms. Harling is concerned that Samuel will not complete his school work. This has been a problem since 2nd grade. It was at this time that she become concerned that Samuel may be having problems with his hands. Ms. Harling is also concerned that Samuel was tested in Feburary 2004 without her permission.

Teacher Input

Ms. Wilson states that her concerns are Samuel's ability to write. He has an awkward pencil grip, and refuses to write, saying that he does not like to write. Samuel is able to verbally show that he knows the content. However, he will not put this knowledge to paper.

OT Evaluation

In the area of visual motor integration, and visual perceptual skills Samuel demonstrated average ability. Samuel was impulsive which may have impacted his scores. Despite the average scores, Samuel presented with difficulty with letter formation, sizing, spacing and alignment during writing. He also had an awkward hand grip that effected pencil mobility. Based on these findings, Samuel appears to be demonstrating deficits in the sensory motor domain that are hindering his academic progress. OT intervention may help Samuel with these obstacles. Services are recommended at this time.

THE PARENT ☒ IS PRESENT ☐ IS NOT PRESENT AT THE MEETING

AFTER A REVIEW OF THE ASSESSMENTS, IT IS DETERMINED THAT Samuel          Mingle

☒ CONTINUES TO BE ELIGIBLE FOR SPECIAL EDUCATION

☐ IS TO BE EXITED FROM SPECIAL EDUCATION

NEXT SCHEDULED IEP DEVELOPMENT MEETING DATE: 5/23/2006

# DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## WASHINGTON, D.C.
### INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP Page 1 of 4

Additional Comments: ☐

## I. IDENTIFICATION INFORMATION

Student Name: Last **Mingle**    First **Samuel**    MI

Student ID **9103128**    Soc. Sec. No. **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**    Age: **9**    Grade **03**

Gender ☒M ☐F    Date of Birth **02/06/1997**    Ethnic Group **Black**

Address **4065**    Street Name **Minnesota Ave**    Quadrant **NE**    Apartment # **204**
Home No.
City **Washington**    State **DC**    Zip Code **20019**

☐ Non-attending

Attending School **Benning Elementary**    Home School

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Parent    **Annette Harling**

Address of (if different from student):    ☒ Parent  ☐ Guardian  ☐ Surrogate

Home No.  Street Name    Quad  Apt. No.  City    State  Zip Code
Telephone: Home **(202) 575-0228**    Work

## II. CURRENT INFORMATION

Date of IEP Meeting: **05/23/2006**

Date of Last IEP Meeting: **01/26/2006**

Date of Most Recent Eligibility Decision: **09/13/2005**

Purpose of IEP Conference:
☐ Initial IEP    ☐ Review of IEP
☒ Requested Eval.  ☐ 3yr ReEval.

Indicate Level of Standardized Assessment:    Level I

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

☐ BEHAVIOR    ☐ TRANSPORTATION
☐ ESY    ☐ TRANSITION

## III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | Native Language | Oral |
| Parent | English | English | English | Native Language | Rdg./Written Instrument: |
| Home | English | English | English | Native Language | Date: |

## IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | GenEd | | SETTING SpecEd | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | DURATION # | wks/mos |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ses. | Time Total | Ses. | Time | Total | Hr./Min | D/W/M | | | | |
| Speech-Language | 0.00 | 0.00 | 0.00 | 1.00 | 1.00 | 1.00 | Hrs | Week | Speech and Language Thera | 05/24/2006 | 10 | Month |
| Occupational Therapy | 0.00 | 0.00 | 0.00 | 2.00 | 30.0 | 60.00 | Mins | Week | Occupational Therapist | 05/24/2006 | 10 | Mon |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| TOTAL HOURS: | 0.00 | | | 2.00 | | Total Combined Hours Per Week: | | | | | |

## V. Disability(ies) Speech and Language Impaired

☐ (Check if setting is general Ed.)

Percent of time in Specialized Instruction and Related Services
☒ 0-20%    ☐ 21-60%    ☐ 61-100%

Percent of time NOT in a General Education Setting    **6.00%**

## VI. IEP TEAM (Participants in the development of the IEP)

Print and sign your name below.

Annette Harling — Parent
Delise Holloman — OT
June Wilson — General Ed Teacher
Rhoda Matthews — LEA Representative
Glenda Smith — Principal or Designee

*[signatures present]*    Student    Occupational Therapy    General Ed. Teacher

☑ I AGREE with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.

Parent/Guardian Signature *[signature]*    Date **5-23-06**

| Student Name | Samuel | Mingle | Home School | Benning ES | DCPS - IEP |
| Student ID Number | 9095145 | DOB  02/06/97 | Attending School | Benning ES | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Score(s) When Available**

**Academic Areas: (Evaluator)**
Math Strengths:

Math Cal. _____

Math Res. _____

Impact of disability on educational performance in general education curriculum:

See goal page: _____

Date: _____

Reading Strengths-

Rdg. Com _____

Rdg. Basic _____

Written Ex. _____

Impact of disability on educational performance in general education curriculum-

See goal page: _____

Date: _____

---

**Communication (Speech & Language) (Evaluator)**  P. Perkins, Speech Therapist - DCPS-Crt.
Strengths-

Samuel's vocal quality, vocal intensity, pitch, rate of speech, and fluency were within functional limits.

Impact of disability on educational performance in general education curriculum:

Articulation errors impact speech production in his classes. Weaknesses in expressive vocabulary and sentence formulation  may impact oral activities in his classes.

**Score(s) When Available**

| | | |
|---|---|---|
| Exp.Lang. | SS | 89 |
| Rec-Lang. | SS | 85 |
| Artic | Below Average | |
| Voice | WNL | |
| Fluency | WNL | |
| Exp. Voc. | SS | 73 |
| Rec. Voc. | SS | 82 |

See goal page: 1

Date:  06/02/05

---

**Motor/Health (Evaluator)**  O.T.
Strengths:

Student is able to verbalize himself (Ex) to questions asked & Reading / math skills

Impact of disability on educational performance in general education curriculum:

Samuel demonstrates poor visual motor/fine motor skills which impacts academic performance

**Score(s) /Results When Available**

Clinical Observation
Teacher Interview

See goal page: 2

Date:  05.23.06

---

**Social Emotional Behavioral Areas: (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

See goal page: _____

Date: _____

---

**Cognitive/Adaptive Behavior: (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

See goal page: _____

Date: _____

---

**Prevocational Skills: (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

See goal page: _____

Date: _____

---

District of Columbia Public Schools    07.02.2001    Division of Special Education    Appendix A    IEP Page 2 of 4

| Student Name | Samuel | Mingle | HomeSchool | Benning ES | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | 9095145 | DOB  02/06/97 | Attending School | Benning ES | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: 1 |
|---|---|---|

Area addressed by goal:  **Communication (Speech/Language)**

**ANNUAL GOAL: (including mastery criteria.)**

Samuel will improve speech production, receptive vocabulary, and sentence formulation by completing the short-term objectives with 80% accuracy.

Provider(s):  Speech-Language Pathologist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Samuel will stabilize production of targeted phonemes in daily speaking activities. | | Monthly |
| Samuel will orally define curriculum-based vocabulary with 80% accuracy. | | Monthly |
| Samuel will formulate semantically and syntactically correct sentences with 80% accuracy. | | Monthly |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☐ Documented Observation  ☐ Report  ☐ Other _____

| Student Name | Samuel | Mingle | | Managing School | Benning Elementary | DCPS - IEP |
|---|---|---|---|---|---|---|
| Student ID Number | 9103128 | | DOB 02/06/1997 | Attending School | Benning Elementary | Page 3 of 4 |

| VIII. SPECIALIZED SERVICES | Additional Comments: ☐ | Goal Number: ☐ |
|---|---|---|

Area addressed by goal: Motor/Health

**ANNUAL GOAL:** (including mastery criteria.)

Samuel will demonstrate independence in the area of visual motor/fine motor skills for greater independence in classroom tasks as eveidenced by the mastery of the short term objectives with 80% accuracy.

Provider(s): Occupational Therapist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Using small manipulative devices, Samuel will attend to a writing activity for 5 minutes with 3 verbal cues. | | Monthly |
| Samuel will demonstrate adequate tripod using various grips triangular or circular with 80% accuracy. | | Monthly |
| Samuel will perform writing tasks with good posture, using non-dominant hand to stabilize paper with 80% accuracy. | | Monthly |
| Using assistive devices for writing, (ie., raised line paper, pencil grip), Samuel will write upper/lower case letters with good directionality, letter formation, sizing and spacing with 80% accuracy. | | Monthly |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio ☐ Log ☐ Chart ☐ Test ☒ Documented Observation ☐ Report ☒ Other Progress notes

District of Columbia Public Schools    07-02-2001    Division of Special Education    Appendix - A    IEP Page 3 of 4

| Student Name | Samuel | Mingle | Managing School | Benning Elementary | DCPS – IEP |
| Student ID Number 9103128 | | DOB 02/06/1997 | Attending School | Benning Elementary | Page 4 of 4 |

**Additional Comments:** ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in general education?   ☐ Yes  ☒ No

Explanation for removal out of regular education classroom.

Samuel requires speech and occupational therapy in a small structured environment, outside of the general education environment.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING GenEd | SpEd | Total | FREQUENCY Hr./ Min | D/W/M. | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing:   ☐ None needed

Timing/Scheduling: Allowance of extra think time when awaiting oral response from student or expecting student to follow through with request

Setting: Preferential seating

Presentation:

Response: Oral responses to tests/oral reports

Equipment: Use of computer/calculator/slantboard. Large pen or specifically designed writing tool

## XI. STATE AND DISTRICT ASSESSMENTS:

☒ Level I   Tested with non-disabled peers under standard conditions without accommodations.

☐ Level III   (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level V Portfolio:

☐ Level II   (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ Level IV   (Describe the alternative assessment)

## XII. Areas Requiring Specialized Instruction and Related Services:

☐ Reading
☐ Mathematics
☐ Written Expression
☐ Other:
☐ None

☒ Physical/Sensory
☐ Social Emotional
☐ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☒ Speech/Language

**Modifications:**
☒ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| In General Education Classroom Setting | Rejected | Continued school failure |
| Combination General Education and Resource Classro | Accepted | Impact on self-esteem |
| Out of General Education Classroom | Rejected | Time away from non-disabled peers in academic sett |

Modification(s)/Accommodation(s) to address the harmful effects:

Specific scheduling to accommodate for related service sessions

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**

MULTIDISCIPLINARY TEAM (MDT)

**Prior to Action Notice**

Check Purpose:
- [ ] Initial Evaluation
- [ ] Initial Placement
- [X] Reevaluation
  - [ ] Change in Category Exit
  - [ ] Related Service Add
  - [ ] Related Service
  - [ ] Change in Placement
  - [X] Annual
  - [ ] Other

Date  5/08/2006

Student  Samuel          Mingle          DOB  2/6/1997

School  Benning Elementary

Current Disability Category  SLI

Setting  Combination general education and resource classroom

Dear  Ms. Annette Harling

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
- [X] Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
- [ ] Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)
- [ ] Your child is not eligible for special education service(s).
- [X] Your child is eligible or continues to be eligible to receive special education services as a student with  SLI
- [X] Your child will begin receiving  Speech-Language, Occupational Therapy  as a related service(s).
- [ ] Your child will no longer receive _____ as a related service(s).
- [ ] Your child's category of disability is being changed from _____ to _____
- [ ] Your child's alternative placement on continuum (next setting) is being changed,
  from _____ to _____
- [ ] Your child is no longer eligible and will be exited from the special education program.
- [ ] Other: _____

Location of Services  Benning Elementary

**Description and Explanation of agency action proposed or refused.**

Based on a review of all the documentation, the MDT proposes the following setting:  Combination.

**Description of Other Options Considered and reasons for rejection of each option**

The student requires a combination setting with pull out speech and OT services in order to access the general education curriculum.

Other relevant factors to the decision-  n/a

MDT Members:
- [X] Principal or Designee
- [X] Parent
- [ ] Student
- [ ] Social Worker
- [X] General Education Teacher
- [X] Special Education Teacher
- [ ] Speech and Language
- [X] *LEA & Interpreter (*may be one)
- [ ] Psychologist
- [X] Other:  Occupational Therapist

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent:

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the Procedural Safeguards for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact  Rhoda Matthews                at  (202)724-4586            (school telephone number).

See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED

MDT Prior to Action Notice
07-02-2001

**DISTRICT OF COLUMBIA PUBLIC SCHOOLS**
**SPECIAL EDUCATION**
**MULTIDISCIPLINARY TEAM**
**(MDT)**

Student Samuel          Mingle          DOB 2/6/1997 Age 9    Grade 03    ID 9103128

You have the right to challenge the recommendations by requesting Mediation or a Due Process Hearing before an impartial hearing officer. To initiate a mediation or hearing, you will need to complete a REQUEST FOR MEDIATION or DUE PROCESS HEARING form and mail it to the address listed below:

Student Hearing Office
D.C. Public Schools
825 North Capitol Street, N.E. 8th floor
202-442-5432

You have the right to be represented at the hearing by legal counsel.
A copy of Parent's Procedural Safeguards handbook is provided.
A list of free or low cost legal service, for which you may qualify depending on your income, is included.
If you would like an additional copy, please contact the principal.

**EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED**

Test/Description: Developmental Test of Visual Motor Integration (VMI) - assesses visual perception and motor coordination in ages 3 years and up using a more structured booklet format.

Date of Report: 2/19/2004

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

Test/Description:

Date of Report:

**Free or Low Cost Legal Services**

| Neighborhood Legal Services | Neighborhood Legal Services | University Legal Services | The Children's Law Center Inc. | National Coalition for Students |
|---|---|---|---|---|
| 701 4th Street, N.E. | 1213 Good Hope Road, S.E. | 300 I Street, N.E. | 1050 Connecticut Avenue, N.W. | with Disabilities |
| Washington, D.C. 20001 | Washington, D.C. 20020 | Washington, D.C. 20002 | Suite 1200 Washington Square | 10560 Main Street, Suite 417 |
| 202-682-2700 (NW) | 202-678-2000 | 202-547-0198 | Washington, D.C. 20036-5317 | Fairfax, VA 22030 |
| 202-682-2732 (NE) | Fax 202-889-3374 | Fax 202-547-2662 | 202-467-4900 | 703-267-6588 |
| Fax 202-682-0588 | | | Fax 202-467-4949 | (fax) 703-267-6992 |

MDT Prior to Action Notice
03-30-2004



# DCPS Office of Special Education Progress Report

Student Name: Samuel Mingle            DOB: 2/6/97 Sex: M Grade: 3RD

ID#: 9103128 Date of IEP: 5/23/06 Date of Proposal: 5/23/06 IEP/Home School: Benning

_____: Quarter Progress Report   Disability: SLI

## Missed Service(s):

| Service | Provider | Total Time Missed | Reason(s) |
|---|---|---|---|
| OT | Occupational Therapist | 56 hrs. | Overdue assessment + review. |
| | | | |
| | | | |

## Quarterly Progress Plan:

| Skill Area(s) | Provider | Beginning Date | Duration Hr/Min Wk/Mo | Remaining Hours | Implementation Mode |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |

| Goals and objectives from the current IEP which are to be implemented for Compensatory Education. | |
|---|---|
| **Annual Goal(s) and Objective(s)** | **Skills Area(s)** |
| Annual Goal: Demonstrate independence in the area of visual fine motor skills. Objective: Using assistive devices Samuel will write upper/lower case letters | Visual motor fine motor skills |
| Annual Goal: Demonstrate independence in the area of visual/fine motor skills. Objective: Using small manipulative devices, Samuel will attend to a drawing activity for 5min w/ verbal cues | Visual/fine motor skills |

## Completion of Services:

| Provider | Service | Total Hrs. Used | Date |
|---|---|---|---|
| | | | |
| | | | |
| | | | |

Parent/Guardian Signature: A. Harling            Date: 5-23-06

Principal Signature: Derwin Bickett            Date: 5/23/06

Special Education Coordinator Signature: Rhoda Matt            Date: 5-23-06

# EXHIBIT

# H

4/19/

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

**MULTIDISCIPLINARY TEAM
(MDT)
MEETING NOTES**

MDT | MDT REFERRAL DATE: _____

STUDENT: Samuel Mingle          SCHOOL: Benning ES          DATE: 4/19/07

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Rhoda Matthews | Rhoda Matthews | LEA Designee |
| Vanessa Gerideau | Vanessa Gerideau | Teacher |
| Glenda F Smith | Glenda F Smith | Counselor |
| Annette Harling | Annette Harling | mother |
| Samuel W. Mingle Sr. | Samuel W. Mingle Sr. | Father |

The purpose of today's meeting is to discuss the ongoing concerns for Samuel. Ms. Gerideau reports that Samuel does not complete any work in class. Samuel is also very oppositional which keeps him from doing anything.

Ms. Harling states that she is seeing some of the same oppositional behavior at home.

The team recommends counseling in the community along with a physical by Samuel's doctor. Educational, a behavioral scale and an OT evaluation will be completed. The behavioral scales will address emotional and behavioral concerns.

Samuel appears not to take school seriously. He plays and talks constantly in class.

Ms. Gerideau will provide some additional strategies (ie. more independent work) to better assist Samuel. Independent work will consist of completing classwork at home.

The parent states that she wants to speak with her advocate first before agreeing to DCPS testing Samuel. She wants him tested

but maybe independently. Ms. Harling will notify this writer next week about her decision.
                                                                                S M

# EXHIBIT

# I

April 30, 2007

Dear Mr. Mingle and Ms. Harling,

I have high expectations for all of my students and it is my goal that your son, Samuel
Mingle, is successful in school. As we have discussed on numerous occasions, Samuel is
not performing at the level he should be. Not only does he rarely produce any school
work, the work he does produce does not show that he has mastered the objective or skill
for that lesson.

For this reason, I am outlining the following steps Samuel must take in order to be
recommended for fifth grade in the 2007-08 school year.

- Each week I will be sending home a packet of work for Samuel to complete. This
  packet will contain both literacy and math work and will be specific to Samuel's
  reading and math levels. The packet must be completed by Friday of each week.
- In addition to the packet, Samuel must complete the regular daily homework
  assignment. This assignment will usually include a short reading assignment and a
  short math assignment. He must also read for 30 minutes each night.
- While in class, Samuel must complete all assignments that are given to him.
- Samuel must maintain an A or B average for his behavior grade. When Samuel
  misbehaves, he is removed from the classroom, which means he is not
  participating in the lesson or learning. In order to stay in class, he must be willing
  to follow instructions.

I would like to see Samuel successfully make it to the fifth grade with the rest of his
classmates. I know he is fully capable of doing the work assigned to him and can be a
great student if he so chooses. If, for some reason, Samuel is not able to complete
these steps, I will be recommending that Samuel is retained in the fourth grade for the
2007-08 school year. It is my hope that he takes on this challenge and shows us all
that he is ready to move on.

If you have any questions, please do not hesitate to call me. You both have been very
patient and cooperative, and I truly appreciate how supportive and understanding you
have been. If we continue to challenge Samuel, I know he will be successful.

Sincerely,

Vanessa Gerideau

SM 11

# EXHIBIT

# J

5|31|c

~~DRAFT~~ 2m

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
WASHINGTON, D.C.

Multidisciplinary Team
(MDT)
MEETING NOTES

### Annual IEP Review Meeting Notes

STUDENT: Samuel        Mingle              SCHOOL: Benning Elementary        DATE: 05/31/2007

| PARTICIPANTS: (Print Name) | PARTICIPANTS: (Sign Name) | POSITION |
|---|---|---|
| Annette Harling | In attendance | Parent/Guardian |
| Keith Norman | Keith Norman | Special Ed |
| Vanessa Gerideau | | General Ed Teacher |
| Rhoda Matthews | Rhoda Mat— | LEA Representative |
| Rhoda Matthews | | Principal or Designee |
| | | Student |
| Pamela Perkins | Pamela Perkins | |
| Cynthia Lambert | via telephone | CT |

The purpose of today's meeting is to review the progress Samuel has made towards his IEP goals. Team members introduced themselves.

Parent Input

Ms. Harling reported that she is concerned about Samuel and making sure that he gets what he needs. She is especially concerned about Samuel not getting his OT services.

OT Report

Ms. Lambert participated via telephone. She reported that since working with Samuel from Sept 2006 she has noticed that he does not have any motor problems. He can write, hold pencils, cut and is beginning to write in cursive. Samuel just chooses not to do his work. In her professional opinion Samuel has met his goals and he no longer requires the service. She is recommend that he be exited from OT.

Ms. Harling does not agree with this decision, especially since Samuel missed so much service prior to this year. Ms. Harling was informed that Samuel is still owed OT services for compensatory ed. (missed service) for that time period when

The Parent ☑ is present ☐ is not present at the meeting.

The evaluation recommended services but the service was not provided. This service should be made up in summer school 2007.

Ms Lambert agreed to retest Samuel on 6/4/07, and Ms. Harling gave verbal permission for her to do so. Ms Harling requested this testing to ensure that Samuel has indeed met all of his goals.

The team requested that a comprehensive Psychological evaluation be completed to look at Samuel's emotional state as he continues not to produce work in the classroom.

Ms. Harling stated that she is working with an attorney and they may do independent evaluation.

The annual goals were reviewed and accepted.

The OT service will remain on IEP pending the evaluation that will be completed on 6/4/07.

On advise from Ms Harling's attorney she did not feel comfortable with signing the documents.

DCPS reiterated that we would like to complete a comprehensive psychological eval. to address the issue of not completing any work in the class.

The classroom teacher reported that Samuel still is not doing any work in the classroom and he is saying inappropriate

## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## WASHINGTON, D.C.
## INDIVIDUALIZED EDUCATIONAL PROGRAM

DCPS - IEP Page 1 of 4

Additional Comments: ☐

### I. IDENTIFICATION INFORMATION

Student Name: Last **Mingle**    First **Samuel**    MI

Student ID **9103128**    Soc. Sec. No. **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**    Age: **10**    Grade **04**

Gender ☒M ☐F    Date of Birth **02/06/1997**    Ethnic Group **Black**

Address **4065**    Minnesota Ave
House No    Street Name

NE    204
Quadrant    Apartment #

Washington    DC    20019
City    State    Zip Code

☐ Non-attending

Attending School **Benning Elementary**    Home School

☒ Elem. ☐ Mid/JHS ☐ SHS ☐ CWS /

Parent **Annette Harling**

Address of (if different from student):    ☒ Parent ☐ Guardian ☐ Surrogate

House No    Street Name    Quad    Apt. No    City    State    Zip Code
Telephone: Home **(202) 575-0228**    Work

### II. CURRENT INFORMATION

Date of IEP Meeting: **05/31/2007**

Date of Last IEP Meeting: **05/23/2006**

Date of Most Recent Eligibility Decision: **09/13/2005**

Purpose of IEP Conference:
☐ Initial IEP    ☒ Review of IEP
☐ Requested Eval.    ☐ 3yr ReEval.

Indicate Level of Standardized Assessment:
**Level III**

ADDENDA TO BE ATTACHED AS NEEDED
Check the appropriate box(es)

| ☐ BEHAVIOR | ☐ TRANSPORTATION |
| ☐ ESY | ☐ TRANSITION |

### III. LANGUAGE

| | Language | Language Used for Evaluation | Language Used in Conference | Communication Requirements | To be completed by Office of Bilingual Education English and Math Proficiency Assessment |
|---|---|---|---|---|---|
| Student | English | English | English | Native Language | Oral |
| Parent | English | English | English | Native Language | Rdg./Written Instrument: |
| Home | English | English | English | Native Language | Date: |

### IV. SPECIAL EDUCATION AND RELATED SERVICES SUMMARY

| SERVICES | GenEd Ses. | GenEd Time | Total | SpecEd Ses. | SpecEd Time | Total | Hr./Min | D/W/M | PROVIDER (by discipline) | BEGINNING DATE mm/dd/yyyy | # | DURATION wks/mos |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Speech-Language | 0.00 | 0.00 | 0.00 | 1.00 | 30.00 | 30.00 | Mins | Week | Speech and Language Thera | 06/01/2007 | 10 | Mo |
| OT | 0.00 | 0.00 | 0.00 | 1. | | 0.00 | hr | Week | Occupational Therapi | 6/1/2007 | 10 | Month |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |

**TOTAL HOURS:** 0.00    1.50    **Total Combined Hours Per Week:**

### V. Disability(ies) Speech and Language Impaired

Percent of time in Specialized Instruction and Related Services
☒ 0-20%    ☐ 21-60%    ☐ 61-100%

☐ (Check if setting is general Ed.)

Percent of time NOT in a General Education Setting **5.00%**

### VI. IEP TEAM (Participants in the development of the IEP)    Print and sign your name below.

Annette Harling
Parent

Keith Norman
Special Ed    *[signature: Keith Norman]*

Vanessa Geridean
General Ed Teacher

Rhoda Matthews
LEA Representative    *[signature: Rhoda Matthews]*

Rhoda Matthews
Principal or Designee

Student
Pamela Perkins
Speech Therapist    *[signature: Pamela Perkins]*

*I AGREE* with the contents of this IEP. I have had an opportunity to be involved in the development of this IEP. I have received a copy of this IEP and consent to the implementation of the services in the IEP. I have received a copy of the procedural safeguards and parent rights pertaining to special education.
Parent/Guardian Signature    Date

District of Columbia Public Schools    04-02-2004    Division of Special Education    Appendix - A    IEP Page 1 of 4

| Student Name | Samuel | Mingle | Home School | Benning ES | | DCPS - IEP |
|---|---|---|---|---|---|---|
| Student ID Number | 9103128 | DOB  02/06/1997 | Attending School | Benning ES | | Page 2 of 4 |

## VII. Present Educational Performance Levels in Areas Affected by the Disability

Additional Comments: ☐

**Academic Areas: (Evaluator)**

Math Strengths:

Impact of disability on educational performance in general education curriculum:

Reading Strengths-

Impact of disability on educational performance in general education curriculum-

**Score(s) When Available**

Math Cal. _____ _____
Math Rea. _____ _____
See goal page: _____
Date: _____

Rdg. Com _____ _____
Rdg. Basic _____ _____
Written Ex. _____ _____
See goal page: _____
Date: _____

---

**Communication (Speech & Language) (Evaluator)**  P. Perkins, Speech-Language Therapist
Strengths-

Samuel's vocal quality, pitch, rate of speech, and fluency were within functional limits.

Impact of disability on educational performance in general education curriculum:

Weaknesses in clarity of speech and sentence formulation (grammatical constructions) may impact oral activities in his class.

**Score(s) When Available**

| | | |
|---|---|---|
| Exp.Lang. | SS | 89 |
| Rec-Lang. | SS | 85 |
| Artic | Below | Average |
| Voice | WNL | |
| Fluency | WNL | |
| Exp. Voc. | SS | 73 |
| Rec. Voc. | SS | 82 |

See goal page:
Date:    06/02/2005

---

**Motor/Health (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) /Results When Available**

_____ _____
_____ _____
See goal page: _____
Date:

---

**Social Emotional Behavioral Areas: (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

_____ _____
_____ _____
See goal page: _____
Date: _____

---

**Cognitive/Adaptive Behavior: (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

_____ _____
_____ _____
See goal page: _____
Date: _____

---

**Prevocational Skills: (Evaluator)**
Strengths:

Impact of disability on educational performance in general education curriculum:

**Score(s) When Available**

_____ _____
_____ _____
See goal page: _____
Date: _____

| Student Name | Samuel | Mingle | HomeSchool | Benning ES | DCPS - IEP |
|---|---|---|---|---|---|
| Student ID Number | 9103128 | DOB 02/06/1997 | Attending School | Benning ES | Page 3 of 4 |

**VIII. SPECIALIZED SERVICES**    Additional Comments ☐                          Goal Number   1

Area addressed by goal:  Communication (Speech/Language)

**ANNUAL GOAL: (Including mastery criteria.)**

Samuel will improve expressive communication skills by completing the short-term objectives with 80% accuracy.

Provider(s):  Speech-Language Pathologist

Consider audience, behavior, condition, degree and evaluation.

| SHORT-TERM OBJECTIVES (include mastery criteria or benchmarks) | Date Mastered | Evaluation Schedule |
|---|---|---|
| Samuel will speak with clarity (correct production of sounds, production of word endings, appropriate vocal intensity levels) during daily speaking activities with 80% accuracy. | | Monthly |
| Samuel will maintain clarity of speech during recitations, monologues, discussions, and reading activities with 80% accuracy. | | Monthly |
| Samuel will formulate sentences using appropriate grammatical constructions with 80% accuracy. | | Monthly |
| | | |
| | | |
| | | |

**EVALUATION PROCEDURE(S)**

☐ Portfolio  ☐ Log  ☐ Chart  ☒ Test  ☐ Documented Observation  ☐ Report  ☐ Other _____

DRAFT

| Student Name | Samuel | Mingle | | Managing School | Benning Elementary | | DCPS - IEP |
|---|---|---|---|---|---|---|---|
| Student ID Number | 9103128 | | DOB 02/06/1997 | Attending School | Benning Elementary | | Page 4 of 4 |

Additional Comments: ☐

## IX. LEAST RESTRICTIVE ENVIRONMENT (LRE) DETERMINATION
### SERVICE ALTERNATIVES

Can curricular modification, accommodation and/or supplemental aids and services be used for a LRE setting in general education?  ☐ Yes ☒ No

Explanation for removal out of regular education classroom.

The student requires speech services outside of the general edcuation classroom.

## X. Supplementary Aids and Services

| Classroom Needs (Do not name products or companies.) | SETTING | | | FREQUENCY | | PROVIDER (by discipline) | BEGINNING DATE (mm/dd/yyyy) |
|---|---|---|---|---|---|---|---|
| | GenEd | SpEd | Total | Hr./Min | D/W/M. | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

Check and list modifications and/or accommodations for testing: ☐ None needed

Timing/Scheduling: Allowance of extra think time when awaiting oral response from student or expecting student to follow through with request

Setting:

Presentation:

Response: Specific praise for appropriate behavior, improvement in work, effort

Equipment: Specific limits, clear consequences defined in advance - consequences in effect immediately and consistently

## XI. STATE AND DISTRICT ASSESSMENTS:

☐ Level I  Tested with non-disabled peers under standard conditions without accommodations.

☒ Level II  (Describe accommodations for level II) Tested under standard conditions with special accommodations.

☐ Level III  (Describe non-uniform conditions for level III) Tested under non-standard conditions with permissible accommodations

☐ Level IV  (Describe the alternative assessment)

☐ Level V  Portfolio:

## XII. Areas Requiring Specialized Instruction and Related Services:    Modifications:

☐ Reading
☐ Mathematics
☐ Written Expression
☐ Other:
☒ None

☐ Physical/Sensory
☐ Social Emotional
☐ Physical Development

☐ Transition
☐ Vocational
☐ Independent Living
☒ Speech/Language

☒ Language Arts/English
☐ Social Sciences
☐ Biological & Physical Sciences
☐ Fine Arts

Apply annual goal(s), objectives and/or modifications to address barriers in each area checked above.

## XIII. PLACEMENT CONSIDERATIONS AND JUSTIFICATION

| DESCRIBE CONSIDERATIONS | ACCEPT/REJECT REASONS | POTENTIAL HARMFUL EFFECTS |
|---|---|---|
| In General Education Classroom Setting | Rejected | Continued school failure |
| Combination General Education and Resource Classro | Accepted | Specific scheduling to accommodate for related ser |
| Out of General Education Classroom | Rejected | Exposure to general education curriculum |

Modification(s)/Accommodation(s) to address the harmful effects:

Specific scheduling to accommodate for related service sessions

DRAFT

DISTRICT OF COLUMBIA PUBLIC SCHOOLS
SPECIAL EDUCATION

MULTIDISCIPLINARY TEAM (MDT)

Prior to Action Notice

Check Purpose:
☐ Initial Evaluation
☐ Initial Placement
☒ Reevaluation
  ☐ Change In Category Exit
  ☐ Related Service Add
  ☐ Related Service
  ☐ Change In Placement
  ☒ Annual
  ☐ Other _____

Date 05/31/2007

Student Samuel Mingle                    DOB 02/06/1997

School Benning Elementary

Current Disability Category   SLI

Setting   Combination general education and resource classroom

Dear Annette Harling

State and federal laws regarding students with disabilities require school systems to notify and inform parents of certain changes being made to their children's education program.
Therefore, you are being notified of the following proposed changes:
☒ Proposes to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☐ Refuses to initiate or change the identification, evaluation, educational placement or provision of FAPE to your child.
☐ Other _____

A multidisciplinary team (MDT), of which you were an invited member, has made the following decisions about your child: (check all that apply)

☐ Your child is not eligible for special education service(s).
☒ Your child is eligible or continues to be eligible to receive special education services as a student with  SLI
☒ Your child will begin receiving  Speech-Language _____ as a related service(s).
☐ Your child will no longer receive _____ as a related service(s).
☐ Your child's category of disability is being changed from _____ to _____
☐ Your child's alternative placement on continuum (next setting) is being changed,
   from _____ to _____
☐ Your child is no longer eligible and will be exited from the special education program.
☐ Other: _____

Location of Services  Benning Elementary

**Description and Explanation of agency action proposed or refused.**

Based on a review of the documentation, the MDT proposed the following setting:
Combination.

**Description of Other Options Considered and reasons for rejection of each option**

General Education and Out of General Education were rejected.  The student requires a
combination setting in order to access the general education curriculum.

Other relevant factors to the decision-  School based data

MDT Members:  ☒ Principal or Designee      ☒ General Education Teacher      ☐ Psychologist
              ☒ Parent                     ☒ Special Education Teacher      ☐ Other: _____
              ☐ Student                     ☒ Speech and Language
              ☐ Social Worker               ☒ *LEA & Interpreter (*may be one)

Parents may bring individuals to participate in the MDT meeting. These participants should have knowledge or special expertise regarding the child. The following individuals invited by parent:

Any questions you may have concerning your child's program may be directed to the principal.
You are protected under the Procedural Safeguards for parents, which are enclosed for your information.
If I can be of assistance to you, or have questions regarding the Procedural Safeguards,
please contact Rhoda Matthews                    at (202) 724-4586        (school telephone number).

**See attachments for - EVALUATION PROCEDURES, TEST, RECORDS OR REPORTS USED**

MDT Prior to Action Notice
07-02-2001

DRAFT

Last Updated By:

## DOCUMENTED LEVEL OF SERVICE
Complete and attach to MDT/IEP meeting notes

| | | |
|---|---|---|
| School   Benning Elementary | Principal   Darwin Bobbitt | Special Education Coordinator   Rhoda Matthews |
| Date: 05/31/2007   Case Manager   Desmond Williams | | Assistant Director   Elva Gloster |

Student   Samuel          Mingle          DOB 02/06/1997  Age 10  Grade  04  ID# 9103128          SSN# 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

Parent  Annette Harling                    Telephone (H) (202) 575-0228          (W)

Address: 4065     Minnesota Ave               NE  204     Washington                    DC     20019
        Street #    Street                    Quad  Apt. No.    City                    State   Zip Code

REFERRAL SOURCE: (Check)   [ ] 120 Day   [ ] Reeval.   [ ] IIOD   [ ] SA   [ ] MA   [X] Annual

[ ] Nonpublic   [ ] Residential   [ ] Citywide   [ ] Courts   [X] Local School   [ ] Other:

Previous least restrictive environment (LRE Setting):   Combination general education and resource classroom

## JUSTIFICATION FOR SETTING CONSIDERATION
(Submit TAT/MDT Documentation)

### SUPPORTIVE DATA/DOCUMENTATION

| 2. ACCOMMODATIONS/MODIFICATIONS | 3. DATA REQUIREMENTS | | |
|---|---|---|---|
| Allowance of extra think time when awaiting oral response from student or expecting student to follow through with request | Current IEP | Yes [X] | No [ ] |
| | Signatures of required participants (MDT notes) | Yes [X] | |
| | Intervention Behavior Plan | Yes [ ] | |
| | Copies of current class work and home work assignments: | Yes [X] | |
| | Medical Reports: | Yes [ ] | No [ ] |
| | Clinical Reports: | Yes [ ] | No [ ] |
| | Psychiatric Reports: | Yes [ ] | No [ ] |
| | Medications: | Yes [ ] | No [X] |
| | Attendance Record | Yes [X] | |
| | Copies of most recent evaluation(s) | Yes [X] | |

| 4. Results of all interventions (TAT, MDT, etc. and attach meeting notes.) | 5. Resources needed for program implementation |
|---|---|
| 5/23/2007 IEP Meeting | None needed |

## 6. CURRENT SETTING CONSIDERATIONS

| ROW | SETTING in neighborhood school (Determined through the IEP team.) | SERVICE PROVIDER (Based on documented need) | LEVEL OF SERVICE (Based on documented need) |
|---|---|---|---|
| 1 | [ ] in general education classroom setting | [ ] general educators with consultation from special education staff | [ ] between 0% and 20% of service time |
| 2 | [ ] combination general education and resource classroom | [ ] combination of general educators, special educators and related service providers | [ ] between 21 % and 60% of service time |
| 3 | [ ] *out of general education classroom | [ ] special educators and related service providers | [ ] between 61 % and 100% of service time |

*In providing or arranging for the provision of nonacademic and extracurricular service and activities, including meals, recess period, and the services and activities, each public agency shall ensure that each child with a disability participates with non-disabled children in those services and activities (300.306) to the maximum extent appropriate to the needs of that child. (300.553) Nonacademic settings).

### Check the level of need as indicated:
### DIRECTIONS:

| If two or three boxes are checked in the Row 1, check LOW. If two or three boxes are checked in the Row 2, check MODERATE. If two or three boxes are checked in the Row 3, check HIGH. | If one box is checked in each row, check either MODERATE or HIGH, depending on the need of the student. |
|---|---|

## 7. LEVEL OF NEED

| [ ] LOW | [ ] MODERATE | [ ] HIGH |
|---|---|---|

07-02-2001                                    Attention: Technical Support Supervisor, Compliance Team

# EXHIBIT

# K

# CAROLYN W. HOUCK
*Attorney at Law*
8801 Connecticut Avenue, 701 North
Chevy Chase, MD 20815

Admitted in Maryland
& The District of Columbia

Tel: (301) 951-4278
Fax: (301) 951-4248

July 19, 2007

By Facsimile

Paula Perelman, Esq.,
Office of Mediation and Compliance
District of Columbia Public Schools
Washington, D.C. 20002

Re:    Samuel Mingle
       Request for Funding of Independent Evaluation (Speech/Language)

Dear Ms. Perelman:

Enclosed please find a DCPS Speech/Language Evaluation Report for Samuel Mingle. The evaluator did not perform a complete and adequate evaluation, especially as it is used as a basis for determining that Samuel's only disability is speech/language impaired. The parent is requesting that DCPS fund an independent speech/language evaluation. Please provide me with written documentation that DCPS will fund such an evaluation or take the other steps required by 34 C.F.R. 300.502. According to the federal regulations, DCPS may not unreasonably delay this process. If you are not the correct person to receive this, please forward this to that person and advise me of your actions.

Thank you very much for your attention to this matter.

Sincerely,

Carolyn Houck

$SM\ 23$

**HP LaserJet** *3050*

# Fax Call Report



Carolyn Houck

Jul-19-2007   2:18PM

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
|-----|------|------|------|----------------|----------|-------|--------|
| 3112 | 7/19/2007 | 2:17:27PM | Send | 2024425517 | 1:15 | 5 | OK |

CAROLYN W. HOUCK
*Attorney at Law*
8101 Connecticut Avenue, 701 North
Chevy Chase, MD 20815

Admitted to Maryland
& The District of Columbia

Tel: (301) 951-4278
Fax: (301) 951-4248

Facsimile Cover Page

Date: _____

To: *Omc* _____

_____

_____

_____

Fax Number: _____

From:   Carolyn Houck _____

Total number of Pages (including cover sheet): _____

Comments: *Re: Samuel Miegle — OT*
*S/L*

## CAROLYN W. HOUCK

*Attorney at Law*
8801 Connecticut Avenue, 701 North
Chevy Chase, MD 20815

Admitted in Maryland
& The District of Columbia

Tel: (301) 951-4278
Fax: (301) 951-4248

July 19, 2007

By Facsimile

Paula Perelman, Esq.,
Office of Mediation and Compliance
District of Columbia Public Schools
Washington, D.C. 20002

Re:    Samuel Mingle
       Request for Funding of Independent Evaluation

Dear Ms. Perelman:

Enclosed please find a DCPS Occupational Therapy Evaluation Report for Samuel Mingle. The evaluator did not perform a complete evaluation. Furthermore, the evaluator did not obtain the parent's consent. In fact, she did not even know that the evaluation had been performed until more than two years after the fact. The parent will not accept the evaluation and report. Samuel has some serious OT issues. The parent is requesting that DCPS fund an independent occupational therapy evaluation. Please provide me with written documentation that DCPS will fund such an evaluation or take the other steps required by 34 C.F.R. 300.502. According to the federal regulations, DCPS may not unreasonably delay this process. If you are not the correct person to receive this, please forward this to that person and advise me of your actions.

Thank you very much for your attention to this matter.

Sincerely,

Carolyn Houck

Carolyn Houck

SM 14

**HP LaserJet** *3050*

# Fax Call Report



Carolyn Houck

Jul-19-2007   2:10PM

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
|-----|------|------|------|----------------|----------|-------|--------|
| 3111 | 7/19/2007 | 2:08:36PM | Send | 2024425517 | 2:05 | 8 | OK |

CAROLYN W. HOUCK
*Attorney at Law*
8101 Connecticut Avenue, 701 North
Chevy Chase, MD 20815

Admitted in Maryland
& The District of Columbia

Tel: (301) 951-4278
Fax: (301) 951-4248

Facsimile Cover Page

Date: _____

To: _O mc_____

_____

_____

_____

Fax Number: _____

From: ___Carolyn Houck_____

Total number of Pages (including cover sheet): _____

Comments: _Re: Samuel Mingle -0T_

# EXHIBIT

# L

Please schedule hearing for this student on a Tuesday or Wednesday.
Please do not schedule a hearing on a Monday, Thursday, or Friday.
Thank you.

Justification for Expedited Hearing: During SY 2006/07, Samuel Mingle was continually suspended from his local elementary school, including not being allowed to attend the last two weeks of school. He was required to attend summer school, but was threatened with expulsion by the second day. Under the circumstances, Samuel cannot return to his local school.

## DUE PROCESS COMPLAINT NOTICE
### Request for Expedited Hearing
Samuel Mingle vs. DCPS
August 1, 2007

| | |
|---|---|
| **Petitioner:** | Annette Harling |
| **Student:** | Samuel Mingle |
| **DOB:** | February 6, 1997 |
| **Current School:** | Benning E.S. |

**Petitioner's Residence:** 3650 Minnesota Avenue #203
Washington, D.C. 20019

**Contact Information for Special Education Purposes:**
Carolyn W. Houck
8101 Connecticut Avenue, 701 North
Chevy Chase, MD 20815
Tel: 301-951-4278
Fax: 301-951-4248

**Violations and Supporting Facts:**

1. Failure to obtain consent prior to evaluating Samuel and failure to provide report to parent. DCPS performed an occupational therapy evaluation on Samuel in February 2004. The report revealed that Samuel requires occupational therapy. The report was not shared with the parent until May 2006, and Samuel has not received occupational therapy.

2. Failure to perform adequate occupational therapy evaluation in February 2004. DCPS did not complete the evaluation (did not test in all areas).

3. Failure to evaluate in all areas of suspected disabilities. DCPS has been on notice for well more than a year that Samuel requires a functional behavioral assessment and a clinical psychological evaluation. DCPS did not perform the evaluations.

4. Failure to provide due process rights when suspending Samuel. Despite repeated and continual suspensions during SY 2006/07, including a two-week suspension beginning June 1, 2007, DCPS never complied with any portion of the federal regulations regarding disciplinary procedures.

5. Failure to provide occupational therapy during school year 2004/05. The February 2004 DCPS occupational therapy evaluation report recommended occupational therapy, which DCPS did not provide.

6. Failure to perform adequate speech/language evaluation in June 2005.

7. Failure to develop adequate IEP on September 13, 2005. There is no basis for determining that Samuel's disability is "speech/language impaired." DCPS did not review the February 2004 OT evaluation report. There are no occupational therapy goals, and occupational therapy is not listed as a related service on the IEP. The present level page is virtually blank. The one goal page has vague and not-measurable objectives. There is no provision for specialized instruction.

$5m\ 15$

8. Failure to fully implement IEP during SY 2005/06, including summer 2006. The IEP states that Samuel will be in special education for part of the day; however, Samuel remained in regular education for the entire school day. DCPS required the mother to transport Samuel to Smothers ES during summer 2006 so that he could receive the required occupational therapy. It was not provided.

9. Failure to provide occupational therapy during school year 2005/06. DCPS still had not reviewed the February 2004 occupational therapy report.

10. Failure to provide appropriate school placement for SY 2005/06. According to the meeting notes, Samuel was not demonstrating that he is learning anything.

11. Failure to develop adequate IEP on May 23, 2006. Although DCPS has determined that Samuel is speech/language impaired, there was no speech therapist at the meeting. There is no basis for determining that Samuel's disability is "speech/language impaired." The present level page is virtually blank and does not reflect "present levels." The goals/objectives are vague and not measurable. The speech/language goal page is simply a photocopy of the prior year's IEP. There is no provision for specialized instruction, despite the fact that Samuel has academic difficulties.

12. Failure to develop adequate compensatory education plan on May 23, 2006. DCPS did not account for the fact that Samuel had not received occupational therapy for two school years.

13. Failure to provide compensatory education, as agreed to on May 23, 2006. The mother reports that no compensatory education was provided.

14. Failure to provide appropriate school placement for SY 2006/07. The school called the parent on almost a daily basis during SY 2006/07, requiring the parent to remove Samuel from the school grounds. When the parent was not available, the school began calling the emergency numbers. The calls would begin within 15 minutes after Samuel arrived at school. The IEP was not implemented, as Samuel missed so much school. Although Samuel was performing at grade level during SY 2005/06, by the end of SY 2006/07, he had fallen so far behind that the school recommended that he be retained.

15. Failure to provide appropriate summer program during summer 2007. Although DCPS required Samuel to attend summer school, due to failing grade, by the second day of summer school, he was facing immediate expulsion.

16. Failure to hold legally valid MDT/IEP meeting on May 31, 2007. The team was composed of only the special education coordinator and a special education teacher (neither of whom had any role in Samuel's education during the school year), the speech/language therapist, and the parent.

17. Failure to develop adequate IEP on May 23, 2007 for SY 2007/08. There is no basis for determining that Samuel's disability is "speech/language impaired." The present level page is virtually blank and does not reflect "present levels." The goals/objectives are vague and not measurable. The speech/language goal page is simply a photocopy of the prior year's IEP. There is no provision for specialized instruction, despite the fact that Samuel has academic difficulties.

18. Failure to evaluate prior to exiting Samuel from occupational therapy in May 2007. DCPS exited Samuel from occupational therapy, without an evaluation and without ever providing him services. At the parent's insistence, DCPS agreed to retest Samuel in June 2007. However, DCPS suspended Samuel on June 1, 2007 for "the rest of the school year."

19. Failure to provide appropriate school placement for SY 2007/08. Samuel's IEP reflects that he will be returning to the same program (possibly the same grade) at Benning E.S., where he failed miserably during SY 2006/07. There is no provision for specialized instruction to address the fact that he regressed significantly during SY 2006/07; there are no occupational therapy goals; there is no behavioral plan; there is no provision for therapeutic intervention.


Proposed resolution:
1. The hearing officer will find that DCPS denied the student a free appropriate public education due to the violations alleged in paragraphs 1 through 19 above.

2. DCPS will fund Samuel's placement at a private school that can provide academic benefit during SY 2007/08.

3. If the parent has unilaterally enrolled Samuel in a private school prior to the due process hearing, DCPS will fund that placement going back to the time of enrollment and will continue funding the placement until such time as DCPS provides an appropriate placement.

4. DCPS will fund independent psychoeducational, clinical, occupational therapy, speech/language, functional behavioral, and social history evaluations.

5. Within ten (10) calendar days following the receipt of the last independent evaluation report, DCPS will reconvene the MDT/IEP meeting to review the student's evaluation reports, revise and update the IEP as appropriate, and develop a compensatory education plan.

6. DCPS will fund the parent's compensatory education plan for its failure to provide a free appropriate public education during school years 2005/06 and 2006/07.

7. DCPS will send all notices and schedule all meetings through parent's counsel in writing, via facsimile to 301-951-4248, with copies to the parent in writing by first class mail.

8. DCPS will provide parent's counsel with copies of all DCPS evaluation reports and all educational records for the student no later than sixteen (16) business hours prior to the convening of any meeting related to the student. D.C. MUN.REGS. Tit. 5 § 3021.8 (2003).

9. Within ten (10) days of the filing of this complaint, DCPS will provide parent's counsel (via facsimile to 301-951-4248) the following: (i) an explanation of why DCPS proposed or refused to take the action raised in the complaint, (ii) a description of other options that the IEP team considered and the reasons why those options were rejected, (iii) a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action, and (iv) a description of the other factors that are relevant to the agency's proposed or refused action.

10. In the event that DCPS fails to answer/respond to the issues alleged in the parent's request for a due process hearing within ten (10) calendar days of the filing of the complaint, the arguments and facts as averred by the parent will be deemed true and accurate and act as a waiver on the part of DCPS for their desire to have a Resolution Meeting. The due process hearing will then be scheduled pursuant to the applicable timelines contained in the IDEIA.

11. Within fifteen (15) calendar days of receiving the complaint, DCPS will respond to the complaint, alleging any insufficiency of notice. 34 C.F.R. § 300.508(d)

12. DCPS' failure to comply with 34 C.F.R. § 300.508(d) and allege any insufficiency of the complaint will constitute a waiver on the part of DCPS to make such argument at any later date and time.

13. DCPS will contact parent's counsel to schedule a Resolution Session. Method of communication will be by facsimile to 301-951-4248. DCPS will comply with all applicable federal and local procedures and timelines.

14. DCPS will convene the Resolution Session with the parent, the parent's representative, and all necessary/relevant members of the student's MDT/IEP Team that have specific knowledge about the student and the facts contained in the complaint. The relevant members of the MDT/IEP team that will be present at the meeting will include the student's special education teacher, the student's regular education teacher, a representative of the local education agency with decision making authority, a person who can interpret the data, any persons who conducted any assessments on the student, and any service providers for the student. 34 C.F.R. § 300.510(a).

15. DCPS' failure to schedule and convene the Resolution Session within the applicable timeframe shall constitute a joint waiver between DCPS and the parent to have the meeting. The forty-five (45) day timeline to hold the student's due process hearing and receive a timely decision will begin to run upon written notice, via facsimile to 202-698-3825 (Student Hearing Office) by parent's counsel.

16. Should the hearing for this student not take place within the timeframe dictated in D.C. MUN.REGS. Tit. 5 § 3030.1, DCPS will be found to have violated the 45-day time line. DCPS

will provide the parent with a due process hearing within 15 calendar days of a request on any issue arising out of the noncompliance with DCPS' obligations hereunder, or any disagreement that the parent may have with the assessment, programming, or placement of the student. Such issues may be raised at the hearing, with or without an amended hearing request.

17. In all matters related to the filing of this complaint, DCPS will communicate with the parent solely through parent's counsel.

18. DCPS will pay parent's counsel for the parent's reasonable attorney fees and related costs incurred in bringing and pursuing this case.

19. The hearing officer will find that the parent is the prevailing party in this action.


Carolyn W. Houck, Attorney for Parent

08/06/2007  13:54     2025353215                    SEID OMPC                    PAGE  08/13

# STATE EDUCATION AGENCY
# DISTRICT OF COLUMBIA PUBLIC SCHOOLS

| | | |
|---|---|---|
| In the Matter of: | ) | BEFORE A SPECIAL EDUCATION |
| | ) | |
| Mingle, S.                    Petitioner | ) | |
| | ) | HEARING OFFICER |
|           Vs. | ) | |
| | ) | |
| PUBLIC | ) | |
| Benning ES | | |
| | ) | DISTRICT OF COLUMBIA |
| | | |
|           Respondent | ) | PUBLIC SCHOOLS |

## SCHEDULING MEMORANDUM

1.   A due process complaint notice and request for due process hearing has been received by
     the Student Hearing Office in the State Enforcement & Investigation Division. Pursuant
     to 20 U.S.C. § 1415(f)(1)(B), prior to the opportunity for an impartial due process
     hearing, the Local Educational Agency shall convene a resolution meeting with the
     parent(s) and the relevant member or members of the IEP Team who have specific
     knowledge of the facts identified in the complaint within 15 calendar days of receiving
     notice of the parents' complaint. The meeting shall include a representative of the Local
     Educational Agency who has decision-making authority. The Local Education Agency is
     responsible for scheduling the resolution meeting in consultation with the parent. The
     Student Hearing Office does not schedule or participate in resolution meetings.

2.   The complaint notice was filed on **August 1, 2007**

3.   The deadline for the resolution meeting is **August 16, 2007** unless the parent and
     Local Educational Agency agree in writing to waive such meeting, or agree to refer
     the case to a mediator for mediation.

### RESPONSE TO THE COMPLAINT

A.   *Prior Written Notice Not Issued by the Local Educational Agency*.  If the Local
     Educational Agency has not sent a prior written notice to the parent regarding the subject
     matter contained in the parent's due process complaint notice, the Local Educational
     Agency shall, within 10 days of receiving the complaint, send to the parent a response
     that shall include:

     1.   An explanation why the Local Educational Agency proposed or refused to take
          action raised in the complaint;
     2.   A description of other options that the IEP Team considered and the reasons why
          those options were rejected;
     3.   A description of each evaluation procedure, assessment, record, or report the
          agency used as the basis for the proposed or refused action, and

Rev'd. 7/6/05

# EXHIBIT

# M

AUG-23-2007 15:31 From:                                    To:3019514248              P.2/3



Rock Creek Academy, Inc.
4401 Connecticut Ave., NW
Washington, DC 20008
202.378.1400

August 23, 2007

Carolyn Houck, Esq.
5505 Connecticut Ave., N.W., # 174
Washington, D.C. 20015

### Re: <u>Samuel Mingle</u>
### DOB: 2/6/97

Dear Carolyn,

Thank you for referring Samuel Mingle to Rock Creek Academy. We have reviewed this information and feel that Rock Creek Academy can provide the required and appropriate services for Samuel. We will contact Ms. Annette Harling to schedule a follow up interview and tour of our facility. Currently we have limited space available. We can enroll Samuel upon receipt of funding, pending space availability. Funding may be secured through parent payment, a DCPS Notice of Placement, or the results of a due process hearing or court order.

A copy of this referral packet has been forwarded to the office of Ruth Blake, Executive Director of the Non-Public Unit at DCPS.

If you have any questions or concerns regarding this referral, please contact me at the above listed number. Thank you for considering Rock Creek Academy as a possible placement for your client.

Sincerely,

Keren Plowden, MA
Executive Director of Student Services

Cc:    Ruth Blake, Director, Non Public, Charter, Interagency Program

rockcreekacademy.org

SM Ko

# EXHIBIT

# N

# CAROLYN W. HOUCK

*Attorney at Law*

8101 Connecticut Avenue N701
Chevy Chase, MD 20815

Admitted in Maryland
& The District of Columbia

Tel: (301) 951-4278
Fax: (301) 951-4248

August 23, 2007

Ms. Paula Perelman, or Acting Director
Office of Mediation and Compliance
District of Columbia Public Schools
Office of Special Education

Re:     Samuel Mingle, DOB: February 6, 1997
        10-day Notice of Unilateral Placement
        Current School: Benning E.S.

Dear Ms. Perelman or Acting Director:

DCPS has failed to provide an appropriate placement for Samuel Mingle for school year 2007/08. Pursuant to 34 C.F.R. Sec. 300.148, I am informing DCPS that the parent intends to place Samuel in a private school, at DCPS' expense, ten days from today unless DCPS takes all necessary steps to provide an appropriate placement. Samuel regressed significantly during school year 2006/07, as a result of almost daily suspensions during the year and in summer school, all without due process. He is slated to return to the same inappropriate program for school year 2007/08. Obviously, the parent is extremely hesitant to subject her son to such unconscionable treatment again.

Sincerely,

Carolyn Houck

Carolyn Houck

Copy:   Office of the General Counsel

*5 m 17*

**HP LaserJet** *3050*

# Fax Call Report



Carolyn Houck

Aug-23-2007   6:06PM

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
|-----|------|------|------|----------------|----------|-------|--------|
| 3518 | 8/23/2007 | 6:05:12PM | Send | 2024425098 | 0:46 | 2 | OK |

CAROLYN W. HOUCK
*Attorney at Law*
8101 Connecticut Avenue, 701 North
Chevy Chase, MD 20815

Admitted in Maryland
& The District of Columbia

Tel: (301) 951-4278
Fax: (301) 951-4248

**Facsimile Cover Page**

Date: _____

To: 1) OMC
    2) OGC
    _____
    _____

Fax Number: _____

From:   Carolyn Houck

Total number of Pages (including cover sheet): _____

Comments: Re: *[handwritten]*
          *Samuel Mingle — resending with*
          *[handwritten]*

          *Re: Josephin Mitchell*

# HP LaserJet *3050*

# Fax Call Report



Carolyn Houck

Aug-23-2007    4:48PM

| Job | Date | Time | Type | Identification | Duration | Pages | Result |
|------|-----------|-----------|------|------------|----------|-------|--------|
| 3499 | 8/23/2007 | 4:23:54PM | Send | 2024425517 | 0:56 | 2 | OK |
| 3500 | 8/23/2007 | 4:24:55PM | Send | 2024425098 | 0:00 | 0 | Busy |
| 3501 | 8/23/2007 | 4:26:19PM | Send | 2024425098 | 0:00 | 0 | Busy |
| 3504 | 8/23/2007 | 4:32:03PM | Send | 2024425098 | 0:00 | 0 | Busy |
| 3506 | 8/23/2007 | 4:37:32PM | Send | 2024425098 | 0:00 | 0 | Busy |
| 3508 | 8/23/2007 | 4:43:00PM | Send | 2024425098 | 0:00 | 0 | Busy |
| 3510 | 8/23/2007 | 4:48:26PM | Send | 2024425098 | 0:00 | 0 | Busy |

CAROLYN W. HOUCK
*Attorney at Law*
8101 Connecticut Avenue, 701 North
Chevy Chase, MD 20815

Admitted in Maryland
& The District of Columbia

Tel: (301) 951-4276
Fax: (301) 951-4248

**Facsimile Cover Page**

Date: _____

To: 1) *Ome*
    2) *OGC*
    _____

Fax Number: _____

From: Carolyn Houck

Total number of Pages (including cover sheet): _____

Comments: Re: *Chickens Cooperators*
           *Samuel Mingle*



## DISTRICT OF COLUMBIA PUBLIC SCHOOLS

OFFICE OF THE CHANCELLOR
825 North Capitol Street, NE, 9TH Floor
Washington, D.C., 20002-1994
(202) 442-5885 – fax: (202) 442-5026

Ms. Carolyn W. Houck
8101 Connecticut Avenue, 701 North
Chevy Chase, MD 20815

August 30, 2007

**By Facsimile: 301-951-4248**

**RE:    Samuel Mingle**

Dear Ms. Houck:

I am writing in response to your letter dated August 23, 2007 in which you inform DCPS of the
parent's intent to unilaterally place the above named student in a private school.  While DCPS
recognizes the parent's right to effectuate placement of their children in the educational placement
of their choosing, DCPS does not agree to bear the cost of said placement.

DCPS as the LEA is charged with the responsibility of providing a Free Appropriate Public
Education to all children in the District of Columbia.  As such, all placement decisions are made
based on a school's ability to meet the needs of children with disabilities as stated in their IEP.

DCPS believes that Benning ES can provide educational benefit to Samuel by meeting his needs as
stated in his IEP.

Lastly, it would be of great assistance to OCDR if your future correspondence is addressed to the
correct party.  This will allow for said correspondence to be routed to the proper individual and to
be addressed in a timely manner.

Sincerely,

*"DCPS: Success, One Student at a Time"*

Linda M. Smalls, Esq.

Director of Compliance
Office of Compliance and Dispute Resolution

cc: OGC
   SEC, Benning ES

SM 18

# EXHIBIT

# O



### District of Columbia Public Schools Report Card
SY 2006-2007 (Page three of three)
### TEACHER COMMENTS

Student Name: Samuel Mingle                                    Grade: 4th

**First Advisory**

It is a pleasure to have Samuel in my class. He seems to enjoy learning new things. He knows his basic math facts well and is showing improvements in reading. I would like to see Samuel participate more in class. I believe he has trouble staying focused and paying attention. It is difficult to get Samuel to write or copy anything. I know he is to get services for this issue, but it has hindered him in his assignments. For the most part, Samuel is very respectful and follows directions. He sometimes has difficulties getting along with others, so I would like to see him improve in this area. Please continue to encourage him to work hard and make good decisions.

Teacher Signature _____    Date _____

**Second Advisory**

Samuel is a very intelligent and capable student. At times, he enthusiastically participates and completes his assignments. Unfortunately, most of the time, Samuel sits at his desk and does nothing. I must go to great lengths to get him to do any literacy work at all. Because he feels stronger in math, it is easier to get him to complete math work. Samuel must begin to take his academics seriously if he is to make any progress this year. I know that if he puts his mind to it, he could be very successful, but he must make that decision for himself.

Teacher Signature _____    Date _____

**Third Advisory**

Samuel has great potential. This advisory, I have seen very little effort from Samuel. He says that math is his favorite subject but he still does very little work. I am disappointed with his behavior and lack of respect. I am hoping that we can end the year on a good note, with him doing his best everyday he comes to school. I need to see a major change in Samuel's attitude toward school in order for him to be successful in the fourth grade. On our last benchmark test in February he scored proficient in math (58%) and basic in reading (38%). Please encourage him to do his very best in school and on the DC CAS in April.

Teacher Signature _____    Date _____

**Fourth Advisory**

Teacher Signature _____    Date _____

SM 19

# EXHIBIT

# P



# Benning Elementary School

100 41st Street N.E.
Washington, D.C. 20019
Telephone: (202) 724-4586
FAX: (202) 724-4588



Date 2/28/07

Dear Parent/Guardian

This letter is to inform you that your son/daughter _Samuel_ has been
disciplined for the following reasons(s) checked below: _Mingle_

- _____ Failure to wear and /or present school I.D. Badge

- _____ In the halls and/or restroom during class time with out a pass

- _____ Using profane language on school grounds

- _X_ Disruptive behavior in the school building/school grounds

- _X_ Failure to obey a lawful order of an administrator/teacher

- _____ Fighting and/or Smoking on the school property

- _____ Accused of stealing someone's belongings

- _____ Possession of drugs and/or weapons on school property

- _____ Sexual harassment

- _____ Tardy       for       class.,....    number       of
  times/dates_____

- _____ Other_____

Before your child can be re-admitted back to school, **YOU
must attend the scheduled conference** at 12:00 am/pm
on _March 5, 2007_

_____
Principal

SM 20



## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
## NOTICE OF STUDENT DISCIPLINARY ACTION

### SUSPENSION LEVEL I

School _Benning ES_

Telephone _202-724-4586_

Signature of Principal

Date of Delivery _March 27, 2007_
[ ] Certified Mail
[X] Hand Delivery

Student _Samuel Mingle_    Date of Birth _2/6/97_

Student's Grade _4th_    Male [X] Female [ ]    Ethnicity Code _AA_

Sp. Ed. Student: Yes [X] No [ ]    Disability Code _SLI_    LRE/Educational Setting _B_

Parent/Guardian _Annette Harling_

Address _4065 Minnesota Ave NE 204 WDC 20019_

Home Telephone _202-575-0228_    Work Telephone _____

Dear _Ms. Harling_ :
    Name of Parent/Guardian

    Please be advised that pursuant to the Rules of the Board of Education, Section 2500, your son/daughter is being disciplined for violating the following section(s) of the Board Rules; _2503.1b Repeated failure to comply with the orders of the teacher._

Brief description of incident:
_Samuel refuses to do any work in class. The teacher repeatedly asked Samuel to do his work. He refused._

(State each section individually)

Page 1 of 4.
SHO 101
August 2005

*Benning Elementary School*
100 – 41ˢᵗ Street, N.E.
Washington, D.C. 20019

## Student Incident Report

Student Name: Samuel Mingle     Date: 5/10/07

Staff Name: Officer Bunn;
Vanessa Gerideau

## Incident:   (check violation)

1.  Inappropriate comments and unnecessary noise in classroom ___ ✓
2.  Fighting with other students ___
3.  Physically aggressive with Teacher/Staff ___
4.  Unnecessary physical contact with others ___
5.  Agitates and provokes peers to level of verbal and/or
    Physical assault. ___
6.  Ignores consequences of behavior ___
7.  Leaves seat/classroom without permission ___
8.  Not following school/classroom rules and regulations ✓
9.  Destroying school and/or other students property ___
10. Stealing or forcibly takes things from other ___
11. Usage of profanity, lying, and being disrespectful ✓

BRIEF DESCRIPTION OF

Security was called to classroom, was asked
to leave classroom and did not cooperate.
Told Security that he wanted to kill
Ms Gerideau. Mc Fletcher & Mrs. Smith also
tried to remove student from classroom without progress

# EXHIBIT

# Q

**Before the**
## DISTRICT OF COLUMBIA PUBLIC SCHOOLS
### OFFICE OF MANAGEMENT SERVICES

|  |  |
|---|---|
| In re | ) |
| Samuel Mingle | ) |
| Petitioner | ) |
|  | ) |

## PETITIONER'S MOTION FOR ENTRY OF DEFAULT
## AND DEFAULT JUDGMENT

The Petitioner respectfully moves for an entry of default for the Petitioner for the failure

of the Respondent to file a response to the Petitioner's Complaint as required by 20 U.S.C. §

1415(c)(2)(i).

### BACKGROUND

On August 1, 2007, the Petitioner filed a "due process complaint" under 20 U.S.C. §

1415(b), the relevant section of the Individuals with Disabilities Act ("IDEIA"), alleging

violations of the IDEIA. As of the time of the filing of the Complaint, the Respondent, the

District of Columbia Public Schools ("DCPS"), had not served a "prior written notice" according

to 20 U.S.C. § 1415(c)(1) on the Petitioner regarding the actions complained of in the Complaint.

As of the date of the filing of this Motion, the Respondent has not served a response to the

Complaint on the Petitioner. The Response was due by August 11, 2007.

### APPLICABLE LAW

The IDEIA requires that:

> [i]f the local educational agency has not sent a prior written notice to the parent regarding
> the subject matter contained in the parent's due process complaint notice, such local
> educational agency shall, within 10 days of receiving the complaint, send to the parent a
> response that shall include –
> (aa) an explanation of why the agency proposed or refused to take the action raised in the
> complaint;
> (bb) a description of other options that the IEP Team considered and the reasons why
> those options were rejected;
> (cc) a description of each evaluation procedure, assessment, record, or report the agency
> used as the basis for the proposed or refused action; and

SM 21

(dd) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(2)(B)(i)(I).[1]

The IDEIA dictates that a "prior written notice," which would negate the need for a

response under 20 U.S.C. § 1415(c)(2)(B)(i)(I), contain all of the following:

(A) a description of the action proposed or refused by the agency;
(B) an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;
(C) a statement that the parents of a child with a disability have protection under the procedural safeguards of this part [20 USCS §§ 1411 et seq.] and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;
(D) sources for parents to contact to obtain assistance in understanding the provisions of this part [20 USCS §§ 1411 et seq.];
(E) a description of other options considered by the IEP Team and the reason why those options were rejected; and
(F) a description of the factors that are relevant to the agency's proposal or refusal.

20 U.S.C. § 1415(c)(1)(brackets in original).

The IDEIA is silent on the question of the proper remedy for the failure of a local

educational agency ("LEA") to file a response under 20 U.S.C. § 1415(2)(B)(i)(I).

---

[1] The District Court in *Massey* recently commented on the significance of the IDEIA's ten-day written response:

"Under the statute, if DCPS had not previously issued a Prior Notice . . ., it was required to respond in writing to the request for a due process hearing. Furthermore, DCPS may not determine the form of its response: the required content of the written response is precisely detailed in the IDEIA . . . [T]he IDEIA does not allow DCPS to respond generally to the substance of the complaint in whatever form it deems appropriate."

400 F.Supp. 2d 66, (D.D.C. 2005)(citations omitted).

Second, and more importantly, the District Court specifically noted that DCPS's failure, *inter alia*, to issue a proper response called into question the adequacy of the entire administrative process and entitled the Plaintiff to some form of appropriate relief:

"Surely Congress did not intend for parents to be left with no remedy when the school district fails to observe the procedural safeguards in the IDEIA. In this Court's opinion, the litany of DCPS failures reveals that it is apparently unable to follow statutory procedures in the first place. Worse yet, DCPS appears incompetent to address, in the manner required by the IDEIA, a parent's complaints about those failures. Therefore, the Courts find that the plaintiffs have demonstrated that pursuing their claim through the administrative process would be inadequate".

*Id.* (citations omitted)

## ARGUMENT

The federal courts have ruled that where the IDELA is silent regarding a procedural rule, the most closely analogous state rule must be applied. The state rules most closely analogous to this situation are District of Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a), which provide the remedy for a civil defendant's failure timely to file an answer to a complaint. Because those rules require that a court enter a default in the event that a defendant fails timely to file an answer, the Office of Management Services should grant the Petitioner a default for the Respondent's failure to serve a response.

### I.    In the Absence of a Clear Procedure in the IDEIA, the Most Closely Analogous State Rules Should be Applied.

The federal courts have ruled that where the IDEIA is silent, the most closely analogous state rule should be applied, provided that the state rule is consistent with the policies of the IDEIA. *See, e.g., Spiegler v. Dist. of Columbia*, 866 F.2d 461 (D.C. Cir. 1989)(applying local limitations period for appeals of administrative decision to federal actions brought following adverse administrative decisions under predecessor to IDEIA).

In *Spiegler*, the Court of Appeals held that the District of Columbia 30-day statute of limitations for review of agency orders applied to federal cases challenging hearing officers' decisions under the Education of the Handicapped Act ("EHA"), the predecessor to the IDEIA. 866 F.2d at 462-470. Congress had not provided a statute of limitations in the text of the EHA, so the Court of Appeals applied the local limitations period because it was closely analogous and consistent with the policies underlying the EHA. *Id.*

The Court in *Spiegler* applied a two-part analysis: 1) identifying the most closely analogous state rule; and 2) determining whether the application of that rule was consistent with the federal policies underlying the EHA. In performing the first part of the analysis, the Court held that a substantive federal claim challenging the findings and decision of an EHA hearing officer was "sufficiently analogous to an appeal from an administrative decision to permit us to

EHA    3

borrow the 30-day local limitations period for such appeals." 866 F.2d at 466. In the second part of the analysis, the Court concluded "that a 30-day limitations period, when combined with a duty by the District to inform hearing participants of the short [limitations] period, was not so harsh as to be inconsistent with [the EHA's underlying] policies." *Id.*

Though the *Spiegler* Plaintiffs had argued for the application of the District of Columbia's default 3-year statute of limitations, the Court of Appeals found the 30-day limitations period consistent with federal policies: "Because the Act emphasizes the prompt resolution of disputes, we find at the outset that a shorter rather than longer statute of limitations would be more consistent with the policies underlying the Act." *Id.* at 467.

According to the *Spiegler* decision, in forming a remedy for the Respondent's failure to serve a response to the complaint, the Office of Management Services should determine the state rules most closely analogous to this situation, and should apply them if they are not inconsistent with the federal policies underlying the IDEIA.

**II.    The State Rules Most Closely Analogous to this Situation are District of Columbia Superior Court Rules of Civil Procedure 12(a)(5) and 55(a).**

Generally, the two best sources for analogous rules in IDEIA hearings are the District of Columbia Office of Administrative Hearings Procedural Rules ("OAH rules"), D.C. Mun. Regs. tit. 1 §§ 2800 *et seq.*, and the District of Columbia Superior Court Rules of Civil Procedure ("Civil Rules").

In *Spiegler*, the Court of Appeals used the OAH rules, but they are not very helpful here because OAH procedure has no analogue to the response to a complaint required by the IDEIA. While the IDEIA now requires a response containing very specific information within 10 days of the filing of the complaint, the OAH rules state that "[u]nless otherwise ordered, no responsive pleading is required in cases commenced by a request for a hearing." *Compare* 20 U.S.C. § 1415(2)(B)(i)(I)(requiring response to IDEIA complaint and listing necessary elements in response); D.C. Mun. Regs. tit. 1 §§ 2813.5. Because the OAH Rules do not require an agency to

serve any responsive pleadings to a complaint filed by a private party, they are not analogous to the circumstances presented in this case.

The Civil Rules, on the other hand, deal extensively with every aspect of pleading practice, including the procedures for serving initial and responsive pleadings and the consequences of violations of those procedures. *See* Super. Ct. Civ. R. 3, 7, 8, 12 & 55. The Civil Rules dictate the necessary contents of answers, the timelines for filing answers and the penalties for failure to file. *See* Super. Ct. Civ. R. 12 & 55.

Because the OAH rules do not require responsive pleadings and the Civil Rules do, the Civil Rules are the state rules most closely analogous to the IDEIA response requirement. The Office of Management Services should therefore apply the Civil Rules by analogy as long as they are consistent with the federal policies underlying the IDEIA.

### III. By Analogy, the Civil Rules Require the Office of Management Services to Rule by Default for the Petitioner.

District of Columbia Superior Court Rule of Civil Procedure 12(a)(5) and 55(a) are the state rules most closely analogous to the Respondent's failure to serve a response, as argued *supra*. The rules require that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend . . . the Clerk or the Court shall enter the party's default." Super. Ct. Civ. R. 55(a); *see also* Super. Ct. Civ. R.12(a)(5)("Except where the time to respond to the complaint has been extended as provided in Rule 55(a), failure to comply with the requirements of this Rule shall result in the entry of a default by the Clerk or the Court *sua sponte* unless otherwise ordered by the Court.")

The courts do not have any discretion in the entry of a default for failure to respond to a complaint; "the Clerk or the Court *shall* enter the party's default." Super. Ct. Civ. R. 55(a)(emphasis added). The comment to Rule 12 makes clear the intent that default be automatic in those circumstances. *See* Super. Ct. Civ. R. 12, cmt ("[P]aragraph (5) has been added to

5

preserve the existing Superior Court rule of automatic entry of default against a defendant who does not timely respond to the complaint.").

The District of Columbia Court of Appeals has addressed this issue, and has enforced the clear text of the Rules in favor of automatic and non-discretionary default. *See Digital Broadcast Corp. v. Rosenman & Colin, LLP*, 847 A.2d 384, 388-89 (D.C. App. 2004)(holding that Rule 55(a) default is automatic and non-discretionary); *Restaurant Equip. and Supply Depot, Inc. v. Gutierrez*, 852 A.2d 951, 954-56 (D.C. App. 2004)(holding that default for failure to file answer was automatic even where defendant had filed motion to dismiss).

An entry of default is not a final judgment terminating a proceeding. "[T]he entry of default does not constitute a judgment, but simply precludes the defaulting party from offering any further defense on the issue of liability." *Lockhart v. Cade*, 728 A.2d 65, 68 (D.C. 1999). "[T]he defaulted party retains the right to contest and mitigate unliquidated damages." *Digital* at 389 n.7. In other words, the default resolves all liability questions against the defaulting party, but does not determine ultimate relief.

Because the serving of a "response" under the IDEIA is a perfect analogue to the filing of an answer under the Civil Rules, and the Respondent has in this case failed to serve a response, by analogy to the Civil Rules the Office of Management Services must issue the equivalent to a default against the Respondent. The equivalent to a default in IDEIA administrative hearings is a finding, as a matter of law, that the Respondent has committed all of the violations identified in the Complaint.

Where a violation is all that is necessary to justify relief, the Office of Management Services may simply order the relief requested in the Complaint. In the alternative, where further evidence is necessary before specific relief can be ordered, the Office of Management Services should schedule a hearing for the sole purpose of adjudicating the issues relevant to relief.

**IV.**     **An Order of Default After an LEA has Failed to Serve a Response is Wholly Consistent with the Policies Underlying the IDEIA in that it Protects the Rights**

6

## of Children, Encourages Prompt Resolution of Disputes, Promotes
## Administrative Efficiency and Preserves Procedural Equity.

The application of the Civil Rules to this situation and the consequential order of default

against the Respondent comports with the policies underlying the IDEIA.

The primary purposes of the IDEIA are, of course, "to ensure that all children with

disabilities have available to them a free appropriate public education" and "to ensure that the

rights of children with disabilities and parents of such children are protected." 20 U.S.C. §

1400(d)(1).

Additionally, it is clear from the statute and the caselaw that certain policies underlie the

procedural aspects of the IDEIA. In *Spiegler*, the Court of Appeals noted that Congress' intent in

passing the EHA was "to ensure the prompt resolution of disputes regarding the appropriate

education for handicapped children." 866 F.2d 461, 467. The recent amendments to the IDEIA,

most notably the clauses regarding the complaint, the response and the resolution session,

indicate a Congressional intent to improve administrative efficiency by narrowing issues and

limiting unnecessary hearings. *See* 20 U.S.C. § 1415(b)(6), (c)(2)(B)(i)(I) & (f)(1)(B). Finally,

Congress' respect for the adversarial process and intent to establish basic procedures to ensure

fairness in hearings can be found in the IDEIA's rights to counsel, to disclosure of evidence, to

subpoenas, to cross-examination and to attorneys' fees; the Act's new clauses enabling the

dismissal of inadequately drafted complaints; and the Act's new provisions regarding the training

and competence of hearing officers. *See* 20 U.S.C. § 1415(c)(2)(A), (f)(3)(A) & (h).

These four purposes – protection of the rights of children with disabilities, prompt

resolution of special education disputes, administrative efficiency and procedural fairness – are

all furthered by an order of default against the Respondent for failing to serve a response.

Obviously, a ruling in favor of a parent or child, particularly a ruling that prevents the

LEA from violating the IDEIA and sandbagging a petitioner at hearing, helps to protect the rights

of children with disabilities. It is equally obvious that a default for failure to respond to a

7

complaint furthers prompt resolution and administrative efficiency, both in the short term, in that the parties and the hearing officer are not forced to litigate issues regarding which the respondent has offered no defense, and in the long term, in that the respondent will be more likely to serve a proper response in future cases.

The impact of a default on procedural equity deserves a bit more consideration, because the recent amendments to the IDEIA have changed the balance of procedural obligations. Under the old version of the law, a petitioner needed only to file a minimum hearing request, and the respondent did not need to file a response. Under the current version of the law, by the time a respondent has failed to serve a response and thereby made itself subject to default, a petitioner has had to file a substantially more comprehensive complaint, which has had to withstand a judgment of its sufficiency. *See* 20 U.S.C. § 1415(b)(7) & (c)(2)(D). If the complaint is found sufficient, the petitioner is granted a hearing, but cannot raise any issue not identified in the complaint. *See* 20 U.S.C. § 1415(f)(3)(B). While petitioners now bear that new burden, respondents bear a new burden of their own – the response to the complaint.

A default against an LEA for failure to serve a response would enforce the policy of procedural fairness evident in the IDEIA's new requirements of a reciprocal information exchange prior to the resolution session and the hearing. To decline to issue a default would confound Congress' clear intent to require LEAs to provide the same level of information that petitioners must provide, and would create a fundamentally unfair system in which a petitioner is denied his/her opportunity to make a case if he/she fails to provide information according to IDEIA procedure, but an LEA is allowed to make its case in the opposite situation.

## CONCLUSION

Because a default against the Respondent in this case is wholly consistent with the policies underlying the IDIEA, and the denial of a default would frustrate Congress' intent, the Office of Management Services should apply the most closely analogous state rule to this situation and grant the Petitioner a default by applying Civil Rules 12(a)(5) and 55(a) by analogy.

8

The Petitioner, by and through counsel, hereby requests the following relief:

1. A finding that DCPS failed to respond within ten (10) days of receiving the complaint, as required under 34 C.F.R. § 300.508(e).

2. A default finding that DCPS denied Samuel Mingle a free and appropriate public education in regard to all allegations contained in Petitioner's administrative complaint of August 1, 2007, and an order that DCPS must complete and fulfill all relief requested in the complaint.

Respectfully Submitted by,

Carolyn W. Houck
8101 Connecticut Avenue N701
Chevy Chase, MD 20815
Tel: 301-951-4278
Fax: 301-951-4248

## Certificate of Service

Counsel for the Petitioner hereby certifies that a copy of this MOTION has been filed

with the Student Hearing Office and sent via facsimile to the Office of the General Counsel.

Respectfully Submitted by,

*Carolyn Houck*

Carolyn W. Houck
8101 Connecticut Avenue N701
Chevy Chase, MD 20815
Tel: 301-951-4278
Fax: 301-951-4248

**DATE FILED:**

9/27/07

10

# EXHIBIT

# R

Received Fax :            Oct 16 2007 4:25PM    Fax Station :    Carolyn Houck          p. 2

10/16/2007  16:30    2026983825         STUDENT HEARING         PAGE  02/13



# Office of Compliance & Review

## State Enforcement & Investigation Division
### STUDENT HEARING OFFICE

**Frederick E. Woods, Esq., Due Process Hearing Officer**
Van Ness Elementary School
1150 5th Street, S.E., 1st Floor
Washington, D.C. 20003
Facsimile: (202) 698-3825

## *Confidential*

| | | |
|---|---|---|
| **In the Matter of** | ) | **IMPARTIAL** |
| | ) | **DUE PROCESS HEARING** |
| **Samuel Mingle (SM)** | ) | |
| **Date of Birth: 02/06/97** | ) | |
| Petitioner, | ) | **DECISION AND ORDER** |
| | ) | |
| vs. | ) | |
| | ) | Hearing Request: August 1, 2007 |
| **The District of Columbia Public Schools,** | ) | Hearing Date: October 4, 2007 |
| **Home School: Benning Elem. School** | ) | Held at: Van Ness Elementary School |
| **Attending: Rock Creek Academy** | ) | 1150 5th Street, S.E., 1st Floor |
| | ) | Washington, D.C. 20003 |
| Respondent. | ) | |
| | ) | |

**Parent:**                         Annette Harling, Mother
                                     3650 Minnesota Ave, S.E., Apt. # 203
                                     Washington, D.C. 20019

**Counsel for the Parent/Student:**  Carolyn W. Houck, Esq.
                                     Attorney at Law
                                     8101 Connecticut Ave., Suite N701
                                     Chevy Chase, MD 20815

**District of Columbia Public Schools:**  Stephanie Ramjohn Moore, Esq.
                                          Assistant Attorney General
                                          Office of the General Counsel, DCPS
                                          825 North Capitol Street, N.E., 9th Floor
                                          Washington, D.C. 20002

## I.     JURISDICTION

This Decision and Order is written pursuant to the Individuals with Disabilities Education Improvement Act of 2004, Pub. L. No. 108-446, codified at 20 U.S.C. §§ 1400 -1482, 118 Stat. 2647; and its implementing regulations codified at 34 C.F.R. §§ 300.01 – 300.818; 5 D.C.M.R. §§ 3000 et seq.; and Section 327 of the D.C. Appropriations Act of 2005.

## II.     DUE PROCESS RIGHTS

The parent through counsel waived a formal reading of the due process rights.

## III.     FIVE-DAY DISCLOSURES

Petitioner:     Admitted, without objection, a disclosure letter filed on 09/27/07 that list six witnesses and attached twenty exhibits sequentially labeled SM-01 through SM-20. Two witnesses testified: (1) S.M.'s mother; and by-phone, (2) Karen Plowden, Rock Creek Academy (RCA) Exec. Dir. of Student Services.

Respondent:     Admitted, without objection, a disclosure letter filed on 09/27/07 that list five witnesses and attached five exhibits labeled DCPS-01 through DCPS-05. No witnesses were present but one witness testified by-phone: Rhoda Mathews, Benning ES Special Education Coordinator (SEC).

## IV.     STATEMENT OF THE CASE

S.M., born 02/06/97, age 10-years 8-months, is a student with a disability, receiving special education and related services as an 4th grade, 5% out-of-general education, Speech-Language Impaired (SLI) student unilaterally parentally placed since Sept. 7, 2007, at Rock Creek Academy (RCA) located in the District of Columbia. (R. at SM-12, 15)

Parent's counsel Carolyn W. Houck alleged in the student's 08/01/07 Due Process Hearing Request that DCPS violated the IDEIA and denied S.M. a Free Appropriate Public Education (FAPE) during the 2007-08 school year by failing to provide him an Occupational Therapy (OT) Assessment; and failing to provide him an appropriate placement for the 2007-08 school year. (R. at SM-15)

As relief the parent wants an OT IEE; and placement, and funding with transportation for S.M. to attend RCA for the 2007-08 school year. (R. at SM-15)

2

The DCPS Student Hearing Office scheduled the Due Process Hearing for 1:00 p.m., Thursday, October 4, 2007 at Van Ness Elementary School, 1150 5th Street, S.E., 1st Floor, Washington, D.C. 20003.

Assistant Attorney General Stephanie Ramjohn Moore appeared in-person for DCPS. Attorney Carolyn W. Houck appeared in-person representing S.M. who was not present; and his mother who was present.

## V.    SUMMARY OF THE EVIDENCE

The parties' five-day disclosure exhibits and the testimony of three witnesses are the only evidence relied on in reaching this decision.

### Three Witnesses:

1. S.M.'s mother;
2. Karen Plowden, Rock Creek Academy (RCA) Exec. Dir. of Student Services; and
3. Rhoda Mathews, Benning ES Special Education Coordinator (SEC).

### Eleven Exhibits:

| | | |
|---|---|---|
| 1. | SM-15 | The 08/01/07 Parent's Due Process Hearing Request |
| 2. | SM-04 | The 01/26/06 SEP Meeting Notes |
| 3. | SM-10 | The 04/19/07 MDT Meeting Notes |
| 4. | SM-11 | The 04/30/07 Teacher Letter to the Parent |
| 5. | SM-12 | The 05/31/07 IEP & MDT Meeting Notes |
| 6. | SM-13 | The 07/19/07 Parent Request for an IEE—Speech-Language |
| 7. | SM-14 | The 07/19/07 Parent Request for an IEE—OT |
| 8. | SM-16 | The 08/23/07 RCA Acceptance Letter |
| 9. | SM-17 | The 08/23/07 Parent Letter to DCPS Re Unilateral Private School Placement |
| 10. | SM-18 | The 08/30/07 DCPS' Response to Parent's Letter to DCPS Re Unilateral Private School Placement |
| 11. | SM-19 | The 2006-07 School Year Report Card |

3

Received Fax :                    Oct. 16 2007 4:25PM    Fax Station :  Carolyn Houck

10/16/2007  16:30   2026983825                STUDENT HEARING                   PAGE  05/13

## Issue

Did DCPS violate the Individuals with Disabilities Education Improvement Act (IDEIA) codified at 20 U.S.C. §§ 1400 - 1482 and deny S.M. a Free Appropriate Public Education (FAPE) during the 2007-08 school year, when it failed to fund the parent's requested two IEEs; and when it failed to provide an appropriate placement for the 2007-08 school year?

## Answer

No. Albeit there is no record evidence of an OT and Speech-Language Assessments after the parent requested IEEs, there is evidence of an existing IEP providing those two related services and a 06/15/05 Speech-Language Assessment Report. The delayed assessments, however, based on this hearing record are procedural violations of the IDEIA that did not result in a denial of a FAPE. And there was no evidence presented about how the student suffered educational harmed by the delay since S.M. was placed at a private school during some of the time of the alleged violations and remains there now.

## VI.    FINDINGS OF FACT

1.      S.M., born 02/06/97, age 10-years 8-months, is a student with a disability, receiving special education and related services as an 4th grade, 5% out-of-general education, Speech-Language Impaired (SLI) student unilaterally parentally placed since Sept. 7, 2007, at Rock Creek Academy (RCA) located in the District of Columbia. (R. at SM-12, 15)

2.      S.M. 05/31/07 IEP calls for him to receive these special education services in a combination general education and resource classroom:

   a.  Speech-Language Services      30-minutes/week, and
   b.  OT                           1.0-hour/week.
   (R. at SM-12)

3.      S.M.'s 01/26/07 SEP recommended an OT Assessment. (R. at SM-04)

4.      There is record evidence that an OT Assessment and Speech-Language Assessment were performed, although they are not in the hearing record, because in the parent's 07/19/07 letters to the DCPS Office of Mediation and Compliance, not to the school principal, requesting IEEs, the letters reference both assessment reports as being incomplete as the reason given for the requested IEEs. (R. at SM-13, 14)

5.   And S.M.'s 05/23/06 MDT Meeting state, in pertinent part, "that the
     purpose of that meeting was to review the OT Assessment Report; and
     based on that review, the team added OT services to S.M.'s IEP. (R. at
     SM-09)

6.   A year later, at S.M.'s 05/31/07 MDT Meeting his OT therapist said,
     according to the meeting notes that, "working with S.M. since Sept.
     2006, she noticed he does not have any motor [skills] problems. ... He
     met his [IEP] goals, no longer requires [OT] services and recommended
     exiting him from OT. (R. at SM-12)

7.   According to those meeting notes, S.M.'s mother disagreed with the OT
     therapist's recommendation. And the team agreed that "the OT service
     will remain in the IEP pending the 06/04/07 OT Assessment." (R. at
     SM-12)

8.   Also according to those meeting notes the IEPT requested a
     comprehensive Psychological Assessment but did not specify a
     completion date. (R. at SM-12)

9.   According to the credited testimony of S.M.'s mother, she did not
     consent to allowing DCPS to perform those assessments based on the
     advice of counsel.

10.  However, on 07/19/07, almost 60-days letter, her attorney sent separate
     letters to the DCPS Office of Compliance, not the school principal,
     requesting an OT and Speech-Language IEEs. (R. at SM-13, 14)

11.  Then, two weeks later, on 08/01/07 the parent filed a due process
     hearing request. And less than four weeks later, on 08/23/07 the parent
     sent DCPS notice of her intent to unilaterally place S.M. at a private
     school; and placed him at RCA on 09/10/07 despite DCPS' objections.
     (R. at SM-15, 16, 17, 18)

12.  There is no record evidence that the OT or Psychological Assessment
     have been performed.

13.  And the parent testified they assessments are necessary because S.M.
     has daily behavior problems at school.

14.  Finally, according to the credited testimony of Rhoda Mathews,
     Benning ES SEC:

     a.  S.M. does not receive specialized instruction because he functions at
         grade level.

5

    b.  DCPS was to perform an OT Assessment to determine if S.M. could be exited from OT services; however, the parent did not consent to the evaluation on 05/31/07.

    c.  The parent has not withdrawn nor enrolled S.M. at Benning ES for the 2007-08 school year.

15.    The record evidence does not reflect what S.M.s suspected disability is and whether it would require a full time program to remediate it.

16.    However, the mother believes Benning ES is an inappropriate placement because it could not control S.M.'s regular behavior problems at school; and he was not doing well academically in the 2006-07 school year as evinced by DCPS' 04/30/07 letter recommending to her steps to take in order for S.M. to pass to the fifth grade.

17.    DCPS stated in its 08/30/07 response to the parent's notice of unilateral private placement that "Benning ES can provide educational benefit to S.M. by meeting his needs as stated in his IEP." (R. at SM-18)

## VII.  DISCUSSION and CONCLUSIONS OF LAW:

### I

**DCPS is required to make a FAPE available to all children with disabilities within the jurisdiction of the District of Columbia.**

The IDEIA at 20 U.S.C. §§ 1400 - 1482 and 5 D.C.M.R. § 3000.1 requires DCPS to fully evaluate every child suspected of having a disability within the jurisdiction of the District of Columbia, ages 3 through 22, determine their eligibility for special education and related services and, if eligible, provide special education and related services through an appropriate IEP and Placement.

1.  Pursuant to 5 D.C.M.R. § 3002.1, LEA Responsibility, "[t]he services provided to the child must address all of the child's identified special education and related services needs and must be based on the child's unique needs and not on the child's disability."

2.  Pursuant to 5 D.C.M.R. § 3013.1(e), Placement, "[t]he LEA shall ensure that the educational placement decision for a child with a disability is …based on the child's IEP."

3.  Pursuant to 5 D.C.M.R. § 3025, Procedural Safeguards—Prior Written Notice, DCPS shall provide written notice to the parent of a child with a disability before it proposes…an educational placement of the child.

6

4. Pursuant to the IDEIA at 20 U.S.C. § 1414 (d) (A), (B) Requirement that Program be in Effect—

> 1. At the beginning of each school year, each local educational agency ... shall have in effect for each child with a disability in the agency's jurisdiction an IEP.

5. The record evidence supports a finding that DCPS did develop a new IEP for S.M. on 05/31/07 that was in place before the start of the 2007-08 school year. (R. at SM-12)

6. As to the 07/19/07 parent's request for a Speech-Language IEE, there exists a 06/15/05 Speech-Language Assessment Report in the hearing record and there was no testimony proffered about it being deficient or why another assessment was warranted. (R. at SM-06, 13)

7. As to the 07/19/07 parent's request for an OT IEE, according to S.M.'s 05/31/07 MDT Meeting Notes, "S.M.'s mother disagreed with the OT therapist's recommendation to exit him from OT; and the team agreed that the OT service will remain in S.M.'s IEP pending the 06/04/07 OT Assessment." (R. at SM-12) The parent however, on advice of counsel, refused to consent to that assessment until 07/19/07. (R. at SM-12, 14)

8. Also according to those meeting notes the IEPT requested a comprehensive Psychological Assessment but did not specify a completion date. (R. at SM-12)

9. There is no record evidence that the OT or Psychological Assessment have been performed before the parent filed their 08/01/07 due process hearing request or to date.

10. Pursuant to the IDEIA at 300 C.F.R. § 300.303, reevaluations must occur at least once every three years but does not specify a time period for the LEA to complete the parties' agreed to revaluation process.

11. However, based on the facts found in this case, failure to perform the assessments is a procedural violation of the IDEIA that did not rise to a denial of a FAPE. Here is why.

12. Pursuant to the IDEIA at 20 U.S.C. § 1414 (E) (ii), and 34 C.F.R. § 300.513 (a) Decision of hearing officer on procedural issues, states that, "[i]n matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education [FAPE] only if the procedural inadequacies—

7

        (I)     impeded the child's right to a free
              appropriate public education;

        (II)    significantly impeded the parent's
              opportunity to participate in the
              decision making process regarding the
              provisions of a FAPE to the parent's child;
              or

        (III)   caused a deprivation of educational
              benefits."

13. And pursuant to 34 C.F.R. § 300.513 (3) Hearing Decisions, "[n]othing in paragraph (a) of this section shall be construed to preclude a hearing officer from ordering an LEA to comply with procedural requirements."

14. S.M. was not denied a FAPE because there was no evidence presented by the parent that the procedural inadequacy impeded S.M.'s right to a FAPE nor deprived him of educational benefit since parent's counsel made no effort to demonstrate—much-less demonstrated—that S.M.'s education was affected by the procedural violation that DCPS committed. Particularly in light of the fact that the parent refused to consent to the reevaluation on 05/31/07; changed their mind on 07/19/07, then two weeks later on 08/01/07 filed a due process hearing request; then three weeks later filed a notice of unilateral private placement and placed S.M., who only receives 1.5 hours of related services and 0-hours of specialized instruction in his IEP, into a 100% special education program. (R. at SM-012, 13, 14, 17, mother's testimony)

15. And the D.C. Circuit held that: "only those procedural violations of the IDEIA which result in a loss of educational opportunity or seriously deprive parents of their participation rights are actionable." Lesesne v. District of Columbia, 447 F.3d 828, 834 (D.C. Cir. 2006) (citing Kruvant v. District of Columbia, 99 F. App'x 232, 233 (D.C. Cir. 2004) (holding that although DCPS admits it failed to satisfy its responsibility to assesses the student within 120 days of the parents' request, the parents have not shown harm resulted from that error; and that procedural flaws do not automatically render an IEP legally defective).

16. And as to the parent's concerns about placement the law is clear on that point.

17. Because under the IDEA the parent is a statutorily required participant in a group discussion about placement and a group placement decision. The parent, however, is only a member of the BLMDT/IEPT and not the final

8

arbiter of the placement decision. No such power is granted the parent under the IDEA. Recent case law makes that point clear.

18. "Although the IDEA guarantees a Free Appropriate Public Education, it does not, however, provide that this education will be designed according to the parent's desires. The primary responsibility for formulating the education to be accorded a [child with a disability] and for choosing the educational method most suitable to the child's needs, was left by the Act to state and local educational agencies in cooperation with the parent or guardian of the child. Thus proof alone that loving parents can draft a better program than a state offers does not, alone, entitle them to prevail under the Act." Shaw v. The District of Columbia, 238 F. Supp. 2d 127, 139 (D.D.C. 2002).

19. So based on this hearing record, there does not exist evidence supporting the parent's claim that S.M. was denied a FAPE because delayed assessments does not alone result in a denial of a FAPE—which is precisely the claim the parent's counsel presented at the due process hearing.

20. Pursuant to 5 D.C.M.R. § 3030.3, "The burden of proof shall be the responsibility of the party seeking relief; either the parent/guardian of the child or the LEA. Based solely upon the evidence presented at the hearing, an impartial hearing officer shall determine whether the party seeking relief presented sufficient evidence to meet the burden of proof that the action and/or inaction or proposed placement is inadequate or adequate to provide the student a Free Appropriate Public Education (FAPE)."

21. The parent, who filed the hearing request, had and did not meet their burden of proof in this case because the parent:

   a. failed to prove harm resulted from S.M.'s delayed assessments particularly when during the entire time of the alleged violations he was receiving all of his special education services.

22. So in consideration of the hearing record, there is no finding that S.M. was denied a FAPE based because the parent did not meet their burden of proof under the IDEIA by proving that the procedural violations of the IDEIA rose to the level of a FAPE denial.

23. DCPS, however, should perform an OT and Comprehensive Psychological Assessment after the parent signs a written Parental Consent to Evaluate to determine if the S.M.'s behavior issues are based on an IDEIA disability. And the parent is encouraged to cooperate with Benning ES towards those ends and to participate, in-person in all meetings to discuss any concerns she has about S.M.'s special education program. And DCPS shall consider how S.M. performed while attending RCA.

9

Therefore, based on the findings of facts and the governing law the hearing officer issues this—

## ORDER

1. The parent's 08/01/07, due process hearing request is dismissed, with prejudice.

2. There is no finding that S.M. was denied a FAPE.

3. And the hearing officer made no additional findings.

This is the **FINAL ADMINISTRATIVE DECISION.** An Appeal can be made to a court of competent jurisdiction within ninety (90)-days from the date of this Decision and Order pursuant to 20 U.S.C. § 1415 (i)(1)(A), (i)(2)(B); 34 C.F.R. § 300.516 (b).

_____          10/16/07
**Frederick E. Woods**                      _____
**Hearing Officer**                          Date

Issued: _____10/16/07_____
**DCPS Student Hearing Office**

10



# Office of Compliance & Review

| In the Matter of | ) | |
| --- | --- | --- |
| | ) | |
| **S.M.** | ) | **IMPARTIAL** |
| Petitioner, | ) | **DUE PROCESS HEARING** |
| vs. | ) | |
| | ) | |
| The District of Columbia Public Schools, | ) | |
| Benning Elementary School | ) | |
| Respondent. | ) | |

The Individuals with Disabilities Education Improvement Act (IDEIA) 20 U.S.C. §§ 1400 – 1482.

Case Information:    Hearing Request Date: August 1, 2007
**Hearing Date: October 4, 2007**
Held at:  Van Ness Elementary School
1150 5th Street, S.E., 1st Floor
Washington, D.C. 20003
SETS Case Number: _____
Student's Birth Date: February 6, 1997
Attending School: Rock Creek Academy
Managing School: Benning Elementary School

## CERTIFICATION OF RECORD

I, Frederick E. Woods, Impartial Due Process Hearing Officer in this matter, do hereby certify that the referenced Record of Proceedings itemizes the entire record in the above captioned matter as of this date, consisting of all letters, pleadings, orders, exhibits, depositions, and audio recordings. The materials placed in the SHO file for this student are either the original or true copy of the original documents submitted in this matter.

Executed this __16 sh__ day of __October__, 2007.

Frederick E. Woods
Due Process Hearing Officer

11

10/16/2007  16:30    2026983825          STUDENT HEARING                    PAGE  13/13

Re: MATTER OF
**S.M. v. DCPS, BENNING ELEMENTARY SCHOOL**

# RECORD OF PROCEEDINGS

## DATE:          ## DESCRIPTION:

08/01/07         **Due Process Hearing Request Filed By Parent**

09/18/07         **Notice of Due Process Hearing Date Sent to Parties**

10/04/07         **Due Process Hearing Convened; Completed; Recorded
                 in HR-5A Start Time 1:00 p.m. and End Time 3:30 p.m.**

10/16/07         **Hearing Officer's Decision Filed with the SHO**

10/16/07         **Hearing Officer's Decision Issued by the SHO**

Frederick E. Woods                        10/16/07
**Due Process Hearing Officer**            **Date**

12

# EXHIBIT

# S

OFFICE OF THE STATE SUPERINTENDENT OF EDUCATION
STUDENT HEARING OFFICE

```
----------------------x
In the Matter of:      :
                       :
SAMUEL MINGLE.         :
----------------------x
```

825 North Capitol Street, NE.
Washington, D.C.

Thursday, October 4, 2007

The HEARING in this matter continued

pursuant to notice.

BEFORE:

FRED WOODS

Hearing Officer

2

```
 1    APPEARANCES:

 2        On behalf of Complainant:

 3            CAROLYN W. HOUCK, ESQUIRE
              Law Office of Carolyn W. Houck
 4            6020 Western Avenue
              Chevy Chase Maryland 20815
 5
          On behalf of Respondent:
 6
              STEPHANIE RAMJOHN-MOORE, ESQUIRE
 7            Office of General Counsel
              District of Columbia Public Schools
 8            825 North Capitol Street, NE., 7th floor
              Washington, D.C., 20002
 9            (202) 442-5000

10

11

12

13                        *   *   *   *   *

14

15

16

17

18

19

20

21

22
```

3

```
 1              C O N T E N T S
 2   WITNESS         DIRECT  CROSS  REDIRECT  RECROSS
 3   Annette Harling    25    50       58       62
 4                                      63
 5                                     121
 6   Keren Plowden      65    79       79
 7   Rhoda Matthews     98   105
 8
 9
10
11
12
13              *   *   *   *   *
14
15
16
17
18
19
20
21
22
```

4

```
 1              P R O C E E D I N G S
 2          MR. WOODS:  Okay.  Good afternoon.
 3   It's Thursday, October the 4th, 2007.  Excuse
 4   me -- my name is Fred Woods, the hearing
 5   officer, convening a due process hearing for
 6   Samuel Mingle.  And as for Samuel's birthday,
 7   it is February the 6th, 1997.
 8              This hearing is being convened in
 9   accordance with the Individuals with
10   Disabilities Education Improvement Act --
11   excuse me -- and the District of Columbia --
12   I should say the Federal District of Columbia
13   laws and regulations that implement the act.
14   My role in this hearing will be to receive
15   the testimony and review the documents that
16   parties will submit in support of their case.
17              Then based on that information and
18   the law, I'll reach a decision with regard to
19   the issues presented for resolution.  That
20   decision will be provided to the parties
21   through their attorneys in the form of a
22   written order within 10 days of this hearing
```

5

1     day.  This hearing is considered a closed

2     hearing, meaning we will not invite anyone

3     else into this room unless they are a witness

4     or party to this case.

5              It is, however, being audio

6     recorded, so I'd ask that each of you make

7     sure that you're in front of the microphone

8     so that we pickup your voice when you're

9     speaking.

10             Before further explaining precisely

11    how the hearing will take place, let me --

12    I'm sorry, not how it will take place, but

13    how we will take the testimony -- before

14    explaining that, let me allow everyone

15    present to introduce themselves, and then I'd

16    like to get clarification of the issue so

17    that we're clear on what we're going to seek

18    to resolve.  Ms. Houck, you can introduce

19    yourself.

20             MS. HOUCK:  Carolyn Houck, I

21    represent the parent, Annette Harling.

22             MR. WOODS:  Yeah, you can go ahead,

6

1    Ms. Harling.

2           MS. HARLING:  I'm Annette Harling,

3    and I'm the mother of Samuel Mingle.

4           MS. RAMJOHN-MOORE:  Stephanie

5    Ramjohn-Moore, attorney advisor, District of

6    Columbia Public Schools.  Good afternoon.

7           MR. WOODS:  Okay.  And welcome all

8    of you here.  Are there any -- Ms. Houck, has

9    Ms. Harling been made aware of her due

10   process rights?

11          MS. HOUCK:  Yes.  We waive that.

12          MR. WOODS:  So you waive that?

13   Okay.  Let me admit, then, if there are no

14   objections, the documents that parties are

15   providing me as their five-day disclosures.

16   These are documents, Ms. Harling, that the

17   parties have submitted in advance of the

18   hearing that they want to rely on at the

19   hearing.

20          MS. HARLING:  Okay.

21          MR. WOODS:  I've just received from

22   Ms. Houck a disclosure but -- and I'm going

7

1       to call them "disclosure letters" -- I've

2       received the disclosure letter dated October

3       -- I'm sorry, September the 27th, 2007, that

4       list six witnesses and attach 20 exhibits.

5       Ms. Ramjohn-Moore, you are in receipt of

6       that?

7                   MS. RAMJOHN-MOORE:  I am.

8                   MR. WOODS:  Any objections?

9                   MS. RAMJOHN-MOORE:  No objection.

10                  MR. WOODS:  Any -- then without

11      objection, it's admitted.  Is there a

12      disclosure from DCPS?

13                  MS. RAMJOHN-MOORE:  Yes, I thought

14      it was in the file.  You saw the file?

15                  MR. WOODS:  It is not.

16                  MS. RAMJOHN-MOORE:  Ms. Houck,

17      could you show me yours?

18                  MS. HOUCK:  Oh, of course.  Oh --

19      I'm sorry, you don't have it?

20                  MR. WOODS:  I don't, no --

21                  MS. HOUCK:  Okay.

22                  MR. WOODS:  I'll give it back to

8

1    you and then I'll get an -- I need a copy.

2            MS. RAMJOHN-MOORE:  Yes, sir.

3            MR. WOODS:  I've now received a

4    disclosure letter from DCPS.  It too is dated

5    -- excuse me -- excuse me again -- September

6    27, 2007, list five witnesses and attached

7    five exhibits.  Ms. Houck, are you in receipt

8    of that?

9            MS. HOUCK:  Yes.

10           MR. WOODS:  Any objections to it?

11           MS. HOUCK:  No.

12           MR. WOODS:  Let's get the issue

13   square away here.  Ms. Houck, you had 19

14   listed concerns, and I was wondering if we

15   still had all 19; are there some that have

16   been worked out?

17           MS. HOUCK:  On our way.

18           MR. WOODS:  Or you could put it in

19   its essence what is at issue if you wanted to

20   do that --

21           MS. HOUCK:  Well, I -- there is --

22   they are all still an issue, but the crux and

9

```
 1    the essence of this is that he's placed

 2    unilaterally at Rock Creek Academy, and we're

 3    asking for funding retroactive to the

 4    beginning of the school year of --

 5              MS. HARLING:  I think it's got to

 6    be September the 10th --

 7              MS. HOUCK:  September 10th.

 8              MR. WOODS:  This year?

 9              MS. HOUCK:  Yes.  And because DCPS

10    did not reply to my request for independent

11    speech language occupational therapy

12    evaluations based upon our challenging the

13    DCPS evaluations, we're asking for a funding

14    independent -- and speech and language

15    independent occupational therapy.  There's

16    other issues, but they all lead to the

17    resolution to be funded at Rock Creek and to

18    fund independent -- shall I read you what we

19    would like funded?

20              MR. WOODS:  Pardon me?

21              MS. HOUCK:  Shall I tell you what

22    the evaluations --
```

1            MR. WOODS:   I thought you said

2    speech and language and OT.

3            MS. HOUCK:   Those based on the fact

4    that we challenged the DCPS evaluations and

5    there was no response from DCPS to defend the

6    evaluations.  But the other evaluations we

7    want funded are psycho-educational, clinical,

8    which I can explain why, occupational

9    therapy, which I can explain why, and the

10   same for speech language functional behavior

11   and social history.

12           MR. WOODS:   In the claim that is

13   being raised that leads to the placement, is

14   it --

15           MS. HOUCK:   Well, in a nutshell --

16           MR. WOODS:   -- an appropriate

17   placement or --

18           MS. HOUCK:   In a nutshell, we're

19   challenging the placement at Benning

20   Elementary.  The child was suspended on

21   almost a daily basis for the entire school

22   year last year.  The child who was

1    functioning, who has solid intelligence and

2    was functioning at grade level the year

3    before, fell so far below grade level that

4    the school intended to fail him for the

5    school year.

6            He was expelled from summer school

7    in the first two days.  So -- and as you can

8    see, there's -- the parent was called at

9    least on a daily basis and sometimes two and

10   three times a day about her son's behavior,

11   especially if she didn't pick him up from

12   school -- leave her work and pick him up in

13   school.  So yes, indeed we're challenging the

14   appropriateness of the placement.

15           MR. WOODS:  Okay.  Miss --

16           MS. HOUCK:  Oh, I'm sorry, if I

17   could say one -- if I could --

18           MR. WOODS:  Oh --

19           MS. HOUCK:  -- one more sentence.

20           MR. WOODS:  Okay.

21           MS. HOUCK:  And this same placement

22   that he was suspended from everyday last year

12

```
 1    because they were going to retain him, we'll

 2    be back in that very same situation for this

 3    school year.

 4            MR. WOODS:  Okay.  So the claim is

 5    based on the last school year?

 6            MS. HOUCK:  And the summer and the

 7    fact that he would be in the same program,

 8    same 4th grade, same school, school year.

 9            MR. WOODS:  Okay.  Ms.

10    Ramjohn-Moore, your thoughts about the

11    placement at Benning, the independent

12    evaluations?

13            MS. RAMJOHN-MOORE:  Hearing

14    Officer, while Benning Elementary School has

15    tried to resolve any issues with the parent

16    -- namely, if you look at parent's exhibit

17    SM12, they approached the parent about having

18    the student comprehensively evaluated through

19    a comprehensive psycho- educational

20    evaluation which contained a clinical

21    component.

22            On May 31, 2007, at that meeting,
```

13

1    SM12, the parent stated that she was working

2    with an attorney, and she wasn't certain if

3    she wanted to have that evaluation done by

4    DCPS, she wanted it done independently.    DCPS

5    has been trying to test the student but

6    unsuccessfully, and I have the special

7    education coordinator, Ms. Rhoda Matthews,

8    available to testify to these things.

9         In addition, Hearing Officer, when

10   DCPS tried to get the parent to sign to

11   consent for them to complete the evaluations,

12   the parent refused DCPS the opportunity to

13   provide the comprehensive psycho-educational

14   evaluation.  His speech and language

15   evaluation is still current, and so is his

16   psycho-educational and occupational therapy

17   evaluations, Hearing Officer.

18        So we would deny any funding for

19   the student based upon inappropriate

20   placement, as DCPS has been trying to resolve

21   the issue with the parent, trying to test him

22   in all areas of suspected disability, and to

14

1    determine appropriate placement.

2         MR. WOODS:  Okay.  Why don't we

3    then just take the evidence that you each

4    have in support of your respective decisions

5    here and we'll see where this comes out.

6         So what we will do now, Ms.

7    Harling, is based on the question as to

8    whether or not -- or whether, I should say,

9    Benning Elementary School is an inappropriate

10   placement for Samuel during the 2006-2007

11   school year, and if so whether Rock Creek

12   Academy can provide him the educational

13   benefit, and as to whether he should be

14   entitled to any independent evaluations.

15        We'll take the testimony with

16   respect to those two in particular -- those

17   two particular issues.  The burden of proof

18   in due process hearings are now on the parent

19   and the parent gets to present their case

20   first.  So the parent, through their

21   attorney, will call witnesses.

22        Each of the witnesses called by the

15

1   parent will be questioned first by the

2   parent's attorney, which will then be

3   followed by questioning of DCPS attorney when

4   this parent's attorney is through calling all

5   of her witnesses, DCPS attorney can then call

6   their witnesses.  They will question their

7   witnesses first, to then be followed by

8   questions from the parent counsel.

9          Following the completion of their

10  case, parties can put on any summary evidence

11  -- oh, summary remarks at the end of their

12  hearing here, and that will basically end

13  this part of the due process hearing.  Okay.

14          MS. HOUCK:  This one -- the motion

15  for default you didn't address that.

16          MR. WOODS:  Okay.

17          MS. HOUCK:  Was sent on the 27th to

18  DCPS at the Student Hearing Office.

19          MR. WOODS:  What's the basis for

20  the default?

21          MS. HOUCK:  No prior notice was

22  issued, no resolution meeting was held,

16

1    there's been no response from DCPS at all as

2    to what DCPS' position is for this regarding

3    the complaint.

4              MR. WOODS:  Okay.  Hearing officer

5    will rule on that after having read the

6    motion.  And DCPS, any response -- I don't

7    know if you have responded to this motion.

8              MS. RAMJOHN-MOORE:  I'm not

9    certain, Hearing Officer.  All I can do is

10   state that under the IDEA, a default should

11   not be granted based upon procedural issues

12   alone, unless there is some sort of prejudice

13   -- the parent -- the prejudice -- the parent

14   filed the hearing request, and is in receipt

15   of my five-day disclosure.  So there was no

16   surprise as to what the defense is, Hearing

17   Officer.  They are privy to all the exhibits

18   in my disclosure, and they are aware of what

19   DCPS' defense is.

20             MS. HOUCK:  There's a reason for

21   the law --

22             MR. WOODS:  Yeah, the hearing

17

1      officer is -- go ahead anyway.

2              MS. HOUCK:  Well, there's a reason

3      for the -- law require either a prior notice

4      or a response.  And I know that in some cases

5      hearing officers will deny the motion for

6      default and there's been a resolution meeting

7      where everything has clearly been spelled out

8      there has been nothing --

9              MS. RAMJOHN-MOORE:  Actually,

10     Hearing Officer, there is a response.  It's

11     in my disclosure and it's in Ms. Houck's

12     disclosure, SM18.  It's a letter from Linda

13     Small.  She is the director of compliance for

14     D.C. Public Schools where they state that

15     they believe Benning Elementary School can

16     provide educational benefits for Samuel by

17     meeting his needs as they did in his IEP.

18             MS. HOUCK:  That's not a response

19     to the hearing request, sir --

20             MS. RAMJOHN-MOORE:  Yeah, it

21     absolutely is.

22             MS. HOUCK:  That's a request to my

18

1    letter of unilateral placement -- my 10-day

2    notice of unilateral placement.  It's not a

3    response to the hearing request.

4              MR. WOODS:  Any legal authority

5    gives the hearing officer authority to grant

6    default judgments in the IDEA for failure to

7    respond to the complaint?

8              MS. HOUCK:  I think there's nothing

9    in the IDEA.  I believe the law is silent as

10   to what the --

11             MR. WOODS:  How about in the

12   Standard Operating Procedures?

13             MS. HOUCK:  No, there's not either

14   in the Standard Operating Procedures.

15   However, I think in the interest of justice

16   to this client -- as I said, if there had

17   been a resolution meeting, we would have been

18   on notice.  But there's -- there was nothing

19   except in the five-day disclosures meeting

20   notes and IEP that we already have.  I would

21   at least --

22             MR. WOODS:  Are you familiar -- I'm

19

1      sorry --

2              MS. HOUCK:  I would at least ask

3      the hearing officer to limit DCPS' defense to

4      these documents in the five-day disclosure.

5              MS. RAMJOHN-MOORE:  My witnesses

6      are disclosed in the five-day disclosure,

7      Hearing Officer.  She is well aware who my

8      witnesses were.  And as Ms. Houck previously

9      stated, there is no remedy in the IDEA for

10     failing to provide notice.

11             MS. HOUCK:  It doesn't say there

12     can be no remedy --

13             MS. RAMJOHN-MOORE:  But I'm saying

14     there is notice in my disclosure and in Ms.

15     Houck's disclosure, SM18.

16             MS. HOUCK:  Law is the law.

17             MR. WOODS:  Yeah, the hearing --

18     are you familiar with the provision in the

19     Standard Operating Procedure as it relates to

20     what hearing officers can do in the absence

21     of getting a response to a complaint?

22             SPEAKER:  I'm -- I have the

20

1    Standard Operating Procedure here now.  I

2    can't recite it offhand, but I have it here

3    and I have read it.

4              MR. WOODS:  Okay.  But -- so is --

5    does that provision that -- if you recall it,

6    give the hearing officer authority to issue a

7    default or does he take that in consideration

8    in reaching his decision?

9              SPEAKER:  Just take it into

10   consideration.

11             MR. WOODS:  Okay.  And that's what

12   the hearing officer would do.  The IDEA does

13   not authorize a hearing officer to issue a

14   default judgment at least as I have

15   understood it, and I have in my research with

16   regard to this particular issue has also

17   realized that because the rule is silent, the

18   law is silent as to whether we even have the

19   authority to issue default judgment, I turned

20   to the rules of the D.C. Superior Court.

21             And I turned to those rules because

22   the Office of Administrative Hearing, which

21

1    is the central administrative hearing body

2    for the District of Columbia, also turn to

3    those rules when the -- their rules are

4    silent as to relief -- procedural relief that

5    could be created.  And it's my understanding

6    for me that D.C.  Superior Court rule is a

7    procedure that would be afterwards a default

8    judgment.

9            It expressly states that a default

10   judgment cannot be entered against the

11   District of Columbia or an agency of the

12   District of Columbia unless there was

13   evidence to support it.  And that seems to be

14   consistent with the IDEA, because it says

15   that we always as hearing officers have to

16   make findings based on the evidence that's

17   presented at the hearing.

18           So I -- for me, that's been a --

19   that's pretty clear that in the absence of

20   that rule for IDEA, that if we would borrow

21   the rule from the court, then the default

22   judgment has to be based on evidence, and

22

1    that's where we are at this hearing.  I don't

2    think it authorizes us to issue a judgment

3    against the government, and I also checked

4    the Federal Rules of Civil Procedure.

5         And those rules govern the United

6    States, and it expressly states that you

7    can't enter a default judgment against the

8    United States Government unless that they are

9    -- I haven't checked any other states.

10   That's interesting when I -- we researched

11   that, that apparently you can't default the

12   government (off mike) entity unless you take

13   evidence to that effect, or unless, I would

14   assume, if we had a rule that expressly said

15   that.

16        So I'm sure at some point the IDEA

17   may be amended to give consequences for a

18   failure to respond.  But in the absence of

19   that, the hearing officer just has the

20   ability -- he has the authority to issue a

21   default judgment, but certainly will take in

22   consideration your concern to the extent that

23

1       that impacted your case.

2                And I take it that will come out in

3       your case.  So that -- the hearing officer

4       would have to deny the motion at least on

5       that basis, unless the law has changed as I

6       came in and --

7                SPEAKER:  Well, I understand and I

8       expected you to say this.  I think at some

9       point there's going to have to be some

10      clarification at some time from the courts or

11      from the IDEA.

12               MR. WOODS:  Yeah, I think the IDEA

13      is -- it's sort of like mediation sessions

14      are confidential, but the IDEA expressly did

15      not say that resolution sessions are

16      confidential.  So sometimes the silence may

17      be for a precise reason.

18               SPEAKER:  It's just interesting,

19      not apropos this hearing is interesting that

20      it will be in there in the IDEA and for what

21      reason, you know, that's what -- they will be

22      addressed at some point.

24

```
1              MR. WOODS:  But I think the reason
2    is that there has to be an answer, but I
3    think the remedy is the only thing that there
4    is a concern.  The reason for it is pretty
5    clear.  It just is the remedy for failure to
6    do (off mike).  And I think that's what we're
7    being asked to find the remedy for that isn't
8    default -- I think in what I -- as I
9    understood the (off mike) you take that in
10   consideration but not that you could issue a
11   default judgment.  Would you like to
12   therefore proceed?
13             MS. HOUCK:  Yes.
14             MR. WOODS:  Okay.  And who would
15   you like to call as your --
16             MS. HOUCK:  I'll call first Ms.
17   Harling --
18             MR. WOODS:  Okay.
19             MS. HOUCK:  -- after that I will
20   call Keren Plowden from Rock Creek Academy.
21   Those will be my two witnesses.
22             MR. WOODS:  Okay.  Ms. Harling,
```

25

```
 1    before giving your testimony, would you mind

 2    taking this oath?

 3            MS. HARLING:  Sure.

 4    Whereupon,

 5                    ANNETTE HARLING

 6    was called as a witness and, having been first

 7    duly sworn, was examined and testified as follows:

 8            MR. WOODS:  Okay.  You will first

 9    be questioned by Ms. Houck then it'll be

10    followed by questions from Ms.  Ramjohn.

11            THE WITNESS:  Okay.

12            DIRECT EXAMINATION

13            BY MS. HOUCK:

14        Q    Ms. Harling, maybe we could start

15    with this past school year.  Can you describe

16    -- where was Samuel in school last year?

17        A    He attended Benning Elementary and

18    his teacher name was Ms. Jerdel.

19        Q    How long had he attended Benning?

20        A    Actually, Sam has been there ever

21    since he was in the kindergarten, so which

22    means it was 2002 -- September 2002.
```

26

```
 1        Q     And does he have an IEP?

 2        A     Yes, he does.

 3        Q     Can you describe for the hearing

 4   officer your experience at Benning Elementary

 5   School year 2006-2007?

 6        A     Well, where do I begin?  Actually,

 7   like I said, he's with -- he's been in

 8   Benning ever since he was in the

 9   kindergarten, and the following years were

10   pretty good.  This past year was horrific.  I

11   mean I cannot describe in words what I went

12   through.  I had -- basically had to resign

13   from my job because Benning would call me

14   every single day, sometimes two or three

15   times a day.

16             They were even calling my emergency

17   numbers, which one was my sister and the

18   other was my grandma.  My grandmother is a

19   75-year-old senior citizen, so of course when

20   she gets the call from my son's school, you

21   know, she's immediately, "Oh, my God, what's

22   wrong with my great grandson?"  So I went to
```

27

1    them on a regular basis, I explained to

2    Benning Elementary, because I work in a

3    school system myself.

4           My occupation -- I'm a preschool

5    teacher, so I know the importance of

6    education is a lifelong.  I let the school --

7    Benning -- know that I am in a school system,

8    and unfortunately the system does not allow

9    any personal phone calls unless it's a matter

10   of life and death.  But I did keep myself on

11   the phone because they were calling me on a

12   regular basis.

13          But I let them know that we're not

14   supposed to have our cell phones on, but I

15   want to keep my cell phone and I used to

16   sneak in the bathroom, sneak wherever I could

17   to get these phone calls.  These phone calls

18   were happening every single day.  Some --

19   most of the days they were happening --

20   school starts at 8:45, and 9:00 o'clock they

21   would call me.

22          And they were threatening me, Ms.

28

```
 1    Harling -- they knew I was at work -- Ms.

 2    Harling, if you cannot get Samuel then --

 3    I'm, like, I can't get him, you know, I'll

 4    try to make arrangements.  I made

 5    arrangements, my sister, his dad, myself --

 6    you know, just so many things went on.  He

 7    was not receiving occupational therapy like

 8    he was supposed to receive.

 9           I'm going to go a step further,

10    because what happened -- D.C. Public Schools

11    went and tested my son behind my back without

12    my knowledge --

13           MS. RAMJOHN-MOORE:  Objection,

14    Hearing Officer.  Is there a question?

15           MS. HOUCK:  There will be.

16           MR. WOODS:  Why don't we -- yeah,

17    go ahead --

18           MS. HOUCK:  I will ask --

19           MS. RAMJOHN-MOORE:  Yeah -- no, I

20    think there needs to be some structure.  It

21    just can't be a ramble.

22           MR. WOODS:  Okay.
```

29

```
 1              MS. HOUCK:  I don't -- she's not
 2    rambling.  She's --
 3              MS. RAMJOHN-MOORE:  There has to be
 4    a question that is answered.
 5              BY MS. HOUCK:
 6        Q    Okay.  You can -- well, I'll ask
 7    you again about the occupational therapy.  Go
 8    ahead and continue on --
 9        A    Okay.
10        Q    -- with what was going on last
11    year.
12        A    Okay.  Yes.  Okay, now, you know,
13    the clear part is I'm not rambling.  This is
14    a court; this is my son's education.  And I
15    will do whatever it takes to have him to get
16    the qualified education he deserves, that he
17    needs to be a productive member of society,
18    and I expect nothing more and I will accept
19    nothing less.  Now that is clarified.
20    Occupational therapy -- as far as they are
21    concerned, my son was tested --
22        Q    Well, let me ask you this -- did he
```

30

1    -- you're talking about the school year

2    2006-2007.  Did he receive any occupational

3    therapy during that school year?

4        A    To my knowledge, very little.  And

5    like I said, I have to give some background

6    so you --

7        Q    Well, I'm going to ask you the

8    background.

9        A    Okay.

10       Q    I'm going to ask you the

11   background.  Did you ever receive any reports

12   that he was receiving any occupational

13   therapy that school year?

14       A    No, never, never.  I didn't find

15   out that he was actually receiving

16   occupational therapy for his last IEP which

17   was May the 31st.  And that's when I was

18   informed that the occupational therapist --

19   over the phone because she was out sick, that

20   he was receiving occupational therapy.

21       Q    But you never spoke with the

22   occupational therapist during the year?

31

```
 1        A    Never, never.

 2        Q    You never got any report cards with

 3   occupational therapy on it?

 4        A    Never, never.

 5        Q    So at -- May 31st -- so what did

 6   the -- there were times -- you said you were

 7   called everyday and sometimes more than once

 8   a day.  What -- could you every time every

 9   day go to the school to pick him up?

10        A    No, I was working.  I was working

11   fulltime in a special needs school.

12        Q    And so what did -- what was going

13   on with Samuel when you -- where did Samuel

14   stay when you couldn't pick him up?

15        A     In the office.  Like I said, I

16   tried to make prior arrangements with my

17   sister, his dad, sometimes myself was able to

18   come in.  And when no one else was able to

19   come in, including myself, he was in the

20   office.

21        Q    So it's safe to say he didn't spend

22   much time in the classroom?
```

32

1       A    No, he didn't.

2       Q    And what were you told at the end

3    of the school year as far as what would

4    happen to Samuel as far as --

5       A    Basically, I was told that he is

6    going to be retained.  That was what I was

7    told all through the school year, so it was

8    not that new to hear at the end of the school

9    year.  That's what I was told that whole

10   school year he will be retained.  He will be

11   retained and not be going to the 5th grade.

12      Q    Did they ever hold a meeting of any

13   kind to discuss the fact that Benning was not

14   an appropriate placement?

15      A    Yeah, several times the special

16   coordinator, the counselor, they spoke and

17   said maybe, you know, this is not the right

18   fit for him, you know, and they've been

19   seeing a lot of kids.  And so as they get

20   older, work is harder so -- yes, they did, so

21   all this --

22      Q    Did they ever have a placement

33

```
1     meeting or suggest other placements to you?

2          A    No, they never did.

3          Q    Did they request Samuel to go to

4     summer school?

5          A    Yes, they did.

6          Q    And can you describe summer school

7     experience?

8          A    The summer school experience

9     unfortunately only lasted for two days.  The

10    first day he went he was given three stripe

11    -- he received one on the first day.  The

12    second day when he came back he received the

13    second stripe.  They only said the second day

14    that one more stripe and he were -- be out of

15    the school, so that was that.  You know, he

16    was threatened to be -- but basically it was

17    -- that was -- it was just a done deal.  It

18    was just a done deal.

19         Q    Was there an evaluation -- all the

20    times that he was "suspended" from school,

21    when he was suspended from class -- whether

22    they could call it a suspension or just put
```

34

```
 1    him out of class, did they ever convene a

 2    manifestation meeting with you to determine

 3    if it was -- did you ever -- did they ever

 4    ask you to come to a meeting to discuss the

 5    suspension?

 6         A    Sometime.  It was not on a regular

 7    basis, most of the time as he was suspended

 8    numerous times.  So sometime -- maybe out of

 9    all the suspensions, maybe about one-third I

10    may have met with the appropriate people.

11    Sometime there would be the counselor or the

12    principal if he wasn't busy.

13         Q    Do you -- did they ever do a

14    functional behavioral assessment on him?

15         A    I'm not sure of that.

16         MS. HOUCK:  For the record, I'll

17    report that there's no functional behavioral

18    assessment in the record -- in the

19    disclosures.

20         BY MS. HOUCK:

21         Q    Did they -- what happened on June

22    -- what happened at the -- during the last
```

35

```
1   two weeks of school?

2       A    The last two weeks of school

3   unfortunately he was suspended June the 1st

4   through the entire school year, which was 14

5   days.  So he was suspended for two weeks with

6   no finding, just nothing.  And I felt that, ✓

7   you know, what did he -- what could he have

8   possibly done to have been suspended for 14

9   days, and how was I going to be able to work

10  and have my son been taken care of at the

11  same time?

12          There's no way possible, my son is

13  only 10 years, I couldn't leave him home, and

14  I can't take off 14 days of my job either.

15      Q    You heard that Ms. Ramjohn, the

16  DCPS attorney, mention that the school had

17  been trying and trying to evaluate your son

18  but you had not allowed it.  But you went to

19  the meeting, the IEP meeting in May?

20      A    Yes, I did.

21      Q    And after that -- and at that time

22  you heard the DCPS attorney say that they had
```

36

1    wanted to evaluate him.  What happened after

2    that meeting?

3         A    Actually, what happened was that

4    they asked and because I had seek the advice

5    of another attorney, she advised me -- but

6    that was the first time.  All throughout the

7    school year, they were asking me was

8    something going on in the house.  They

9    believed it's an emotional problem what's

10   going on in my home.

11        And I let them know I still -- I'm

12   still in the same home, my son is an only

13   child, nothing is going on, you know.  So

14   they just wanted to put it off as being an

15   emotional thing and they were telling me,

16   well, seek outside help, try to get him

17   evaluated outside, go to his doctor's office.

18   They gave me numbers and I called up one of

19   the numbers, and unfortunately, that service

20   was disconnected.

21        So basically through the school

22   year they had it so that it was an emotional

37

1    thing that was tied into my home, his home

2    life.  And for the first time in May, that's

3    when they recommended the psycho -- I don't

4    know the name of it, but that's what they

5    came up with, and I let them know because of

6    the advice that I had spoken with a prior

7    attorney, she advised me not to have that

8    particular test done at that time.

9          But she didn't know about -- she --

10    it would be best to go to D.C. Public School

11    or outside.  And that is what I told them.

12    Q    And what -- then after you talked

13    to me, after that meeting what did you do?

14    A    And after I talked with you, I went

15    to the school I have -- I wrote a letter, and

16    the letter was taken to the school and --

17    stating that I did want him to have those

18    tests done.

19    Q    So at the -- you are telling me

20    that they had permission to test?

21    A    Yes.

22    Q    Since that time, have you received

38

```
 1      any calls from DCPS wanting to test your son?

 2          A    No, no.

 3          Q    So is it your understanding that

 4      this -- from what you were told that he would

 5      be back in the same 4th grade class at

 6      Benning this school year?

 7          A    Yes.

 8          Q    How -- the prior school year, you

 9      described this when you said -- I think you

10      said horrendous experience -- what about the

11      prior school year?

12          A    The prior school year, this

13      teacher's name was Ms. Wilson she was an

14      older lady.  And she really, really worked

15      with my son and myself.  She was seeing the

16      potential and she is very eager to have him

17      to do the best that he could do.  And so she

18      really worked with him.  I mean we talked

19      everyday, we came up with different plans,

20      strategies, things of that nature, that's how

21      we came to the point that we figured out that

22      he needed occupational therapy.
```

39

```
 1            So the prior school year yes, Ms.

 2     Wilson was an excellent teacher, she did

 3     everything in her power to see that he makes

 4     it to the next grade, and she just didn't

 5     stop, you know, she just didn't stop.  She

 6     paid attention in my son.

 7            MS. HOUCK:  The record, Hearing

 8     Officer when he reviews the record will note

 9     that her son's scores continued to go down to

10     where he was basic -- he was on grade level

11     that year --

12            THE WITNESS:  Yes, he was.

13            MS. HOUCK:  -- and then that -- by

14     the time the next year rolled around he was

15     below grade level and failed.

16            THE WITNESS:  Yes.

17            BY MS. HOUCK:

18     Q     Do you work with him at home?

19     A     Yes, I do.  I'm a proactive parent.

20     I am in the field of education.  I am a

21     preschool teacher.  I am proactive in every

22     way possible, I work with him on a daily
```

40

1    basis, I get him motivations, talk every

2    morning, we read every night, we've been to

3    -- we've been -- we travel, yes, I am

4    proactive all the way.

5            I have been that way from day one

6    and I will continue to be that way until he

7    is out of college.  So that is -- goes to

8    show -- yes, I am proactive in his education.

9    I attend all of the PTA meetings, all of the

10   special or regular activities, anything and

11   everything that has to do with his school,

12   because, sir, he's my son, I'm there.

13           MS. HOUCK:  Your indulgence for

14   just a moment, please.

15           BY MS. HOUCK:

16       Q    Where is he in school this school

17   year?

18       A    He is attending Rock Creek Academy.

19       Q    Have you visited Rock Creek?

20       A    Yes, I have.

21       Q    Can you just -- has he been

22   suspended from -- how long has he been at

41

1      Rock Creek?

2          A      He's been at Rock Creek about a

3      month, ma'am.

4          Q      Has he been suspended from Rock

5      Creek?

6          A      No, he hasn't.

7          Q      Did they ever make calls from the

8      school stating that they can't handle his

9      behavior?

10         A      No.

11         Q      Have you discussed with Samuel his

12     school day?

13         A      Yes.  He's very excited; he has the

14     confidence, he is motivated.  It's such a joy

15     to see my son actually enjoying school, it's

16     a joy.

17             MS. HOUCK:  For the -- I'll just

18     ask the hearing officer to note that on

19     August 23, 2007 I sent a notice of unilateral

20     placement to DCPS Office of Mediation and

21     Compliance, and received a reply just simply

22     stating that Benning was appropriate

42

```
 1    placement, no offer to hold a meeting or

 2    evaluate him or anything like that, just that

 3    Benning -- all right let's go --

 4            BY MS. HOUCK:

 5        Q    You mentioned that he received an

 6    occupational therapy evaluation --

 7            MS. HOUCK:  This is violation of

 8    supporting facts number one, Mr. Woods.

 9            BY MS. HOUCK:

10        Q    An occupational therapy evaluation

11    in 2004, was that record ever shared with

12    you?

13        A    No, it was never shared with me

14    until May of 2006.

15        Q    Did you know that the evaluation --

16        A    I had no idea.  And to make it

17    still bad is that I went to school IEP

18    meeting two weeks prior to them doing his

19    testing.  No one ever called me, no one ever

20    said anything about it, I had no idea.  I had

21    no idea.

22            And I would have never known, if I
```

43

1    didn't press the issue for him to have the

2    occupational therapy tested, therapy testing

3    done.  And that is how I found out because

4    several times a special coordinator tried to

5    have his testing done, and she never got any

6    luck.

7           They founded, they send a report

8    back and say, "Well, you know, he had this

9    test done in 2004."  I am like, "What 2004?"

10   I mean I've never heard about it.  And he

11   didn't need the service and he never received

12   the services.

13       Q    So the February 2004 reports states

14   that he requires occupational therapy?

15       A    Yes.

16       Q    Uh-huh. That is in the --

17       A    Yes, it's in the report.  I have

18   the report right here as well.

19       Q    Yes, the report is number 3, in the

20   record.  So throughout all this DCPS never

21   volunteered to do what's called the "clinical

22   emotional evaluation" for him?

44

```
 1        A    No.

 2        Q    Did they ask you to get it

 3   yourself?

 4        A    Basically, I guess they basically

 5   the whole school year, they were saying that

 6   they believe it's an emotional problem.

 7   Home-like setting, that was basically what

 8   they were telling me and they gave me a

 9   couple of numbers, and I guess I did call one

10   number and that office location said it was

11   closed.  They referred me to maybe go to his

12   doctor, things of that nature, but no, not

13   officially, no.

14        Q    Okay.

15             MS. HOUCK:  Indulgence for a moment

16   please.  Sorry, Mr. Woods.

17             BY MS. HOUCK:

18        Q    I kind of guess, I was just going

19   to ask you to look at the IEP that was

20   developed on May 23, 2006 and that is

21   document 9.  What is his disability

22   classification?  Roman numeral 5.  It's this
```

45

```
1        -- I can show it to you, this is fine.  Yes,

2    right here.

3        A    Yes.  Speak and language

4    impairment.

5        Q    Was there speech and language

6    therapist at the meeting.  You can read here

7    and look and see -- what they -- each

8    person's title is.

9        A    Right.

10                (Discussion off the record)

11             MS. HOUCK:  There is no speech and

12   language therapist at the meeting.

13             BY MS. HOUCK:

14       Q    I'll go to the May 31, 2007, IEP

15   which is document 12, this is the at the end

16   of the school year where they said they were

17   going to retain him -- at the meeting was a

18   special education teacher Rhoda Matthews, who

19   is Rhoda Matthews?

20       A    She is the special coordinator.

21       Q    Special education coordinator.

22       A    Uh-huh.
```

BETA COURT REPORTING
www.betareporting.com
(202) 464-2400      800-522-2382

46

```
 1        Q    And do you know Keith Norman?

 2        A    Actually I've just seen him

 3   briefly.  I know that he is the staff of the

 4   special education teacher there then.

 5        Q    Was he -- did he know Samuel?

 6        A    No, he didn't, no.

 7        Q    So at this meeting, none of

 8   Samuel's teachers were present, is that

 9   right?

10        A    No, none of his teachers were

11   present.

12        Q    Do you know Pamela Perkins speech

13   therapist?

14        A    Yes.

15        Q    Do you know if she knows Samuel?

16        A    Yes, she is his speech therapist.

17        Q    So she provides him speech therapy?

18        A    Yes, she does.

19        Q    His OT is on his IEP for one hour a

20   week, you've never known that he get any OT

21   --

22        A    No.
```

47

```
 1        Q    If during this school year -- when

 2   he was suspended, I think you said every day,

 3   if they had called you to a meeting in

 4   wanting to evaluate Samuel, would you have

 5   given your consent?

 6        A    Yes, yes -- like I said, I kind of

 7   began to put the words (off mike) yes, I am

 8   more than willing to whatever it takes for

 9   him to get the best education, the quality

10   education that he deserves indeed, so yes.

11        Q    Do you believe he was educated

12   during last school year?

13        A    No.

14        Q    Do you believe he is being educated

15   now?

16        A    I know he is, I see his work, the

17   teachers they show me report concerned

18   everyday, I know he is.

19        Q    At the end of school year -- the

20   year before this past school year that was so

21   bad, the end of that school year, and then

22   compare that to the end of this school year,
```

48

 1    could you see during the year that Samuel was

 2    regressing?

 3         A    Yes, I believe -- yes, he my son

 4    used to read fluently I mean, maybe one or

 5    two grade levels above.  It got so bad he

 6    wasn't -- won't -- wasn't reading fluently,

 7    he started to hate reading, his lack of

 8    interest, withdrawn, just so many things that

 9    I have noticed, I picked up, and like it's

10    just a course of one school year.

11         MS. HOUCK:  I think that's all from

12    -- I have for her, let me just review the

13    record please.

14         BY MS. HOUCK:

15         Q    You are still working in the same

16    preschool?

17         A    Unfortunately no, I had to resign

18    my job.

19         Q    In part -- there may have been

20    several reasons, was one of the reasons what

21    was going on with Samuel's school?

22         A    Yes.  My direct supervisor came to

49

1    me several times, and then the head

2    supervisor came to me, and that he know that

3    I was missing too many days, and I explained

4    to him that it was because of my son, he gets

5    suspended from school.  And I am his

6    custodial parent, and I was the sole person

7    responsible for caring my son.

8            So most of the time I had to even

9    leave work early or sometime I had to go in

10   late because it was meetings, getting home

11   from school I mean, just a whole the nine

12   yards, and like I said I worked in the school

13   myself.  And they just didn't allow you to

14   miss it so many days, because they needed you

15   to be there with the children as well.

16       Q    If it had been a successful school

17   year, would -- and you have still intended to

18   keep him at Benning?

19       A    Yes because he's been there with us

20   when he was in the kindergarten he knows the

21   kids.  My son was very shy when he started in

22   the kindergarten.  And probably by the second

50

1    and third grade he started to really opening

2    up to kids, and stuff.

3           And so yes, I would have let him

4    graduate from his sixth grade with these

5    children that he had -- basically grew up

6    with.  Yes, I was very familiar with the

7    school, the staff, great setting location,

8    yes, he would have been still at Benning when

9    he graduated from the sixth grade.

10    Q    And the school would call meetings

11    and so forth which you attend?

12    A    Yes, I attended each and every

13    meeting, yes.

14    Q    Okay.

15           MS. HOUCK:  That's all that I have

16    for you I think that DCPS attorney might have

17    cross examinations.

18           MR. WOODS:  Okay.  Ms. Moore.

19           MS. RAMJOHN-MOORE:  Hi, yes.

20           CROSS-EXAMINATION

21           BY MS. RAMJOHN-MOORE:

22    Q    You stated that you never received

51

```
1    any phone calls from DCPS requesting to test

2    your son, and you also stated that you

3    brought a letter up to the school saying that

4    they could go ahead and test him.

5         A    Yes.

6         Q    Can you show me in your parents

7    disclosure, where that letter is?

8         A    I don't where the letter is.  But I

9    do have a copy of it.

10        Q    Do you have a copy in the

11   disclosure, was there a copy provided to your

12   attorney?

13        A    You know, I am -- I don't know I

14   have the letter, so --

15        Q    Does your attorney have the letter?

16        A    I don't think she does, no.

17        Q    Okay.  You said that they never

18   convened a placement meeting, when did you

19   request a placement meeting for Samuel?

20        A    I requested a -- no, I don't know

21   about the placement meeting -- I didn't, what

22   I did was --
```

52

```
 1              MS. RAMJOHN-MOORE:  Hearing

 2    officer.

 3              MS. HOUCK:  No, no I am not writing

 4    her note, I am writing notes to myself and

 5    I'll do it over here.

 6              BY MS. RAMJOHN-MOORE:

 7        Q    When did you request a placement

 8    meeting?

 9        A    Five, April 5, well, are you

10    talking about occupational therapy I mean,

11    what do you mean?

12        Q    When did you request a placement

13    meeting for --

14              MS. HOUCK:  I am going to object to

15    the --

16              MS. RAMJOHN-MOORE:  Hearing officer

17    --

18              THE WITNESS:  Okay, I don't know

19    what you mean, so can you elaborate --

20              MR. WOODS:  What was the basis for

21    the objection -- hold on just a second?

22              MS. HOUCK:  That the parent is not
```

53

1    required to -- she doesn't know what she's

2    talking, she doesn't understand the question.

3          MS. RAMJOHN-MOORE:  She testified

4    to it.  So now all of a sudden she doesn't

5    know what it is?

6          MS. HOUCK:  I -- no, what she

7    testified to is that DCPS never called a

8    placement meeting.

9          MS. RAMJOHN-MOORE:  And she

10   testified that they never did.  So how can

11   she not know what it is now, when I am asking

12   on cross-examination?

13         MS. HOUCK:  The -- a meeting to

14   discuss placement, and Mr. Woods it's not the

15   parent's responsibility to call a placement

16   meeting.  And there's no reason to ask the

17   parent this question she is -- it's just not

18   her responsibility.

19         MR. WOODS:  What's the -- I am not

20   understanding objection to the question.

21         MS. HOUCK:  That is the objection.

22         MR. WOODS:  Then the parent -- I

1    don't think you asked her, did she call you,

2    you asked did she request a meeting.

3             MS. RAMJOHN-MOORE:  Yes, I did.

4             MS. HOUCK:  Well, request, call,

5    it's --

6             MR. WOODS:  I don't know, I -- if

7    the parent has a right to ideally request to

8    meetings.

9             MS. HOUCK:  But she doesn't --

10             MS. RAMJOHN-MOORE:  She testified

11    to it on direct, hearing officer.

12             MR. WOODS:  Yeah, I have to

13    overrule the objection, I mean, if you don't

14    understand what is meant by that, but parent

15    does definitely have rights to request a

16    meeting.

17             MS. HOUCK:  She has a right, yes.

18             THE WITNESS:  Right.  The only

19    think I don't understand is that I don't

20    understand what you mean placement -- are you

21    talking about occupational therapy, are you

22    talking about placement in another school, I

55

```
 1    mean --

 2            BY MS. RAMJOHN-MOORE:

 3        Q    What did you think it meant when

 4    Ms. Houck asked you, "Did DCPS call you to

 5    ask for a placement meeting?"  And you

 6    responded.  What did you think it meant?

 7        A    I though that it meant, did they

 8    call and ask me about any additional testing

 9    or going to any additional school anything of

10    that nature.

11        Q    Okay.  Additional schooling.

12        A    Yes.

13        Q    Did you request a placement meeting

14    from anyone at Benning Elementary School?

15        A    No, I did not request a placement

16    meeting.  I am going to -- with my attorney.

17        Q    Okay.  You said that you never got

18    any reports or documentation pertaining to

19    occupational therapy services?

20        A    Yes.

21        Q    To whom did you make that request

22    for those reports?
```

56

```
 1        A    I didn't make a request to nobody,

 2   because of the simple fact I did not know

 3   that he was receiving services because he was

 4   -- had supposed to be receiving services for

 5   almost 2 1/2 years and not receive services.

 6             MS. RAMJOHN-MOORE:  Your indulgence

 7   hearing officer.

 8             BY MS. RAMJOHN-MOORE:

 9        Q    Please have your attorney show you

10   SM12.

11             MS. HOUCK:  A particular page or --

12             MS. RAMJOHN-MOORE:  The second page

13   of the notes, starting where "the team

14   requested a comprehensive psychological

15   evaluation to be completed to look at

16   Samuel's emotional state, he continuous to

17   not produce work in the classroom."

18             BY MS. RAMJOHN-MOORE:

19        Q    Did the team ask you to complete

20   that psycho educational?

21        A    Yes, they did, they did, and I got

22   to -- I told them I was working through with
```

57

```
 1     another attorney and she advised me and not

 2     to have the testing done.  I --

 3         Q    What was that attorney's name?

 4         A    I don't know her name, it was

 5     through parental education services, it was

 6     only briefly in that school with her, because

 7     I was not happy with speaking with her, so I

 8     left her, and then my sister found her.  So

 9     yes, that is why --

10         Q    Did you sign an occupational

11     therapy, I guess it's a comp ed plan for your

12     son, in May of 2006?

13         A    You know what, I had -- I will have

14     to look through my notes, I guess, probably

15     you know, what actually it might have because

16     what happened was he was supposed to receive

17     the occupational therapy that he was due on

18     start at summer school which would have been

19     at Smothers.  So I probably did something for

20     him to get the services.

21         Q    When did you bring that letter up

22     to the school requesting them to go ahead and
```

58

```
 1    test your son?  What was the date of the

 2    letter?

 3        A    It was mid July the 26th.

 4        Q    And when did he start Rock Creek

 5    Academy?

 6        A    He started September the 10th.

 7             MS. RAMJOHN-MOORE:  I have no

 8    further questions, hearing officer.

 9             MR. WOODS:  Ms. Houck.

10             MS. HOUCK:  Redirect --

11             REDIRECT EXAMINATION

12             BY MS. HOUCK:

13        Q    You brought up Smothers, the summer

14    school at Smothers that was December of 2006,

15    why did he go to Smothers Summer School.

16        A    At first he was supposed to go to

17    Benning, but Benning said that there was not

18    enough children there receiving occupational

19    therapy, so he needed to got Smothers where

20    he will be getting the occupational therapy.

21        Q    Did you take him to Smothers?

22        A    Yes, I did.
```

59

1       Q      At the request of the school

2    district?

3       A      Yes.

4       Q      Did he receive any occupational

5    therapy?

6       A      No, he did not.

7       Q      And I just want to clarify at any

8    time during the school year did the school

9    team call a meeting, it's called an MDT or

10   IEP or placement a meeting with the teachers

11   and principals over there, and say to you we

12   think this is not appropriate because he gets

13   suspended lately we want you to look at other

14   schools and give you names to look at?

15      A      They never did.  Like I said, they

16   always said it was basically an emotional

17   problem, and they wanted to know about our

18   home life, what was going on at home.  They

19   never recommended any other schools.

20      Q      And -- going back and forth about

21   this May 31st meeting, what when did you

22   retain me, when did you first come to see me?

60

```
 1        A    Well, I believe it was in June, I

 2   believe.

 3        Q    And why did you -- this June of

 4   this school year, 2007?

 5        A    Yes.

 6        Q    And why did you and it was after

 7   you retained me that you then took the letter

 8   to the school --

 9        A    Yes.

10        Q    -- saying that you were giving me

11   provision to evaluate this?

12        A    Yes.

13        Q    And just to clarify the OT you

14   testified that they evaluated him without

15   your knowledge in 2004, and how many years

16   was it before you found out he was supposed

17   to be receiving occupational therapy?

18        A    Exactly two years and two months,

19   he was evaluated February '04 and didn't

20   found about it until May '06.

21        Q    Okay.  Thank you.

22             MS. HOUCK:  Mr. Woods might have
```

61

1    some questions, I don't know.

2            MS. RAMJOHN-MOORE:  I have a

3    follow-up question.  May I ask it?

4            MR. WOODS:  Any objection there?

5            MS. HOUCK:  Well, I guess it could

6    go on forever.  I -- it's out of --

7            MS. RAMJOHN-MOORE:  Well, it's just

8    one question.  That's Okay. I can talk about

9    it in my closing.  Go ahead.

10            MR. WOODS:  Okay.

11            MS. HOUCK:  I don't -- it's --

12            MR. WOODS:  Do you have -- Okay.

13    There is no objections, here.  Question Ms.

14    Moore.

15            MS. RAMJOHN-MOORE:  I just wanted

16    to talk about you know, because her attorney

17    just asked about occupational therapy

18    services and she said two years.

19            MR. WOODS:  You said you had no

20    objection.

21            MS. RAMJOHN-MOORE:  I am getting to

22    my question.

62

1          MR. WOODS:  Oh, okay.

2          BY MS. RAMJOHN-MOORE:  She said

3    there was two years without services, but my

4    cross-examination the parent, I don't know --

5          RECROSS EXAMINATION

6          BY MS. RAMJOHN-MOORE:

7      Q    Did you state that you did sign

8    this comp. ed services for the 56 hours.

9      A    But that was in 2006.  They tested

10   him and (off mike) services in February 2004.

11     Q    Right and this comp. ed plan was

12   developed to give your son those missed

13   services.  It says that on the piece of paper

14   that you signed.

15     A    Okay.  Yes, but that's two years

16   and two months later, he still didn't receive

17   what he was supposed to which was in summer

18   school of June '06.

19     Q    But you did sign this Comp. ed

20   plan, right?

21     A    Yes, I did.

22     Q    Okay.  I have no further questions,

63

```
 1    thank you.

 2            MS. HOUCK:  Well, then I have one

 3    quick redirect.

 4            MR. WOODS:  Okay.  Go ahead.

 5            FURTHER REDIRECT EXAMINATION

 6            BY MS. HOUCK:

 7       Q    The Comp. ed plan that you signed,

 8    did he ever receive any of the --

 9       A    That what I am trying to make my

10    point, he did not receive it, he was

11    supposedly received at Smothers Elementary

12    School that summer, he did not receive it,

13    services did not begin there.

14            MS. HOUCK:  Okay.  That's -- that's

15    all.

16            MR. WOODS:  Oh -- anything?

17            MS. RAMJOHN-MOORE:  No.

18            MR. WOODS:  Okay.  You can call

19    your next witness.

20            MS. HOUCK:  I'll call Keren Plowden

21    from Rock Creek.

22            MR. WOODS:  Maybe I'll dial it
```

64

1    here?

2              MS. HOUCK:  Oh actually I have to

3    call her cell phone, it's 240 --

4              MR. WOODS:  Oh, let me see how to

5    do this.

6              MS. HOUCK:  I was doing it earlier

7    in the appearance room, I dealt 9 and then

8    240.

9              MR. WOODS:  It's 240?

10              MS. HOUCK:  Yes, sir.  475 1978.

11              MR. WOODS:  I'll let you talk to

12   her --

13              MS. PLOWDEN:  Hello.

14              MS. HOUCK:  Hi, Ms. Plowden, It's

15   Carolyn.

16              MS. PLOWDEN:  Carolyn.

17              MS. HOUCK:  Hi.

18              MS. PLOWDEN:  Hi.

19              MS. HOUCK:  We are here in hearing

20   room --

21              MS. PLOWDEN:  Okay.

22              MS. HOUCK:  -- with Mr. Woods, Ms.

65

```
 1    Harling, Stephanie Ramjohn, and myself.

 2            MS. PLOWDEN:  Okay.

 3            MR. WOODS:  Okay.  All said.

 4            MS. HOUCK:  Yes.

 5            MR. WOODS:  Okay.  What her name

 6    again.

 7            MS. HOUCK:  Keren Plowden.

 8            MR. WOODS:  Okay.  Ms. Plowden, can

 9    you hear me, this is Fred Woods the hearing

10    officer.

11            MS. PLOWDEN:  I can hear you.  Can

12    you hear me?

13            MR. WOODS:  Yes.  Okay.  We are

14    prepared now to receive your testimony before

15    giving it would you mind taking this oath.

16    Whereupon,

17                    KEREN PLOWDEN

18    was called as a witness and, having been first

19    duly sworn, was examined and testified as follows:

20            MR. WOODS:  Okay.  Ms. Houck, you

21    may proceed.

22                    DIRECT EXAMINATION
```

66

```
 1          BY MS. HOUCK:

 2      Q    Ms. Plowden, did you -- you want

 3   spell your name for the record?

 4      A    Sure, my name is Keren K-e-r-e-n,

 5   my last name is Plowden, it's P-l-o-w-d-e-n.

 6      Q    And what is your occupation?

 7      A    The executive director of student

 8   services at Rock Creek Academy.

 9      Q    And as the executive director what

10   are your duties?

11      A    There are many, but I am

12   responsible for reviewing and receiving

13   referrals to our school, and making admission

14   decisions.  I am responsible for making sure

15   that student services are in compliance, IEP

16   (off mike) special ed meetings, things of

17   that nature.

18      Q    What is your educational

19   background?

20      A    My educational background, I hold a

21   bachelors degree in psychology.  I hold a

22   masters degree in education and human
```

67

1    development.  I am currently a doctoral

2    student in special education and I am a

3    licensed special education teacher in the

4    District of Columbia.

5        Q    Can you describe Rock Creek

6    Academy?

7        A    Sure, Rock Creek Academy is a

8    full-time special education program that

9    provides services on a permanent or interim

10   basis for students with multiple distorties,

11   primarily we serve students with the

12   emotional disabilities, learning disability,

13   other health impairment, speech and language

14   impairment, mild mental retardation.

15           And we provide specialized

16   instruction, we provide counseling services,

17   we provide speech and language therapy,

18   occupational therapy, physical therapy.

19   Crisis intervention, the staff behavior

20   specialist, who is a full time nurse, you

21   know a staff reading specialist, who am I

22   missing.  (off mike) counselor we -- all our

68

1    teachers are -- like the special education

2    teachers -- at the school level they may be

3    content certified.

4        Q    Are you familiar with the student

5    Samuel Mingle?

6        A    Yes, I am.

7        Q    And how are you familiar with him?

8        A    I have his -- Samuel's record even

9    admissions decision, I have spoken with Ms.

10   Harling, I have conducted a torn interview,

11   I've met with Samuel's teacher Ms.

12   Annunziata, I am familiar with his program

13   that he is part of on a daily basis.

14       Q    What are the issues that brought,

15   that caused me to refer Samuel to Rock Creek

16   -- what?

17       A    I am sorry I couldn't hear you.

18       Q    Well, I'll rephrase that.

19       A    Okay.

20       Q    Well, I'll get to that in a minute.

21   Let me ask you this, who is Samuel's teacher?

22       A    His teacher is Rachel Annunziata.

69

```
1        Q    And she's certified special
2   education teacher?
3        A    Yes, she is.
4        Q    How many students --
5        A    In juvenile education and special
6   education.
7        Q    In juvenile education and special
8   education?
9        A    Yes.
10       Q    Can you describe Samuel's class?
11       A    Sure, there are currently six
12  students including Samuel in his classroom.
13  They are students that are between the ages
14  of 10 and 11.  Do you want me go through like
15  a typical day, or how --
16       Q    No.
17       A    Okay.
18       Q    Let me just ask you how Samuel is
19  doing in school?  And in the process of that
20  describe Samuel.
21       A    Sure, in speaking with Ms.
22  Annunziata, he has been attending Rock Creek
```

1    Academy since September 10.  So the

2    information I have is just be (off mike).

3    But his teacher describes him as kind of a

4    bit silly and (off mike).

5        Q    I am sorry I didn't here that.

6        A    Teachers describes him as being

7    (off mike) having a hard time --

8            MS. RAMJOHN-MOORE:  She needs to

9    repeat that.

10           MR. WOODS:  You are breaking up.

11           MS. HOUCK:  Keren.

12           THE WITNESS:  Is this any better?

13           MS. HOUCK:  Try it, yes try it.

14           THE WITNESS:  Is it better now?

15           MS. HOUCK:  Yes.

16           THE WITNESS:  Okay.  I can give you

17   my landline, if that's easier.

18           MS. HOUCK:  Would that be easier?

19           THE WITNESS:  It may be easier for

20   you to hear me, I am sorry, sometimes my cell

21   phone doesn't work very well -- I can give

22   you a direct line, if that's easier and you

71

```
 1    can --

 2              MS. HOUCK:  Is that okay, Mr.

 3    Woods?

 4              MR. WOODS:  Yes.

 5              MS. HOUCK:  Okay.  What is that?

 6              THE WITNESS:  It's 301 --

 7              MS. HOUCK:  Uh-huh.

 8              THE WITNESS:  925 --

 9              MS. HOUCK:  Uh-huh.

10              THE WITNESS:  2150.

11              MS. HOUCK:  Okay.  We'll hang up

12    and call you back.

13              THE WITNESS:  Okay, sorry about

14    that.

15              MS. HOUCK:  That's okay.

16              MR. WOODS:  925.

17              MS. HOUCK:  2150.

18              MR. WOODS:  You can just --

19              THE WITNESS:  Hello.

20              MS. HOUCK:  Hi.

21              THE WITNESS:  Is that better?

22              MS. HOUCK:  Yes.
```

72

```
 1              MS. RAMJOHN-MOORE:  Much.

 2              THE WITNESS:  Okay.

 3              BY MS. HOUCK:

 4        Q     Now, I had you asked you to

 5   describe Samuel.

 6        A     Okay.  From what I know he -- since

 7   he started on the September 10 at Rock Creek

 8   Academy.  So since that point since he has

 9   been with us he is been kind of a off, he's

10   having a hard time with social interactions

11   and peer interaction.

12              Although he is responding to our

13   point-sheet system, we have a level system

14   that we use for behavior management, and he

15   seems to be responding well to the positive

16   incentives that come along with him having a

17   successful day and for earning his point.

18              He has at times difficulty

19   completing tasks, like class work and

20   assignments in the classroom and he is

21   prompting from his teacher, and I did

22   indicate he is having some difficulties with
```

73

1    peer interaction.  His, he is not aggressive

2    or there is no issues with any kind of

3    physical concerns he just has a hard time --

4    he is cut up, silly sometimes and he has a

5    hard time making friends with some of the

6    other students are frustrated by him.  And so

7    he needs a lot of prompting and some good

8    social skills training and things to support

9    in that way.

10        Q    You are aware that in his prior

11   school he had -- was suspended most everyday?

12        A    Yes, I am.  I am aware of that.  He

13   has not been suspended since he's been with

14   us, or demonstrated behaviors that are

15   needed, or wanted any type of in-school or

16   out-of-school suspension.

17        Q    Has -- you have behavioral

18   specialist in your school to handle students

19   whose behavior, I guess that you would -- a

20   teacher would refer students to, if their

21   behavior were out of control or you couldn't

22   control him in the classroom?

74

```
 1      A    Yes.  We staff 11 in our entire

 2   program, for Samuel's program there are two

 3   that are on his school all day, every day.

 4      Q    Have you had to -- has the teacher

 5   had to refer Samuel to the behavioral

 6   specialist?

 7      A    Not that I am aware of, no.  He has

 8   been able to manage both of his behaviors

 9   within the classroom and just give him extra

10   support as needed.

11      Q    Is it -- what does it take for a

12   child to get suspended from your school?

13      A    It should be very extreme issue for

14   a student to get suspended, an example might

15   be that they maybe have hit a staff member or

16   engaged in a fight with another student, and

17   it was a serious is that would want kind of a

18   not only a suspension, but a parent meeting,

19   and either a peer mediation or a re-entry

20   type meeting.

21      Q    Would -- I mean, have you ever had

22   a student that you've had to suspend
```

75

```
 1    everyday?

 2         A    Suspend everyday?

 3         Q    Yes.

 4         A    No.  All of our students -- by law

 5    we can only suspend the student -- can only

 6    be suspended up to 10 days before there was a

 7    manifestation meeting.  But that's not

 8    really, we train our staff to be able to

 9    respond to crisis situation and deescalate

10    them, so that they don't get to the point

11    that type of extreme behavior is

12    demonstrated.

13              And now, we have had instances

14    where students have been suspended, you know,

15    for one reason or another, it has happened

16    but not to that level of frequency, no.

17         Q    If you had a student that you felt

18    you could not have in the classroom, and you

19    felt he had to be out of the classroom every

20    day, would you think that would be an

21    appropriate placement for the student?

22         A    No, if we has a student who
```

1    behavior was so severe, we would most likely

2    hold a either a manifestation meeting, it's

3    the number of suspensions got to that point

4    or just hold an MDP meeting, to describe what

5    interventions maybe needed.

6           Some students with severe behavior

7    display may need a one-to-one they may need a

8    smaller setting they may need a more

9    therapeutic setting.  They may even need

10   residential treatment.  So I mean, it's just

11   depends on the student, and the behaviors

12   that they are displaying, and the

13   circumstances around again.

14      Q    So Samuel has been there close to a

15   month now, have -- does your school do any

16   informal testing or do development IEP at

17   some point if you consider this one's not,

18   needs to be revised, how do you -- what's the

19   next step?

20      A    Well, a couple of things, one there

21   is informal reading assessment that is done

22   just to kind of group him in the right

77

1    reading group, so that's been done by our

2    reading specialist.  But a 30-day review will

3    be held and actually I know we've sent out an

4    invitation for a 30-day review, but a day has

5    not yet been confirmed, and that, so that we

6    can discuss how he is doing.

7           If there is any new data to be

8    considered by that date MDT-IEP team they can

9    review that information if there needs to be

10   updates for the IEP that can be done at that

11   time as well.

12       Q    If it's determined that he needs

13   related services such as counseling, can you

14   provide that?

15       A    Yes, we can.

16       Q    Do you believe Rock Creek -- well,

17   you -- Samuel has had in your opinion

18   apparently successful days at school?

19       A    He has since he's been with us.

20   Yes.

21       Q    From what you know about Samuel,

22   and your school, and you believe that Samuel

78

1    can make academic progress at your school?

2        A    I do believe so, if it is

3    determined that he needs a full-time setting

4    and additional related services, but yes, I

5    do.

6        Q    If after all the evaluations are

7    completed including the clinical and all the

8    evaluations need to be completed, if the IEP

9    team determines that he does not need a

10   full-time specification placement, how do you

11   handle that?

12       A    Well, D.C. Public School are

13   monitored by D.C.  Public Schools, our

14   placement specialist attends the meetings, so

15   if the students needs a less restrictive

16   environment then the DCPS representative is

17   there to recommend an alternative placement

18   or to propose placement possibilities to the

19   parent, so that they can make a informed

20   decision about where the student would go.

21       Q    That's all from me.  Ms. Ramjohn,

22   and Mr. Woods might have some questions.

79

```
 1              MR. WOODS:  Okay.  Ms. Ramjohn.

 2              MS. RAMJOHN-MOORE:  I just have one

 3    question.

 4              CROSS-EXAMINATION

 5              BY MS. RAMJOHN-MOORE:

 6        Q    Ms. Plowden, do you teach Samuel?

 7        A    I can't hear you.

 8        Q    Do you teach Samuel?

 9        A    Do I teach him?  No, I do not.

10        Q    I have no further questions.  Thank

11    you.

12              MS. HOUCK:  I have one follow-up

13    from that --

14              MR. WOODS:  Go ahead.

15              REDIRECT EXAMINATION

16              BY MS. HOUCK:

17        Q    You are still there?

18        A    Yes, I am still here.

19        Q    Is it safe to say that you've

20    testified at a lot of due process hearings?

21    Or -- are you there?

22        A    I am here, you are kind of cutting
```

80

```
 1    out on me -- I heard, "is it safe to say,"

 2    and that was all I heard.

 3            MS. HOUCK:  May I come closer?

 4            MR. WOODS:  Yes.

 5            BY MS. HOUCK:

 6       Q    Is it safe to say that you've

 7    testified at a quite few due process hearings

 8    for placement at Rock Creek?

 9       A    Yes, I have.

10       Q    Are you the designated person to

11    testify for Rock Creek?

12       A    Yes, I am.

13            MS. HOUCK:  That's all from me.

14            MR. WOODS:  This Fred Woods, the

15    hearing officer I just have a couple of

16    questions.

17            THE WITNESS:  Okay.

18            MR. WOODS:  One was that you said

19    that it's going to be a 30-day review meeting

20    and at that time -- I'm not sure exactly what

21    all you would do at this stage, but it

22    sounded like you said Rock Creek Academy
```

81

1    would be appropriate if it could be -- if he

2    needs a fulltime program.  Are you saying

3    that that determination has not been made?

4            THE WITNESS:  That determination

5    has not been made in light of the fact that

6    additional data evaluations and stuff -- and

7    such are still needed to make a more

8    appropriate permanent placement decision.

9            The 30-day review is kind of -- we

10    use that as a standard process for all of our

11    students that enter and a variety of

12    different things can occur at the 30-day

13    review.

14            It may just be that the parent and

15    the team are just discussing the student's

16    transition into our program.  If there's

17    concern some students may have new

18    evaluations that are presented within 30 days

19    that the team can review at that time and

20    update the IEP.  So it is specific to each

21    individual student's entrance into the

22    program.

82

1   For Samuel, my understanding at

2 this point is that there are still

3 evaluations that are needed and some data

4 that's still outstanding.  So the team would

5 probably then note that for the record if

6 it's not available on the day of the meeting

7 and then reconvene once it is.

8   MS. HOUCK:  I just have one thing

9 to make sure.

10   MR. WOODS:  The IEP -- what IEP did

11 you use to make your decision?

12   THE WITNESS:  The IEP, was it from

13 -- one second, I'll look at the date.  I

14 reviewed meeting notes from April 19, 2007,

15 but the IEP was from -- was it May 31, 2007?

16 But I used that information in addition to

17 information from the parent.  There was also

18 evaluations that were sent as part of the

19 referral and in speaking with Samuel's

20 attorney, Ms. Houck.

21   MR. WOODS:  Is that IEP a fulltime

22 IEP?

83

1          THE WITNESS:  No, it's not.

2          MR. WOODS:  I think I have it --

3    but you still feel that this would be an

4    appropriate placement?

5          THE WITNESS:  Well, no, what we did

6    was the office placement on an interim basis

7    until such time as the follow-up evaluations

8    can be completed that that team can determine

9    what type of placement or services Samuel

10   will need.

11         So it's just, it was our

12   understanding at the time of admissions that

13   Samuel did not have his school placement,

14   that he had frequent suspension, Samuel was

15   in need of a school placement until such time

16   as an MDT or IEP team met, so admission was

17   granted to him on an interim basis until that

18   took place.

19         MR. WOODS:  And if you determined

20   -- what was the IEP again, ma'am, I'm sorry I

21   was so --

22         THE WITNESS:  The IEP is from May

84

```
 1    31, 2007.

 2              MS. HOUCK:  It's document --

 3              MS. RAMJOHN-MOORE:  Speaking --

 4              MS. HOUCK:  Twelve.

 5              MS. RAMJOHN-MOORE:  After the

 6    notes.

 7              MR. WOODS:  What was your

 8    understanding of that -- do you have that IEP

 9    ma'am?

10              THE WITNESS:  I do.

11              MR. WOODS:  Does he get any

12    specialized institution under the IEP?

13              THE WITNESS:  Not under this -- not

14    on this IEP, no, not on the first page, it's

15    just speech and language services and

16    occupational therapy.  But I did also review,

17    I mean, meeting notes that talked about the

18    need for additional assessments and

19    evaluations and his previous evaluations did

20    report that he was functioning academically

21    for low grade level.

22              MR. WOODS:  Do you have any
```

85

1    reasoning, I mean, as to why --

2         THE WITNESS:  Why he's functioning

3    below grade level?  Just from some what I've

4    reviewed, and my own personal observations,

5    it sounds like there's something that has not

6    been determined yet that's impacting his

7    educational performance, and it's not his

8    cognitive ability, because his cognitive

9    ability was in the below average to average

10   range.

11        So it could be an emotional

12   disability, it could be -- there could be

13   another health impairment such as ADHD, but

14   clearly additional evaluations are needed to

15   be able to make that determination.

16        MR. WOODS:  So if I understand,

17   your testimony, you didn't make the

18   determination based on a disability that --

19   and the school could meet his needs, you just

20   said, this is an interim placement, and we'll

21   see if it's an appropriate placement based on

22   the guy's --

86

1          THE WITNESS:  Well, I'm not a -- I

2    can be a member of an IEP or MDT team, but I

3    can't make that determination in and of

4    itself.  So I reviewed the documents, it's --

5    well, my admissions decision was based on the

6    fact that he needs speech and language

7    therapy, occupational therapy and he may also

8    need additional services, and that Samuel did

9    not have a school placement to my knowledge,

10   for the school year, and that we could offer

11   interim services until evaluations that his

12   MDT team could meet and make a final

13   determination of what additional services may

14   or may not be warranted.

15          MR. WOODS:  So your testimony isn't

16   to say to me this is an appropriate placement

17   for him?

18          THE WITNESS:  My testimony is to

19   share with you that since Samuel has been

20   with us this is how he is -- academically how

21   he's performing or how he is transitioned

22   within our program, these are the services we

87

1    can offer.

2           Should it be determined that he

3    needs a fulltime placement we can provide the

4    OT, the speech counseling services, if that's

5    determined needed and -- as well as

6    specialized instruction.

7           We also, came from my testimony,

8    spoke to you that we can provide the

9    behavioral support and structure that.  It

10   appears Samuel does need and has demonstrated

11   progress within that -- within our setting.

12          MR. WOODS:  Yeah, yes.  I

13   understand the situation you're in, because

14   you're talking about a student who's in a 5

15   percent program to now being placed in a --

16   the most restrictive environment.

17          THE WITNESS:  Which is why his

18   acceptance was on an interim basis until such

19   time as a team determines or does, you know,

20   what permanent-type setting, programming he

21   will need.

22          MS. HOUCK:  I can hear you clear up

88

1    a little bit.

2            MR. WOODS:  I seem to know what she

3    will say.

4            So on what basis could I make a

5    determination that this school could meet his

6    needs without those evaluations?

7            THE WITNESS:  Are you asking me?

8            MR. WOODS:  Yes, ma'am.

9            THE WITNESS:  On what basis could

10   you -- can you just repeat the question?

11           MR. WOODS:  Since you made a

12   determination apparently, you -- did you

13   admit him by yourself or did you have a team?

14           THE WITNESS:  I have a team, that's

15   myself, there's another admissions person --

16           MR. WOODS:  But no evaluators there

17   but?

18           THE WITNESS:  You mean, as in terms

19   of a psychologist or --

20           MR. WOODS:  Yes, yes.

21           THE WITNESS:  No, I'm a special

22   educator, I mean, I am well-versed enough to

1   be able to review evaluations and make

2   interpretations based on that, but in terms

3   of making a permanent placement decision,

4   that's an IEP and MDT team's decisions and I

5   am only one person on the other team --

6           MR. WOODS:  Yeah., but taking --

7           THE WITNESS:  I can't do it in and

8   of itself.

9           MR. WOODS:  I guess, is that

10  unusual to have a person with one hour of OT

11  and 30 minutes of speech and language moving

12  into a fulltime program?

13          THE WITNESS:  It's not unusual.  It

14  would only be unusual if that IEP is the most

15  appropriate IEP.  Then clearly then, the

16  student is not in the least restrictive

17  environment.  But my understanding is, of

18  this IEP, is that this is not reflective of

19  all the supports and services that Samuel

20  needs, it does not address any behavioral

21  concerns that he has as indicated by the

22  parent and his frequent suspension, it

1    doesn't address essentially the need for

2    specialized instruction which is, at least

3    from the evaluation on file, he was below

4    grade level at that point as well, though

5    there seems to me, as the indication, the

6    disability classification in speech and

7    language impaired on this document and I

8    didn't see any evidence of where that

9    diagnosis came from either, so there are some

10   questions about the validity of this

11   particular document in making a placement

12   decision based on solely that IEP.

13          MR. WOODS:  So what did you base

14   the placement decision on?

15          THE WITNESS:  As I indicated

16   earlier I reviewed this, I reviewed

17   evaluations, I met with the parent, I spoke

18   to the attorney, we conducted a tour of our

19   program and through all of that information

20   determined that we could offer services on an

21   interim basis.

22          MR. WOODS:  For what though.  What

```
 1    did you offer him services on since you

 2    disagree with the IEP?

 3              THE WITNESS:  What -- I'm sorry, I

 4    didn't --

 5              MR. WOODS:  What is the disability

 6    that you're servicing him as since you

 7    disagree with the IEP?

 8              THE WITNESS:  He's receiving

 9    specialized instructions, speech and language

10    therapy, and occupational therapy --

11              MR. WOODS:  As what --

12              THE WITNESS:  -- since September

13    10th.

14              MR. WOODS:  What's the disability?

15              THE WITNESS:  It's based on this

16    IEP, and we have to go by this document, this

17    is the legal document.  However there are

18    concerns to the validity of this document as

19    it solely represents his needs.  It is my

20    understanding that Samuel is going to need

21    additional supports and services based on my

22    understanding of his record, speaking with
```

92

1      his mother, speaking with his attorney.

2              MR. WOODS:  Let me allow the

3      parties to follow- up on any of the questions

4      that I ask.

5              BY MS. HOUCK:

6          Q    Ms. Plowden?

7          A    Yes?

8          Q    How many students do you have in

9      Rock Creek Academy?

10         A    How many students?

11         Q    Yes.

12         A    We have about 260 students.

13         Q    And are they all funded by DCPS?

14         A    Yes, they are.

15         Q    Do all of the students who've come

16     to your school through a hearing officer's

17     order or settlement agreement have when they

18     come, fulltime IEPs?

19         A    No, they do not.

20         Q    Do some of them have no IEP at all?

21         A    Yes, there have been occasions when

22     that occurs.  In those instances the students

93

1    are placed with us on an interim basis until

2    such time as an IEP team can convene and

3    review and make a determination.

4        Q    Samuel was below grade level in his

5    school work?  Ms. Plowden?

6        A    Yes.  I'm sorry, it cut out on me.

7        Q    Is it true that -- it's true isn't

8    it that Samuel is below grade level in his

9    school work?

10       A    That's my understanding.

11       Q    And he has average cognitive

12   ability?

13       A    Yes.

14       Q    For a student in that circumstance,

15   specialized instruction should be a part of

16   his IEP?

17       A    Typically, when a student is below

18   grade level but their cognitive ability is in

19   the average range then there is usually

20   another intervening factor which is

21   prohibiting them from learning.

22            For many students it may an

94

1    emotional disability or other health

2    impairment and so for those issues

3    specialized instruction is typically

4    warranted.

5        Q    Even if a student comes with a

6    fulltime IEP but requires evaluation, after

7    that student is evaluated and it's determined

8    the student does not require fulltime

9    placement, what steps do you take?

10       A    Well, regardless of the IEP all of

11   our students have a 30-day review and

12   placement and such is determined at that

13   time.  If after the 30-day review, additional

14   data comes forward like evaluations or even

15   if a parent requests a change in placement or

16   a less restrictive environment, then another

17   meeting is held and that is discussed at that

18   time.  And a student, if in a situation they

19   don't need a fulltime placement, then they

20   are placed back into the less restrictive

21   environment.

22       Q    And when a student who's having

95

1    trouble in this -- in a public school

2    situation, is -- or, and has no IEP at all

3    and is placed in your school based upon, oh,

4    I don't know, evaluations that have taken

5    place or experiences in the school that the

6    hearing officer determines he needs more

7    restrictive environment then you -- are -- do

8    you have people on your staff who can

9    evaluate the student?

10        A    Yes.  We do staff -- we have two

11    fulltime clinical psychologists, a part-time

12    clinical psychologist, we have eight

13    evaluators, we have someone who can do an

14    occupational therapy evaluation; we conduct

15    clinical, cognitive, educational,

16    neuropsychological, speech and OT evaluation.

17        Q    That's all from me. Thank you.

18            MR. WOODS:  Ms --

19            MS. RAMJOHN-MOORE:  Nothing, thank

20    you.

21            MR. WOODS:  Anything further?

22            MS. HOUCK:  Nothing.

96

```
 1              MR. WOODS:  Okay.  Thank you,

 2    ma'am.

 3              THE WITNESS:  You're welcome.  Have

 4    a good day.

 5              MS. HOUCK:  Thanks.

 6              MR. WOODS:  Anything further?

 7              MS. HOUCK:  No further testimony.

 8              MS. RAMJOHN-MOORE:  I'd like to

 9    call my witness.

10              MR. WOODS:  Okay.

11              MS. HOUCK:  Oh God, I'm so used to

12    going second that I forget when I'm finished.

13              MS. RAMJOHN-MOORE:  Let's try 645.

14    Oh you don't have to dial 202?

15              MR. WOODS:  Oh, I don't know.

16              MS. RAMJOHN-MOORE:  I think you do.

17              MR. WOODS:  Oh, I do?

18              MS. RAMJOHN-MOORE:  Uh-huh.

19    645-3227.

20              MR. WOODS:  I'll let you talk to

21    whoever it is.

22              MS. RAMJOHN-MOORE:  Thank you.
```

97

1           MS. MATTHEWS:  Good afternoon, and

2      this is Ms.  Matthew speaking, may I help

3      you?

4           MS. RAMJOHN-MOORE:  Hi, Ms.

5      Matthews, this is Stephanie Ramjohn-Moore

6      calling.  How are you?

7           MS. MATTHEWS:  Fine, and you?

8           MS. RAMJOHN-MOORE:  Fine, thank

9      you.  I'm in the hearing with -- regarding

10     Samuel Mingle, with attorney Caroline Houck,

11     and Samuel's mother Ms. Harling.

12          MS. MATTHEWS:  Uh-huh.

13          MS. RAMJOHN-MOORE:  Hearing Officer

14     Woods, you have to swear her in.

15          MR. WOODS:  Okay.  What's her name?

16          MS. RAMJOHN-MOORE:  Rhoda Matthews.

17          MR. WOODS:  Ms. Matthews can you

18     hear me?

19          MS. MATTHEWS:  Yes.

20          MR. WOODS:  Officer Fred Woods, the

21     hearing officer, and we're prepared now to

22     take your testimony in this case, if you

98

1    wouldn't mind taking this oath before giving

2    that testimony.

3    Whereupon,

4                    RHODA MATTHEWS

5    was called as a witness and, having been first

6    duly sworn, was examined and testified as follows:

7            MR. WOODS:  Okay.  I'll turn you

8    over first to Ms. Moore, then to Ms. Houck.

9            THE WITNESS:  Okay.

10            DIRECT EXAMINATION

11            BY MS. RAMJOHN-MOORE:

12       Q    Ms. Matthews, what is your current

13    position at Benning Elementary School?

14       A    I am the special education

15    coordinator.

16       Q    Are you familiar with a student by

17    the name of Samuel Mingle?

18       A    Yes.

19       Q    How are you familiar with him?

20       A    Well, Samuel was a student at

21    Benning, who was receiving services under the

22    special education program.

99

```
 1        Q     And what sort of services was

 2   Samuel receiving?

 3        A     He was receiving speech therapy and

 4   occupational therapy.

 5        Q     Was Samuel receiving specialized

 6   instruction?

 7        A     No.  No, he was not.

 8        Q     Why wasn't Samuel receiving

 9   specialized instruction?

10        A     Because based on testing that we

11   had at the time, it said that he was on grade

12   level academically.  The only areas of

13   concern was speech and occupational therapy.

14        Q     And was the parent aware of this?

15        A     I'm sorry, can't hear that.  One

16   more time.

17        Q     Was the parent aware of this?

18        A     Yes.

19        Q     And was she in agreement with this?

20        A     Yes.

21        Q     Did she ever express any

22   dissatisfaction with the services Samuel was
```

100

1    receiving?

2         A    She did express dissatisfaction

3    with occupational therapy when the therapist

4    had recommended that Samuel be withdrawn from

5    occupational therapy services.

6         Q    And what did the team determine?

7         A    The team determined that we should

8    do some updated testing so that we will have

9    the proof and the evaluation that he no

10   longer needed occupational therapy.

11        Q    And was an additional evaluation

12   completed?

13        A    No, it was not.

14        Q    Why not?

15        A    In terms of the occupational

16   therapy evaluation, there was an agreement

17   that the therapist would test him on this one

18   particular day and the day she came Samuel

19   was not there.

20        Q    And let me ask you this question --

21   did you participate in an MDT/IEP meeting for

22   Samuel on May 31, 2007?

101

    1        A    Yes.

    2        Q    And did the team ask the parent to

    3    conduct additional evaluations, at that time?

    4        A    Yes, we did.

    5        Q    And were those evaluations

    6    conducted?

    7        A    No, they were not.

    8        Q    Why not?

    9        A    The parent only agreed to allow us

    10    to do the occupational therapy evaluation.

    11    We felt that a comprehensive psychological

    12    evaluation was necessary as well as this

    13    updated speech evaluation.  However she did

    14    not want the school system to proceed with

    15    those evaluations.  She stated that she

    16    needed to speak with her attorney first.

    17        Q    After -- subsequent to this

    18    meeting, on the 31st of May, did the parent

    19    bring you a letter telling you that she would

    20    now like the school to test the student?

    21        A    Yes, that letter I saw toward the

    22    end of the summer.  Unfortunately over the

102

1    summer, I was working summer school.  So I

2    was not attending most of the time, and the

3    letter was just put on my desk and I saw that

4    towards the end of the summer.

5        Q    And have you had any contact with

6    the parents since that time?

7        A    No.

8        Q    Why not?

9        A    The parent has not come back to the

10   school to either withdraw Samuel or to enroll

11   him for the new school year.

12       Q    Where is Samuel now?

13       A    I'm not sure where Samuel is.

14       Q    Has the parent ever requested a

15   placement meeting from you, Ms. Matthews?

16       A    No.

17       Q    Has the parent ever asked you for

18   any documentation pertaining to Samuel's

19   occupational therapy?

20       A    No.

21           MS. RAMJOHN-MOORE:  Your

22   indulgence, Hearing Officer.

103

```
 1                    (Recess)

 2              BY MS. RAMJOHN-MOORE:

 3         Q    Ms. Matthews, has the parent ever

 4    expressed to you that she believes the

 5    student is in need of a fulltime special

 6    education program?

 7         A    No.

 8         Q    Has the parent ever expressed to

 9    you that she wishes her son to have

10    specialized instruction?

11         A    No.

12         Q    Have any of Samuel's teachers

13    expressed to you that Samuel is in need of

14    specialized instruction?

15         A    No.

16         Q    How is Samuel performing

17    cognitively?

18         A    Cognitive -- cognitively, and I

19    don't have a (off mike)  In front of me, but

20    from what I can remember he was an average

21    student, average cognitive abilities, so he's

22    able to perform work.  However, he makes the
```

104

1    decision not to do the work in class.

2         Q    What were some of the team's

3    concerns while they asked for additional

4    testing?

5         A    The primary concern was that Samuel

6    would not complete any school work while he

7    was in school.  He would not do any of the

8    written assignments and we were beginning to

9    get concerned that there was some emotional

10   things going on with Samuel that was keeping

11   him from doing work at school.

12        Q    Was he displaying any particular

13   types of behavior that would lead you to come

14   to the conclusion.

15        A    He was starting to be disruptive in

16   the classroom, and the teacher would

17   frequently ask someone to come and speak with

18   him or he would be sent to the office.  And I

19   do believe that there were a lot of sexual

20   comments that were starting to come out as

21   well.

22              MS. RAMJOHN-MOORE:  I've no further

105

1    questions at this time.  But, Ms. Houck may

2    have some questions.

3              MR. WOODS:  Ms. Houck.

4              MS. HOUCK:  Yes.

5              CROSS-EXAMINATION

6              BY MS. HOUCK:

7        Q    Ms. Matthews, this is Caroline

8    Houck, the parent attorney.

9        A    Uh-huh.

10       Q    You testified that you were -- he

11   didn't show up for school on the day that --

12   June, the first day you were going to do the

13   OT evaluation?

14       A    Yes.

15       Q    Actually he was suspended on June

16   1st for the rest of the school year, wasn't

17   he?

18       A    Oh, I'm not aware of that.

19       Q    He wasn't at school the last two

20   weeks of the school year was he?

21       A    I'm not aware of that as well.  I'm

22   only there part-time so I'm not sure who

106

1    comes to school every day.

2         Q    You're familiar with Samuel Mingle

3    and the parent?

4         A    Yes.

5         Q    It's not a parent who just doesn't

6    send your child to school is it?

7         A    No, she's not.

8         Q    It's true the school told the

9    parent that Samuel was going to fail the

10   fourth grade, isn't it?

11        A    My understanding was that the

12   teacher and the parents had worked out an

13   agreement because Samuel was not completing

14   work in school, that if he completed the work

15   at home, he should be able to pass.  So I'm

16   not sure what the final resolution of that

17   was.

18        Q    Isn't it true that one of the

19   things he had to do was to go to summer

20   school?

21        A    I'm not sure if that was a

22   mandatory, but I believe he was scheduled to

107

1    go to summer school, yes.

2        Q    You were aware that he was expelled

3    after two days?

4        A    No, I was not aware that he was

5    expelled from summer school.

6        Q    You're aware of the "Three Strikes

7    and You're Out" program at Benning Summer

8    School?

9        A    I'm sorry, could you repeat that

10   one?

11       Q    "Three Strikes and You're Out of

12   School" -- you're aware of that, that policy

13   at Benning?

14       A    Yes, I'm aware of that policy.

15       Q    I'm going to refer you, if, well,

16   if you're the special education coordinator,

17   you were at the meeting on May 31st, were you

18   not?

19       A    Yes.

20       Q    I refer you to the IEP attended by

21   special education teacher, Mr. Norman.  He's

22   not -- he wasn't Samuel's teacher, was he?

108

```
 1        A    No.

 2        Q    You, and a speech and language

 3   therapist.

 4        A    Uh-huh.

 5        Q    Are you aware of special -- well,

 6   especially as LEA representative, of who

 7   needs to attend?

 8        A    Yes.

 9        Q    Of an IEP meeting, were all the

10   people present there?

11        A    No, his classroom teacher was not

12   there.

13        Q    Right.  Wouldn't you think it would

14   be pretty important for his classroom teacher

15   to be there?

16        A    Yes, and I cannot remember the

17   circumstances as to why she was not in

18   attendance.

19        Q    Is it a valid IEP when the

20   classroom teacher isn't there?

21        A    I believe that Mom said we could

22   proceed without the teacher.
```

109

1      Q     Do you think in the notes it says

2   that?

3      A     I don't have the notes in front of

4   me, so I don't know.

5      Q     Just to find he's getting OT

6   services, how do you know he's got OT

7   services during the school year?

8      A     I've seen him with occupational

9   therapist and she does the encounter tracking

10  form.

11     Q     There's no documents that shows he

12  was getting occupational therapy?

13     A     Okay.  Well, I don't know.  I've

14  seen him receive therapy, because oftentimes

15  she was providing it in my office.

16     Q     Then, why did the school recommend

17  that he be dismissed from occupational

18  therapy?

19     A     That was based on her working with

20  him and she felt that he did not have any

21  issues of fine motor skills.

22     Q     Are you aware of what's necessary

110

1     for a school district to do before you

2     dismiss a child from therapy?

3          A     That's why we recommended testing.

4          Q     Can you dismiss a child from

5     therapy before you do the testing?

6          A     No, that's why -- he's still his

7     occupational therapy on his IEP.

8          Q     You're testimony is that he

9     received -- how many -- when was he supposed

10    to start receiving occupational therapy?

11         A     I'm sorry, say that one more time?

12         Q     What school year was he supposed to

13    start receiving occupational therapy?

14         A     Since I don't have the record in

15    front of me, I do not know what school year.

16         Q     Told you 2004, would you be

17    surprised?

18         A     I know there was an issue as to

19    when the report was presented to the school

20    so there was delay.

21         Q     You're aware of the fact, as

22    education coordinator I guess one of your

111

```
 1    duties is to know how a child is progressing

 2    in his program, is that true?

 3        A    I'm sorry, say that one more time,

 4    I can't hear you.

 5        Q    As special -- I'm sorry, as special

 6    education coordinator is one of your roles,

 7    one of your duties to monitor the students

 8    and their progress?

 9        A    Yes.

10        Q    You're aware of the fact that

11    Samuel was on grade level at the end of

12    school year 2006, and was below grade level

13    and to the point he was going to be retained

14    at the -- are you aware of his severe

15    regression in one school year?

16        A    Yes.  And that's why we recommended

17    testing him.

18        Q    Actually, Ms. Matthews, didn't the

19    school district throughout the year tell the

20    mother that there was something going on at

21    home and that the mother should have him

22    tested outside?
```

112

```
 1        A    Oh, I've never said to her that he

 2   should be tested outside.

 3        Q    But you never recommended that he

 4   be tested until May 31st did you?

 5        A    No, there was a meeting prior to

 6   that where I recommended testing.

 7        Q    When was that?

 8        A    I believe it was in April.  I know

 9   there was some recommendations about Samuel

10   getting counseling in the community.

11        Q    Not the school though?

12        A    No, not in the school.

13        Q    Even though he was -- the mother

14   was called on a daily basis, didn't need any

15   counseling in the school, is that your

16   opinion?

17        A    The issues that Samuel was

18   presenting, we felt that counseling in the

19   community would be more appropriate.

20        Q    Even though he got -- the mother

21   got called every single day and sometimes

22   more than once a day to pick him from school,
```

113

1    you think counseling in the school was not

2    appropriate?

3         A    I don't know that he was -- she was

4    called every single day.  But there is a

5    school counselor on staff, as well as the

6    school social worker and if Samuel had any

7    issues in school he was always welcome to see

8    them.

9         Q    Oh, so Samuel would go on his own

10   to see the counselor?

11        A    No, if he was sent to the office or

12   if the teacher asked that the counselor meet

13   with them.

14        Q    But it's not on his IEP is it?

15        A    No, that's not.

16        Q    And you think a student might need

17   counseling whether it's in the community or

18   in the school or he's having some behavior

19   problems, is suspending the student under --

20   does the parent testify it on a daily basis?

21   Is that in your opinion the way you deal with

22   a student?

114

```
 1        A    I'm sorry, I need you to repeat
 2    that one more time.
 3        Q    If you think a student is having --
 4    if a student is having problems in school
 5    such that he is sent to the office, or the
 6    parent is called on a daily basis, or the
 7    parents, or the child's father or the child's
 8    grandmother, all kinds of emergency numbers
 9    are called on an almost daily basis, and the
10    child is forced to go home, is that an
11    appropriate way to deal with a child's
12    behavior?
13        A    By sending them home on a daily
14    basis?
15        Q    Yes.
16        A    No.
17        Q    You think maybe that might have
18    been appropriate sometime during the school
19    year to hold a meeting and look at a more
20    restrictive environment for the student?
21        A    I think it would have been
22    appropriate to hold a meeting to discuss the
```

115

1    behavior and to see if additional testing was

2    necessary.

3         Q    You think a functional behavioral

4    assessment might have been appropriate?

5         A    Yes.  And I believe that was

6    recommended at the April meeting.

7         Q    It wasn't done, though, was it?

8         A    No, again, because Mom did not want

9    the school to do any testing.

10        Q    That was on May 31st and you

11   testified that the parent brought something

12   to the school.  You did not see it till the

13   end of the summer, correct?

14        A    Right.

15        Q    You think that one of the reasons

16   he might have regressed so during the school

17   year from being on task and on grade level

18   with a lot of intensive support from his

19   teacher when he was in the third grade, to

20   receiving no support in the fourth grade, you

21   think that might be one reason, if not the

22   only reason?

116

```
 1        A    He gets support from his general ed

 2   teacher?

 3        Q    Do you think that one of the

 4   reasons he might have regressed so from being

 5   on task and at grade level, at the end of the

 6   third grade, to being the low grade level and

 7   being retained at the end of the fourth grade

 8   might be because he was suspended on an

 9   almost daily basis, and wasn't in class

10   receiving instruction?  Would that tend to

11   cause a person to fall back in his school

12   work?

13        A    Yes, that would, but I'm not sure

14   if he was being suspended on a daily basis.

15            MS. HOUCK:  That's all.

16            MR. WOODS:  Ms. Ramjohn?

17            MS. RAMJOHN-MOORE:  I have no

18   further questions.

19            MR. WOODS:  Ms. -- what's your

20   name?

21            THE WITNESS:  Matthews.

22            MR. WOODS:  Oh, I'm sorry.  What's
```

117

1    your first name?

2              THE WITNESS:  Rhoda, R-h-o-d-a.

3              MR. WOODS:  Couple things you

4    mentioned that I was curious about.  You said

5    that there were sexual comments.  What do you

6    mean?  What does have to do with his

7    behavior?

8              THE WITNESS:  I know toward the end

9    of the school year, the teachers had made

10   statements that Samuel was making sexual

11   comments to some of the female students, and

12   she was extremely concerned about that.

13             MR. WOODS:  What was this behavior

14   that you felt was better served in counseling

15   outside of school than --

16             THE WITNESS:  There were some

17   issues in reference to his relationship to

18   his mother, and he had made some comments to

19   the school counselor that his teacher was

20   just like his mother, and -- I'm sorry to say

21   this -- that's why he didn't like her.

22             MR. WOODS:  Did the mother ever

1    know about that?  She knows now, I mean she's

2    sitting in the room.

3             THE WITNESS:  Right.

4             MR. WOODS:  I don't -- yeah.

5             THE WITNESS:  I believe the school

6    counselor did have a discussion with Mom

7    about that, but I'm not absolutely sure.

8             MR. WOODS:  Did -- what was the

9    basis for that comment?  Was that just a

10   comment that was made?

11            THE WITNESS:  I'm really not sure.

12   I wasn't present when the comment was made.

13   He had told this directly to the school

14   counselor at Benning.

15            MR. WOODS:  Let me let either

16   attorney follow-up on any questions that I

17   asked.

18            MS. HOUCK:  I only have one

19   question.

20            BY MS. HOUCK:

21        Q    The sexual comments -- to your

22   knowledge is that -- would that be one of the

119

1    reasons for the suspensions?

2        A    I don't know.  It may have been,

3    but I'm not sure.

4        Q    Do you know why he was suspended so

5    often?

6        A    I don't recall his being suspended

7    that often.

8        Q    Well, let me ask you this.  There

9    are no documents in the record about

10   suspension.  Would you say if a child is not

11   allowed to attend school during the school

12   day and the mother is called within the first

13   50 minutes of the school day to come pick him

14   up, and he's not in school, would you say

15   he's suspended from school?

16       A    That sounds like a suspension.

17       Q    Your student is sitting in the

18   office because the mother can't pick him up

19   but he's not in school, do you call that some

20   kind of suspension?  Like in, maybe a

21   in-school suspension?

22       A    Right, that would be an in-school

120

```
 1    suspension.

 2            MR. WOODS:  Ms. Houck, you're --

 3    are you done?

 4            MS. RAMJOHN-MOORE:  Yes.

 5            MR. WOODS:  All right.  Thank you,

 6    Miss --

 7            MS. RAMJOHN-MOORE:  Thank you, Ms.

 8    Matthews.

 9            THE WITNESS:  You're welcome.

10            MS. HOUCK:  Thank you.

11            MS. RAMJOHN-MOORE:  Bye, bye.

12            THE WITNESS:  Bye, bye.

13                (Witness excused)

14            MR. WOODS:  Anything further?

15            MS. RAMJOHN-MOORE:  -- the rest of

16    the document is the testimony of my witness.

17            MR. WOODS:  Okay.  Any summary

18    remarks then?  Are you -- anything further --

19            MS. RAMJOHN-MOORE:  Well --

20            MS. HOUCK:  I would like to do a

21    closing.

22            MR. WOODS:  Okay.
```

121

```
 1              MS. HOUCK:  I just would like to

 2    call the parent for one rebuttal question.

 3              MR. WOODS:  Okay.

 4              SPEAKER:  Ms. Harling.

 5              MR. WOODS:  Ms. Harling you are

 6    still under oath, you may answer the

 7    questions that are being posed to you now.

 8    Whereupon,

 9                   ANNETTE HARLING

10    was recalled as a witness and, having been

11    previously duly sworn, was examined and testified

12    further as follows:

13              FURTHER REDIRECT EXAMINATION CONTINUED

14              BY MS. HOUCK:

15       Q    Well, actually two.  Did you at any

16    time during the school year refuse to have

17    the school evaluate Samuel until the

18    discussion on May 31st?

19       A    No.  That was the first time that

20    psychoeducational was actually brought up.

21       Q    The DCPS witness testified that you

22    didn't show up for school on the day he was
```

122

1    to have an OT evaluation why wasn't -- she

2    didn't know, why wasn't he at school?

3         A    He wasn't at school because he was

4    suspended.  She clearly knows that he was

5    suspended because she was still there.

6              MS. HOUCK:  That's all.

7              MR. WOODS:  Okay.  Miss -- any --

8    okay.

9              MS. RAMJOHN-MOORE:  Nope.

10             (Witness excused)

11             MR. WOODS:  Okay.  Why don't we

12   move into our closings now?  Miss -- well, if

13   you want to, it's up to you, I won't force it

14   on you, but if you want closings --

15             MS. HOUCK:  Do you want me to go

16   first?

17             MR. WOODS:  Yes, yeah, you have --

18             MS. RAMJOHN-MOORE:  Yeah, if you

19   have to go you got to go first.

20             MS. HOUCK:  Well, for starters

21   there seems to be some -- I want to clarify

22   something the hearing officer I know already

123

```
 1    knows that Samuel does not have fulltime IEP,

 2    but the law is very clear about what the

 3    school district is to provide and what the

 4    parent -- the bar the parent has to step over

 5    to provide -- place him in the school

 6    district.  District doesn't provide the

 7    placement.

 8              School district is required to

 9    provide an appropriate placement for a

10    student with an IEP and Samuel has an IEP and

11    has had an IEP for several school years.

12    Now, I don't think I need to go into the fact

13    that the school was not an appropriate

14    placement.  He regressed during the year, he

15    was suspended -- the mother is credible

16    witness -- suspended everyday of the school

17    year.  The DCPS witness didn't know one way

18    or the other whether he was suspended.  He

19    was not receiving occupational therapy ever.

20    The DCPS witness said that she saw the

21    occupational therapist there.  She saw him

22    sometimes in the office receiving
```

124

1   occupational therapy.  I didn't question her,

2   but a school office is not a place to receive

3   occupational therapy, occupational therapy is

4   given in a occupational therapy room, not in

5   an office.  There is no document to show that

6   he is receiving any occupational therapy, and

7   the mother testified that if he received any

8   she never knew about it.

9          There is nothing, nothing that was

10  appropriate about this past school year.

11  There is nothing appropriate about the summer

12  school -- (interruption) -- failed after the

13  second day.  And there is no reason to

14  believe that this school year would be any

15  different because he'd be back in the same

16  grade because he failed.  And yet DCPS

17  document 18 on August the 30th, 2007, says

18  Benning is an appropriate placement.

19          They didn't offer to do any

20  evaluations.  They didn't offer to hold a

21  placement meeting.  They didn't, apparently,

22  check in to see what the situation was in the

1    school year.  (off mike) Benning is an

2    appropriate placement.  I don't think anybody

3    sitting in this room would believe that an

4    appropriate placement for student is a

5    placement where a student is suspended every

6    single day.  The parent, on the other hand,

7    when there is no placement for the child, or

8    no appropriate placement, and I think we can

9    say this is no appropriate placement, is only

10   required to provide a placement where the

11   student can receive benefit, academic

12   benefit.  That's all.

13           Whether or not this turns into what

14   would be called an appropriate placement

15   where DCPS would actually determine this is

16   an appropriate placement waits to be seen

17   because he hasn't received any of the -- the

18   two most important evaluations that he

19   requires, which is a clinical evaluation and

20   the functional behavioral assessment.

21           Ms. Plowden testified that it is

22   not uncommon for a student to be referred to

126

1    Rock Creek Academy either through the school

2    district, or through a hearing, or through a

3    settlement with either no IEP or not a part

4    -- not a fulltime IEP if the DCPS placement

5    was considered not appropriate.

6            Mr. Woods, it's not up to the

7    parent to go in and say, I want a placement

8    meeting.  As a matter of fact if she doesn't

9    have an advocate or a lawyer she wouldn't

10   probably know to say I want a placement

11   meeting.  This parent is working with the

12   school district.  This parent worked with the

13   school district from the time he was in

14   kindergarten.  This parent testified that she

15   would have continued to work with the school

16   district and he would still be there.  And he

17   probably would still be there if DCPS had not

18   decided that the way you handle the student

19   is to call the parent everyday instead of if

20   they had evaluated him and held a placement

21   meeting and perhaps determine it wasn't the

22   appropriate placement.

127

```
 1          Parent testified -- parent is not

 2    required, especially after an entire year of

 3    being in a situation like this, the parent is

 4    not required to accept the school district

 5    evaluations, especially when the school

 6    district had been telling her that all of the

 7    problems stemmed from his home environment.

 8    (off mike) the parent trust that she wanted

 9    the school district to evaluate him

10    especially when they went the whole year

11    without evaluating him.  So at the meeting

12    it's clear, yes, she said she had an advocate

13    and needed to talk with the advocate before

14    she agreed to anything.

15          After talking with me -- then I

16    explained to her that she needed to give --

17    show good faith by allowing the school

18    district to evaluate him.  She went and gave

19    the letter to the school, she testified in

20    July whether or not it -- you know, when it

21    got to the special education coordinator she

22    said she was on vacation, or wasn't there, or
```

128

1    at another school.

2         When it got to her in August, you

3    know, is not really the parent's problem.

4    From July all through August school district

5    certainly had the parent's number.  They

6    could have called to evaluate him.  This is

7    not a parent, Mr. Woods, who could be called

8    at all uncooperative.  As a matter of fact

9    DCPS witness testified that she was

10   cooperative.  She attends all the meetings,

11   she is there, she did her best to pick him up

12   when he was suspended.

13        And by the way, there are no

14   suspension notices in here, but even the DCPS

15   witness says if a child is not in school, he

16   is suspended.  And often times it's been my

17   experience that schools do not call them

18   suspensions because they know they can't

19   suspend the special education student more

20   than 10 days.  So they take precautions to

21   make sure that it's not called a suspension.

22   Whether or not that was his case, I don't

129

1    know.  But we do know that he was suspended

2    on a daily basis.  He made no progress.  He

3    regressed.  And after one month at Rock Creek

4    Academy where he is receiving occupation

5    therapy, speech and language therapy, and

6    specialized instruction, hopefully to build

7    him back up, he is already beginning to make

8    progress.  He is happy.

9         He is not -- he has emotional

10    issues, they're clear about that, he needs to

11    be evaluated.  But he is able to maintained

12    in the classroom and make progress.  Now if

13    that is not a place that is providing

14    academic benefit, I don't know why.

15         Yes, it's a clear cut case of DCPS

16    not providing an appropriate placement and

17    parents stepping in and providing placement.

18    And it happens all -- it's happened to me,

19    it's happened -- it happens all the time that

20    a school that can provide academic benefit is

21    sometimes in more restrictive environments,

22    sometimes less restrictive environment.

130

```
 1              It doesn't really make a difference

 2    the team still has to determine what the end

 3    result appropriate placement is.  So whether

 4    this is less restrictive or more restrictive

 5    is not important.  What's important is that

 6    he is making academic progress in the school

 7    where he made no progress and regressed, and

 8    it's highly inappropriate placement last year

 9    where he would be in the (off mike) and what

10    the mother testified where he'd be again this

11    year.

12              MR. WOODS:  Ms. Moore.

13              MS. RAMJOHN-MOORE:  Hearing

14    officer, it would be an injustice if we were

15    to take a student that has five percent

16    special related services, five percent

17    special education, speech and language and

18    occupational therapy and then put him in a

19    fulltime program.  We heard from special

20    education coordinator Ms. Matthews that this

21    cognitively this student is average to low

22    average.  That means he can function, he can
```

131

    1    complete the work.

    2            And that somehow this school year

    3    there is something going on with that young

    4    man that they have noted in school that they

    5    wanted to test him, and they brought it to

    6    the parent's attention in April and in May

    7    according to the testimony of my witness Ms.

    8    Matthews.  The parent refused to let the

    9    school system test the student.  Then when

   10    the special education coordinator who is not

   11    available at the school during the summer

   12    months the parent comes during the summer and

   13    drops off a letter and leaves it on her desk

   14    or whoever put it on her desk while she is

   15    not there and then expects the school system

   16    between may and July or -- excuse me, July

   17    and August before she places her son in Rock

   18    Creek Academy to test the student.

   19            DCPS, first of all, has 120 days to

   20    assess the student, and 120 days had no

   21    passed from July to August, nor had it passed

   22    from July to September, hearing officer, yet

132

```
 1    the parent chose to take her son from Benning

 2    Elementary school, the school he attended

 3    since kindergarten, and had progressed in

 4    prior to last school year and put him in a

 5    fulltime special education program with

 6    students that are emotionally disturbed.

 7            We all know that children are

 8    impressionable and they may mimic people that

 9    are around them, so you're going to take a

10    student who has zero specialized instruction,

11    has the cognitive ability to perform and

12    place him with students who have serious

13    emotional issues.

14            Yes, the student may need

15    counseling, but as testified to by Ms.

16    Matthews, they believe it is a home issue,

17    because of what he has said to the counselor

18    and what he has said to his teachers.

19    Hearing officer, we think it would be

20    inappropriate to place this student in a

21    school that is fulltime special education.

22    Yes, he probably is making some progress
```

133

1    because he is surrounded by a bunch of kids

2    who are receiving fulltime specialized

3    instruction.  He is probably the academic

4    star in the classroom hearing officer.

5             And yet still being the academic

6    star he is with all of his cognitive ability

7    he is still acting silly and he needs help

8    with his social skills.  This is from the

9    school that has him now.  This is the same

10   behaviors they reported last school year,

11   hearing officer.  His behaviors haven't

12   changed.  They are just not calling the

13   mother.

14             Hearing officer, we have not denied

15   the student FAPE.  We have tried to test him

16   in every area of suspected disability.  We

17   have made pleas to the parent to test him

18   further.  The parent has been cooperative in

19   the past, that's why I think the school

20   system is little confused about why we're

21   here now when all along we travel down this

22   road together.  Now, all of a sudden we're

134

1    denying him FAPE, and we're not providing for

2    her son.  That's not true, hearing officer,

3    if you look at all of the IEPs, all the

4    documentations -- documentation that has been

5    provided in both my disclosure and parent's

6    disclosure that is not the case.  Hearing

7    officer, we ask that you would dismiss this

8    complaint and if anything order -- at the

9    very minimum order a meeting to -- for

10   everyone to determine what additional

11   evaluations if any need to take place and for

12   DCPS to have the opportunity to complete

13   those evaluations as they wanted to in May of

14   last year.

15           MR. WOODS:  Okay, final comments --

16           MS. HOUCK:  Yes.  First whatever --

17   DCPS throws around this 120 day rule at will,

18   whatever the 120 day rule is it certainly

19   doesn't apply here.  120 days if it is still

20   in existence at all has to do with --

21           MS. RAMJOHN-MOORE:  Absolutely --

22           MS. HOUCK:  Excuse me, please.

135

```
 1              MS. RAMJOHN-MOORE:  Go ahead.
 2              MS. HOUCK:  -- has to do with a
 3    parent who request that her child be
 4    evaluated.  Parent is not in special
 5    education at all, requested her child be
 6    evaluated.  And if the rule is still in
 7    existence DCPS has 120 days to take that
 8    child that they had no reason to believe had
 9    any needs at all, and had no evaluations, and
10    evaluate that child, hold an eligibility
11    meeting, develop an IEP and have the child
12    sitting in an appropriate placement.  That's
13    what a 120 day rule was when it came into
14    existence several years ago.  Further --
15              MS. RAMJOHN-MOORE:  (Off mike)
16              MS. HOUCK:  I really would
17    appreciate if you wouldn't -- if you would
18    ask the DCPS attorney not to comment.
19              Secondly, Mr. Woods, I find my self
20    disgustive (sic) that DCPS is -- now with
21    nothing left to hang its head on is blaming
22    the parent, is baling what's going on at home
```

136

1  for what's going on at school.  Maybe there

2  are some issues at home, I don't know.  But

3  DCPS chooses to suspend this child everyday

4  and says it's all the parent's fault.

5      Next, if the hearing officer wants

6  to order the independent evaluations

7  requesting that this child requires and needs

8  the evaluations he needs and order a

9  placement meeting I think that's absolutely

10 appropriate and that's what we've asked.

11      In the meantime, this child needs

12 to be in a school where he is receiving

13 benefit.  That's in the meantime.  It maybe

14 that he does need a fulltime placement.  But

15 certainly I do not believe this hearing

16 officer will order he go back to Benning

17 Elementary where he did not attend school for

18 any full single school day last year and was

19 expelled from summer school.  No, he will not

20 order that he go back to Benning.  He is

21 there is now, and he is making progress.  And

22 as soon as we can get the evaluations done

137

1    they're going to have true placement meeting

2    with everybody present and over the

3    evaluations see what this child needs.

4            This child is 10 years old, you

5    know, so it's a crime to suspend a

6    10-year-old, 9-year-old boy from school every

7    single day and say it's an appropriate

8    placement.  And also I would ask the hearing

9    officer order that transportation be

10   included.  His mother is driving him to

11   school everyday, picking him up.

12           MR. WOODS:  Okay.  Thank you all.

13   Ms. Harling, thank you for -- in doing this.

14   And at this point this ends the evidentiary

15   phase of the hearing.  I have 10 days from

16   this date to issue an order, and I will

17   provide that to your attorney who can then

18   let you know what the outcome is.  All right,

19   thank you all.

20           (Whereupon, the HEARING was

21            adjourned.)

22              *   *   *   *   *